**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MERIX PHARMACEUTICAL CORP.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 11 C 3318** |
| | ) | |
| **CLINICAL SUPPLIES MANAGEMENT,** | ) | |
| **INC., and CETERO RESEARCH, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Merix Pharmaceutical Corporation has sued Clinical Supplies Management, Inc. (CSM). Merix asserts state law claims for negligence, breach of fiduciary duty, breach of implied warranty, breach of contract, and fraud. The Court has jurisdiction based on diversity of citizenship. CSM has moved to dismiss Merix's claims. For the reasons stated below, the Court grants the motion in part and denies it in part.

### Background

Merix is an Illinois corporation with its principal place of business located in Barrington, Illinois. It manufactures Releev, an over-the-counter topical medication used to treat infections caused by the herpes virus. In 2005, Merix was involved in litigation with GlaxoSmithKline (GSK), a pharmaceutical company that manufactures medications that compete with Releev. As part of that litigation, GSK challenged the claims that Merix made about the efficacy of Releev in the drug's packaging and advertising.

To prove the validity of the claims made in its advertising and packaging, Merix decided to conduct a clinical trial of Releev comparing it with a chemically inactive placebo. The trial was to be double-blind, so that neither the test subjects nor the test administrators would know which patients received Releev and which received the placebo. Merix hired the PRACS Institute, to which it alleges Cetero Research, Inc. is a successor, to conduct the clinical trials. To avoid learning which patients received Releev and which the placebo, PRACS decided to use a subcontractor to receive the clinical supplies and then label, package, and distribute the supplies to the sites where the trial would occur. PRACS suggested CSM as the subcontractor. In October 2005, PRACS hired CSM to process the clinical supplies and distribute them to the test centers.

CSM received the Releev and placebo preparations from the manufacturer, which Merix does not name in the complaint. Both the Releev and the control shipments were accompanied by a certificate of analysis (COA) that detailed the ingredients in each preparation. The COAs revealed that the placebo contained benzalkonium chloride, an antiseptic chemical that is one of the active ingredients in Releev. In short, the placebo was not a true placebo. CSM failed to notice this problem and distributed both the placebo and Releev to the clinical trial sites. No one noticed the problem with the control until after some data from the trial had been collected. The data from the trial was worthless to Merix, however, because both the Releev and placebo preparations contained an active ingredient.

**Discussion**

CSM argues that personal jurisdiction is lacking and that the majority of Merix's claims against it should be dismissed because they fail to state a claim. Fed. R. Civ. P. 12(b)(2) & (6).

**A.    Personal jurisdiction**

"A complaint need not include facts alleging personal jurisdiction. However, once the defendant moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (citation and internal quotation marks omitted). "[O]nce defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleading and submit affirmative evidence supporting the exercise of jurisdiction." *Id.* at 783.

> [W]hen the district court rules on a defendant's motion to dismiss based on the submission of written materials, without the benefit of an evidentiary hearing . . . , the plaintiff need only make out a prima facie case of personal jurisdiction. In evaluating whether the prima facie standard has been satisfied, the plaintiff is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record.

*Id.* at 782 (emphasis, citations, and internal quotation marks omitted).

"[A] federal court in Illinois may exercise personal jurisdiction over [a defendant] if it would be permitted to do so under the Illinois long-arm statute. A state's exercise of personal jurisdiction is also subject to the demands of the Fourteenth Amendment's due process clause." *uBid, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 425 (7th Cir. 2010) (citations omitted). CSM primarily argues that personal jurisdiction is lacking under

several specific sections of the Illinois long-arm statute.  The Illinois long-arm statute,

however, contains a provision making the jurisdiction it allows coextensive with the

jurisdiction allowed by due process, so the Court need only determine whether the

requirements of federal and state due process are satisfied.  735 ILCS 5/2-209(c);

*Citadel Group, Ltd. v. Wash. Reg'l Med. Ctr.*, 536 F.3d 757, 760–61 (7th Cir. 2008).

Although the Illinois Supreme Court has stated that "the Illinois and federal due process

requirements hypothetically might diverge in some cases," CSM has not argued that the

Illinois due process requirement would prevent the exercise of personal jurisdiction over

it even if the federal due process requirement would not.  *Citadel Group*, 536 F.3d at

761 (internal quotation marks omitted).

Discussing federal due process requirements for personal jurisdiction, the

Seventh Circuit has stated:

> The Due Process Clause of the Fourteenth Amendment prevents a state
> from exercising specific jurisdiction over a defendant, unless the
> defendant had certain minimum contacts with the forum state such that
> the maintenance of the suit does not offend traditional notions of fair play
> and substantial justice.  A state has an interest in providing its residents
> with a forum for redressing harms caused by an out-of-state actor,
> particularly where the out-of-state actor has purposefully availed itself of
> the privilege of conducting activities within the forum State, thus invoking
> the benefits and protections of its laws.  The defendant's contacts must
> not be merely random fortuitous, or attenuated, rather, the defendant's
> conduct and connection with the forum [s]tate must be such that it should
> reasonably anticipate being haled into court there.

*Id.* (citations, internal quotation marks, and brackets in original omitted).  "Personal

jurisdiction can be either general or specific, depending on the extent of the defendant's

contacts with the forum state."  *uBid*, 623 F.3d at 425.  For specific jurisdiction, but not

general jurisdiction, the plaintiff's claim must also "arise out of or relate to" defendant's

4

minimum contacts with the forum state.  *uBid*, 623 F.3d at 429 (internal quotation marks omitted).

In an affidavit, Jennifer Lauinger, a CSM manager, stated that CSM has limited contacts with Illinois.  CSM has never had an office or employees in Illinois, and it owns no property in the state.  CSM Ex. 1 at 1–2.  Lauinger also states that "CSM has never advertised, held a telephone listing or maintained a bank account in Illinois," nor has it been registered with the Illinois Secretary of State to do business in Illinois.  *Id.* at 2. Other than its relationship with Merix, CSM has had only one client in Illinois, Takeda Global R&D Center, Inc., and the revenue CSM generated from Takeda is a very small portion of its overall revenue.  *Id.*  CSM never shipped any products to Takeda in the state of Illinois.  *Id.*  When working for Merix, CSM never shipped any of the Releev or placebo preparations to Illinois.  *Id.* at 4.

On the other hand, Merix has presented documents showing that even if CSM did not do much business with Illinois companies, it actively sought out customers in this state.  *See uBid*, 623 F.3d at 427 (Internet company had minimum contacts when its national advertising reached significant numbers of Illinois customers and it had some Illinois specific advertising).  Between 2005 and 2001, CSM had sales-related contacts with more than twenty Illinois businesses in addition to Merix and Takeda. Cannon Affidavit, Ex. 6.  Those contacts included phone calls, e-mails, and meetings. CSM also entered into confidential disclosure agreements (CDAs) with three Illinois companies as a preliminary step to discussing a business relationship, although apparently none of the three ever became clients of CSM.  *Id.*, Ex. 7.  CSM employees

5

attended a trade show in Chicago in 2010, and the company and its employees placed advertising and articles in national publications that were available to Illinois residents. *Id.*, Exs. 8 & 9.

In addition, Merix has presented documents indicating that CSM made almost 200 shipments to destinations in Illinois. *Id.*, Ex. 5. Neither party indicates who received the shipments, except that according to Lauinger's affidavit, it was not Takeda or Merix. CSM also held Illinois licenses to operate as a pharmacy and to distribute controlled substances in Illinois between 2003 and 2010, although it apparently obtained the licenses as part of a planned business expansion that never actually took place. CSM Ex. 1 at 2–3.

Perhaps most importantly, Merix's evidence shows that CSM contacted Merix in Illinois to initiate their business relationship. Lauinger states that PRACS first contacted CSM outside Illinois to discuss CSM working as a subcontractor on the Merix clinical trial. *Id.* at 3. In an affidavit, however, Meryl Squires, the president and CEO of Merix, stated that PRACS and CSM employees placed a joint telephone call to her at Merix's offices in Illinois. Squires Affidavit ¶ 13. In that call, PRACS and CSM proposed that Merix hire CSM to do part of the work on the clinical trial. *Id.* Squires discussed confidentiality with PRACS and CSM, and in the course of the conversion, she asked CSM to submit a lower bid. *Id.* ¶¶ 13–14. CSM submitted the lower bid the next day. *Id.* ¶ 14. CSM eventually generated and signed a work order setting out the tasks it would perform for PRACS. Squires Affidavit, Ex. 12. Merix, PRACS, and CSM signed the work order, which required CSM to "use its best efforts to be available to [Merix] to

6

testify, if necessary, in any litigation concerning the Study(ies), and [Merix] and CSM shall enter into a separate agreement concerning such services." *Id.*

The evidence presented by Merix is sufficient to establish a prima facie case of specific personal jurisdiction over CSM. CSM argues that a corporation does not have minimum contacts merely because it advertises nationally and those advertisements are visible in a state. *See C.S.B. Commodities, Inc. v. Urban Tren (HK) Ltd.*, 626 F. Supp. 2d 837, 853–54 (N.D. Ill. 2008). That particular contact aside, however, the evidence reflects that CSM purposefully availed itself of the privilege of doing business in Illinois such that it should have anticipated being haled into court here. CSM repeatedly solicited business from Illinois entities, and it shipped products into Illinois and maintained a license allowing it to operate as a pharmacy. *See Citadel Group*, 536 F.3d 762–64 (company that commissioned work from Illinois company and had corresponded with company twenty-four times had minimum contacts). In this case, after PRACS first contacted CSM, both companies contacted Merix in Illinois and proposed that CSM work for Merix. CSM offered Merix a reduced bid, and it signed a work order with Merix that obliged it to testify in Merix's ongoing legal disputes.

Furthermore, Merix's suit against CSM arises out of CSM's contacts with Illinois, both those contacts related to Merix specifically and those involving soliciting business in Illinois more generally. In *uBid*, the Seventh Circuit addressed a similar situation. There, uBid claimed that it lost business and revenue to cyber-squatters who registered domain names similar to uBid's through GoDaddy's registration business. *uBid*, 623 F.3d at 424–25. GoDaddy had hundreds of thousands of customers in Illinois, but only

two of the squatting websites were established by Illinois customers. *Id.* The court concluded that uBid's lawsuit arose out of all of GoDaddy's extensive advertising and large number of customers in Illinois (not just the two cyber-squatters). *Id.* at 429–32. The court held that the proper inquiry for determining whether a suit arose out of contacts was whether susceptibility to suit was a fair quid pro quo for the privilege of conducting the business that GoDaddy carried out in Illinois. *Id.* at 430–31. GoDaddy had advertised itself to Illinois residents and made sales by promoting its customers ability to cyber-squat, and therefore Illinois courts could exercise jurisdiction over it when two of the customers did so. *Id.*; *see Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 716–17 (7th Cir. 2002) (suit arose out of entire course of dealing between Italian individual and Illinois-based corporation, even though many contacts were connected to failed deal that was not directly related to dispute in lawsuit). The situation here is similar. CSM solicited business from many Illinois corporations and from Merix specifically. It is not unreasonable for CSM to be haled into court in Illinois for a dispute arising from its business relationship with Merix.

The exercise of specific personal jurisdiction over CSM does not offend federal or state due process requirements. Accordingly, the Court declines to dismiss CSM for lack of personal jurisdiction.

## B. Sufficiency of claims

"When analyzing the sufficiency of a complaint, [the Court] construe[s] it in the light most favorable to the nonmoving party, accept[s] well-pleaded facts as true, and draw[s] all inferences in the nonmoving party's favor." *Fednav Int'l Ltd. v. Cont'l Ins.*

8

*Co.*, 624 F.3d 834, 837 (7th Cir. 2010). A plaintiff "has stated a claim only if it has alleged enough facts to render the claim facially plausible, not just conceivable." *Id.*

CSM contends that five of Merix's six claims against it should be dismissed for failure to state a claim.

### 1. Negligence

Merix alleges that CSM was negligent when it failed to notice that the placebos it was shipping to the clinical trial sites contained one of the active ingredients in Releev. CSM contends that this negligence claim is barred by the economic loss rule first set out in Illinois by *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill. 2d 69, 86, 435 N.E.2d 443, 450 (1982).[1]

Under the economic loss rule, a plaintiff generally cannot recover in a tort action for economic loss, which is "defined as damages for inadequate value, costs of repair, and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property." *Mars, Inc. v. Heritage Builders of Effingham*, 327 Ill. App. 3d 346, 350, 763 N.E.2d 428, 434 (2002). Instead, a plaintiff's remedy for these types of loss lies in contract law. *Moorman*, 91 Ill. 2d at 86, 435 N.E.2d at 450. "Recovery in tort for disappointed commercial expectations due to breach of implied duties and warranties between non-contracting parties is also barred by the economic loss doctrine." *Am. United Logistics, Inc. v. Catellus Development Corp.*, 319 F.3d 921, 926 (7th Cir. 2003) (concluding that economic loss doctrine barred plaintiff's negligence claim against the party with which it had contracted as well as

---

[1] The parties agree that Illinois law applies to all of Merix's claims.

9

against various subcontractors with which the plaintiff had not directly contracted).

Merix alleges that it entered into a contract with CSM governing CSM's obligations with respect to the clinical trial. 2d. Am. Compl. ¶ 37. Merix does not dispute that it is largely seeking to recover economic damages in its negligence claim or that CSM's negligence is related to its duties under the contract. Instead, it contends that its negligence claim falls into two exceptions to the economic loss rule. First, Merix argues that its claim is an exception because it "has sustained a personal injury or property damage as a result of a sudden or dangerous occurrence," and it contends that the resulting personal injury and property damage are not economic losses for which recovery in tort is barred. *Mars*, 327 Ill. App. 3d at 351, 763 N.E.2d at 434; *accord Neumann v. Carlson Envtl., Inc.*, 429 F. Supp. 2d 946, 951 (N.D. Ill. 2006) (exception to economic loss rule when plaintiff suffers personal injury or property damage). It argues that the test subjects suffered personal injuries when they applied the placebo drug, which contained an active ingredient from Releev. But the test subjects who took part in the clinical trial are not the plaintiffs in this suit. Merix does not allege that it suffered personal injury.

Merix also argues that it suffered property damage because, as a result of CSM's actions, the Releev and placebo preparations were destroyed. Additionally, it contends that CSM's actions destroyed the value of the data and report that the clinical trial was supposed to generate and that this constitutes property damage giving rise to an exception to the economic loss doctrine. For the sudden or dangerous occurrence exception to apply, however, the property damage plaintiff suffered must have occurred

10

to property that was not itself subject to the contract. *See Northern Ins. Co. of N.Y. v. Silverton Marine Corp.*, No. 10 C 345, 2010 WL 2574225, at *2 (N.D. Ill. June 23, 2010) (defective yacht that caught fire and sank did not satisfy sudden or dangerous occurrence exception because there was no damage to property of the plaintiff other than the yacht); *Mars*, 327 Ill. App. 3d at 353–54, 763 N.E.2d at 436–37 (collapse of building frame did not satisfy sudden or dangerous occurrence exception when no property of plaintiff's other than frame was damaged). Here, the property that Merix claims was damaged—the drug preparations and the data and report the trial should have generated—were the same property that CSM had a duty to handle or create under the work order. Merix does not allege that any of its other property was damaged. Thus its claim does not fall within the sudden or dangerous occurrence exception.

Merix also contends that the economic loss rule does not bar its claim because CSM owed it extracontractual duties. The economic loss "doctrine is applicable to the service industry only where the duty of the party performing the service is defined by the contract that he executes with his client. Where a duty arises outside of the contract, the economic loss doctrine does not prohibit recovery in tort for the negligent breach of that duty." *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 159 Ill. 2d 137, 162, 636 N.E.2d 503, 514 (1994). This exception exists in part to preserve traditional malpractice suits for negligence from the economic loss rule. *MW Mfrs., Inc. v. Friedman Corp.*, No. 97 C 8319, 1998 WL 417501, at *6 (N.D. Ill. July 21, 1998). Under the exception, malpractice suits against attorneys, accountants,

11

insurance brokers, investment consultants, and environmental consultants are not barred by the economic loss rule. *Neumann*, 429 F. Supp. 2d at 952. The economic loss rule does, however, bar malpractice actions against engineers and architects, because they produce tangible products that "are more susceptible to reduction in a contract." *Id.*

Merix does not offer any authority to suggest that a subcontractor involved in a clinical trial of a medication owes an extracontractual duty, similar to that of an attorney or accountant, to the corporation that makes the medication. Nor does Merix suggest that CSM's duties were not or could not be reduced to a contract like the duties of an engineer or architect. Indeed, CSM's duties to Merix and PRACS were set out in the work order that it signed. Merix contends that companies that conduct clinical trial on humans are heavily regulated by the FDA to protect the public. Merix does not suggest, however, any reason why CSM's duties under federal statute and regulation or to the test subjects who were given an adulterated placebo should be enforced by allowing Merix to bring a negligence suit for its own damages.

Merix seeks economic damages via its negligence claim and does not meet any of the exceptions to the economic loss doctrine. Accordingly, the Court dismisses this claim.

## 2.      Breach of fiduciary duty

Merix alleges that CSM owed it a fiduciary duty and breached that duty. CSM contends that it did not owe a fiduciary duty.

Under Illinois law, parties to a contract generally do not owe each other fiduciary

duties. *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992).

> The factors to be considered in determining whether a fiduciary relationship exists include the degree of kinship, disparity of age, health and mental condition, the extent to which the allegedly servient party entrusted the handling of his business and financial affairs to and reposed faith and confidence in the dominant party.

*In re Estate of Long*, 311 Ill. App. 3d 959, 964, 726 N.E.2d 187, 191 (2000). A fiduciary "relationship only goes to a situation where one party, because of some close relationship, relies very heavily on the judgment of another." *Carey Elec. Contracting, Inc. v. First Nat. Bank of Elgin*, 74 Ill. App. 3d 233, 238, 392 N.E.2d 759, 763–64 (1979). "Parties to a business agreement . . . are presumed capable of guarding their own interests." *Yokel v. Hite*, 348 Ill. App. 3d 703, 706, 809 N.E.2d 721, 725 (2004).

In its complaint, Merix alleges only that it relied on CSM to perform its part of the clinical trial and argues that this created a fiduciary relationship. Merix also argues that because of the double-blind nature of the trial and the need to conceal which medication was Releev and which was a placebo, it could not observe the work that CSM was performing and had to rely on CSM to note the contents of the placebo preparations. Nothing that Merix alleges, however, suggests that it and CSM were anything other than parties to a contract that was bargained for at arm's-length. The clinical trial was important to Merix, but that alone does not create a fiduciary relationship.

The Court dismisses this claim.

### 3.    Breach of implied warranty

Merix alleges that CSM impliedly warranted that the placebo preparation was fit for a particular purpose and that CSM violated that warranty when it shipped placebos that contained one of Releev's active ingredients. 810 ILCS 5/2-315. "To state a claim for breach of implied warranty of fitness for a particular purpose, plaintiffs must allege that (1) the seller had reason to know of the particular purpose for which the buyer required the goods; (2) the buyer relied on the seller's skill and judgment to select suitable goods; and (3) the seller knew of the buyer's reliance on its skill and judgment." *In re McDonald's French Fries Litig.*, 503 F. Supp. 2d 953, 957 (N.D. Ill. 2007) (internal quotation marks omitted).

CSM contends that it is not liable for breach of implied warranty because it did not sell any goods to Merix. *See* 810 ILCS 5/2-102 (Illinois version of UCC applies to transactions in goods); *Brandt v. Boston Sci. Corp.*, 204 Ill. 2d 640, 645–48, 792 N.E.2d 296, 299–301 (2003) (plaintiff asserting breach of implied warranty claim must show that contract was for the sale of goods). Under the UCC, "'goods' means all things, including specially manufactured goods, which are movable at the time of identification to the contract for sale," and "a 'sale' consists in the passing of title from the seller to the buyer for a price." 810 ILCS 5/2-105(1), 106(1). CSM states that it provided a service, and it points out that Merix does not allege a sale of goods in its complaint. "When there is a mixed contract for goods and services, there is a transaction in goods only if the contract is predominantly for goods and incidentally for services." *Brandt*, 204 Ill. 2d at 645, 792 N.E.2d at 299 (internal quotation marks omitted).

The work order that CSM, PRACS, and Merix signed discusses the duties CSM undertook. *See Duferco Steel v. M/V Kalisti*, 121 F.3d 321, 324 n.3 (7th Cir. 1997) (on a Rule 12(b)(6) motion to dismiss, court can consider contracts referenced in complaint but only attached to motion to dismiss). The work order states that "[t]he following Clinical Supplies *Services* will be provided by CSM," and it divides the services into broad categories of project management, packaging and labeling, and storage and distribution. Squires Affidavit, Ex. 12 at 2–3 (emphasis added). This indicates that CSM was packaging, labeling, storing, and shipping Releev and the placebo but was not selling either Releev or the placebo to Merix or PRACS. *Id.* The work order also includes a detailed summary of CSM's fee, which does not include any separate charge for obtaining or offering the drug preparations. *Id.* at 4; *see Brandt*, 204 Ill. 2d at 652, 792 N.E.2d at 303 (considering the fact that cost of goods was less than majority of bill when determining that contract was not a sale of goods). In short, CSM was not selling the drugs to Merix.

Merix argues that CSM essentially obtained Releev and the placebo at Merix's request and that many sellers of goods first procure the goods at the request of customers and then sell them. But the complaint does not allege that Merix required CSM to obtain Releev and the placebo for it, and it would make little sense for Merix, the supplier of Releev, to require CSM's assistance to obtain a supply of Releev. Additionally, Merix admits that it already owned the drug preparations at the time that CSM received the Releev and the placebo and began to work with them, a fact that further confirms that CSM's work order was not a contract for a sale of goods. *See IMI*

15

*Norgren Inc. v. D&D Tooling & Mfg., Inc.*, No. 00 C 5789, 2003 WL 21501783, at *3 (N.D. Ill. June 25, 2003) (breach of implied warranty claim failed when third-party plaintiff produced the goods and retained third-party defendant only to heat treat them; there was no transaction in goods); *NIM Plastics Corp. v. Standex Int'l Corp.*, 11 F. Supp. 2d 1003, 1005–06 (N.D. Ill. 1998) (contract was not a sale of goods when plaintiff engaged defendant to chemically etch material that plaintiff already owned).

Merix also cites the case of *Indus. Harm Chrome Ltd. v. Hetran*, 64 F. Supp. 2d 741 (N.D. Ill. 1999), to support its argument. That case, however, is readily distinguishable because there the defendant entered into a contract "for the design, manufacture and delivery of an integrated series of machines" for the plaintiff. Here, CSM neither designed nor manufactured either the Releev or the placebo.

The Court dismisses this claim.

### 4.    Breach of confidential disclosure agreement

In addition to its breach of contract claim based on the work order, a claim that CSM does not challenge as insufficient, Merix also alleges that CSM agreed to be bound by the terms of a CDA but then violated those terms. CSM moves to dismiss this claim. It disputes that it ever signed the CDA or otherwise agreed to the terms, but contends that even if it had, Merix has not alleged any violation of its terms.

Under Illinois law,

[t]he basic rules of contract interpretation are well settled. In construing a contract, the primary objective is to give effect to the intention of the parties. A court will first look to the language of the contract itself to determine the parties' intent. A contract must be construed as a whole, viewing each provision in light of the other provisions. The parties' intent is not determined by viewing a clause or provision in isolation, or in

16

looking at detached portions of the contract.

*Thompson v. Gordon*, 241 Ill. 2d 428, 441, 948 N.E.2d 39, 47 (2011).

The CDA provides:

> Merix or Squires may give [CSM] the right to use the Information and/or
> Intellectual Property solely for the provision of services to, or for the
> benefit of, Merix and/or Squires pursuant to or in conjunction with this
> Agreement. [CSM] shall not use or disclose, nor allow any of its
> employees or agents or subcontractors to use or disclose, any of such
> Information and/or Intellectual Property without first making sure that
> appropriate documentation of such permitted use or disclosure under this
> Agreement has been executed.

Squires Affidavit, Ex. 4 at 2. Merix argues that when CSM shipped the placebo drugs

without noticing that the certificate of analysis said they contained an active ingredient,

it used Merix's confidential information without authorization. Merix asserts that

because no documentation authorized CSM to ship an adulterated placebo, CSM

violated the CDA when it did so.

Viewing the contract as a whole, however, it is clear that the CDA does not

impose a duty on CSM to make sure that the placebo preparations it is labeling and

shipping do not contain active ingredients. The CDA begins by listing various types of

information that are "confidential and proprietary." *Id.* at 1. It then states:

> [CSM] agrees to maintain the information in the strictest confidence and
> agrees not to disclose, modify, duplicate, or distribute this information,
> whether orally or in writing, directly or indirectly, in whole or in part, except
> to those of the [CSM]'s employees, agents, and subcontractors with a
> need to know the information.

*Id.* These provisions, along with the title "Confidential Disclosure Agreement," indicate

that the CDA is focused on protecting Merix's proprietary information and intellectual

property from disclosure. Viewing the contract as a whole, the provision requiring CSM

17

have written authorization to use confidential information is unambiguously a term aimed at protecting Merix's confidential information from disclosure to others. This contractual term does not impose upon CSM an obligation to follow Merix's instructions on matters unrelated to disclosure without making mistakes.

The Court dismisses this claim.

### 5. Fraud

As stated above, CSM denies that it ever entered into a CDA with Merix. As an alternative to its CDA claim discussed above, Merix alleges that CSM committed fraud by allowing Merix to think that CSM had signed the CDA. CSM argues first that this claim is not sufficiently specific under Federal Rule of Civil Procedure 9(b). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "A complaint alleging fraud must provide the . . . who, what, when, where, and how." *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citation and internal quotation marks omitted).

Merix's complaint states:

> PRACS' Vicki Clauson specifically stated to Merix that CSM had in fact signed Exhibit A to the CDA, and had thus agreed to be bound by the terms thereof. The statement was made in the presence of CSM personnel Stephen Purdy, who adopted same by his silence and failure to challenge or correct it.

2d Am. Compl. ¶ 59. This allegation does not indicate when, where, or by what means Clauson made the statement, nor to whom at Merix the statement was made. *See Jet,*

*Inc. v. Shell Oil Co.*, No. 02 C 2289, 2002 WL 31641627, at *7–8 (N.D. Ill. Nov. 22, 2002) (dismissing claim under Rule 9(b) that failed to allege the dates on which communications were made, as well as what specific individuals said to plaintiff). Accordingly, the claim does not meet the requirements of Rule 9(b).

Merix has offered affidavits and statements in its briefs that provide more details surrounding the alleged communication from Clausen, but a plaintiff cannot satisfy the particularity requirements of Rule 9(b) through affidavits or facts stated in briefs. *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 593 (7th Cir. 2003). "The *complaint* must allege the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Id.* (emphasis in original).

Merix may be able to amend its complaint to comply with Rule 9(b). Thus the Court addresses CSM's second contention, that it had no duty to speak and correct the misstatement allegedly made by a PRACS employee.

> Under Illinois law, silence or concealment will constitute a fraud only when the silent party had an opportunity and duty to speak. And the duty to speak arises only when a fiduciary relationship is present or when the defendant's acts contribute to the plaintiff's misapprehension of a material fact and the defendant intentionally fails to correct plaintiff's misapprehension.

*PXRE Reins. Co. v. Lumbermens Mut. Cas. Co.*, 342 F. Supp. 2d 752, 757 (N.D. Ill. 2004) (citations and internal quotation marks omitted). As discussed above, Merix has not sufficiently alleged that it and CSM were in a fiduciary relationship. Merix may, however, be able to allege that CSM otherwise had a duty to speak.

"Mere silence does not amount to fraud. However, silence accompanied by

19

deceptive conduct or suppression of a material fact can give rise to concealment and the party which has concealed information is then under a duty to speak." *Miner v. Fashion Enters.*, 32 Ill. App. 3d 405, 421, 794 N.E.2d 902, 917 (2003). Merix has alleged not just that CSM failed to inform it that CSM had not signed the CDA, but also that a CSM employee was silent while a PRACS employee incorrectly told Merix that CSM had signed the CDA. This silence in the presence of a misstatement, concerning information that one reasonably would expect was important to Merix, may constitute deceptive conduct or may have contributed to Merix's misapprehension, such that CSM would have had a duty to speak to correct the misapprehension. *See Heider v. Leewards Creative Crafts, Inc.*, 245 Ill. App. 3d 258, 269–71, 613 N.E.2d 805, 814–15 (1993) (defendant seller had a duty to speak when it knew that exposed material in buildings contained asbestos and plaintiff asked about the material, but defendant said nothing).

## Conclusion

For the reasons stated above, the Court grants CSM's motion to dismiss [docket no. 55] in part and denies it in part. Specifically, the Court dismisses Merix's negligence claim (Count 1), its breach of fiduciary duty claim (Count 2), its breach of implied warranty claim (Count 3), its breach of the confidential disclosure agreement claim (Count 5), and its fraud claim (Count 6). The Court otherwise denies the motion. The case is set for a status hearing by telephone on May 15, 2012 at 9:00 a.m. to set a schedule for further proceedings. Plaintiff's counsel should get defendant's counsel on the telephone and then call chambers. The Court directs counsel directed to confer

prior to the status hearing to attempt to agree on a schedule to propose.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  May 4, 2012