# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MERIX PHARMACEUTICAL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:11-cv-03318 |
| | ) | |
| v. | ) | Judge: Hon. Matthew F. Kennelly |
| | ) | Magistrate: Hon. Sidney Schenkier |
| CLINICAL SUPPLIES MANAGEMENT, INC.; | ) | |
| | ) | |
| Defendant. | ) | |

**Clinical Supplies Management Inc.'s Motion to Strike
Expert Rebuttal Reports of Leonard Valenti and James Walters**

# **TABLE OF CONTENTS**

**Page**

Table of Authorities ...............................................................................................ii

I.   Introduction: ...................................................................................................1

II.  Overview of Issue: .........................................................................................1

    A.  Background of Case: .................................................................................1

    B.  Merix's Initial Expert Disclosures: .........................................................2

        James Walters: ......................................................................................2

        Robert Pinco: ........................................................................................5

    C.  CSM's Expert Disclosures: ......................................................................5

    D.  Merix's Rebuttal Expert Disclosures: .....................................................5

III. Applicable Law: .............................................................................................6

IV. Argument: ......................................................................................................8

    James Walters: .............................................................................................8

    Leonard Valenti: ..........................................................................................9

Conclusion: .........................................................................................................19

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Braun v. Lorillard, Inc.*, 84 F.3d 230, 237 (7th Cir. 1996) ................................................................. 7

*Ernst v. City of Chicago*, 2013 WL 4804837 (N.D. Ill. Sep. 9, 2013) ..................................... 7, 8

*Hussein v. Oshkosh Motor Truck Co.*, 816 F.2d 348, 360 (7th Cir. 1987) .................................. 6

*Noffsinger v. The Valspar Corp.*, 2011 WL 9795, at 6 (N.D. Ill. Jan. 3, 2011) .................... 6, 7, 8

*Peals v. Terre Haute Police Dep't.*, 535 F.3d 621, 630 (7th Cir. 2008) ................................... 6

*Sunstar, Inc. v. Alberto-Culver Co., Inc.*, 2004 WL 1899927 at 25 (N.D. Ill. Aug. 23, 2004) ...... 8

**Rules**

Fed. R. Evid. 403 ............................................................................................................................. 7

**Regulations**

21 CFR 210 ..................................................................................................................................... 13

21 CFR 210.1(a) ............................................................................................................................... 3

21 CFR 210.3(b)(12) ........................................................................................................................ 3

21 CFR 211 ..................................................................................................................................... 13

21 CFR 211.125 ............................................................................................................................... 9

21 CFR 211.130 ............................................................................................................................. 10

21 CFR 211.134 ............................................................................................................................. 10

21 CFR 211.22 ................................................................................................................. 4, 18, 19

21 CFR 211.22(a) ....................................................................................................... 3, 4, 15, 16

21 CFR 211.25 ............................................................................................................................... 18

21 CFR 211.25(a) ........................................................................................................................ 3, 4

21 CFR 211.25(b)-(c) ................................................................................................................... 3, 4

21 CFR 211.84 ...................................................................................................... 3, 4, 16, 18, 19

21 CFR 312 ....................................................................................................... 11, 14, 17, 20

ii

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MERIX PHARMACEUTICAL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:11-cv-03318 |
| | ) | |
| v. | ) | Judge: Hon. Matthew F. Kennelly |
| | ) | Magistrate: Hon. Sidney Schenkier |
| CLINICAL SUPPLIES MANAGEMENT, INC.; | ) | |
| | ) | |
| Defendant. | ) | |

**Clinical Supplies Management Inc.'s Motion to Strike**
**Expert Rebuttal Opinions of Leonard Valenti and James Walters**

Defendant, Clinical Supplies Management, Inc. ("CSM"), hereby moves to strike certain expert rebuttal opinions offered by Leonard Valenti and James Walters. In support of this motion, CSM states as follows:

## I. Introduction:

"Rebuttal opinions" that merely repeat or support earlier opinions already in the case are not properly "rebuttal." The vast majority of Merix's rebuttal disclosures fall into this category, as they relate to matters that are part of Merix's case-in-chief and are almost entirely duplicative of Merix's original disclosures. Even the two rebuttal experts Merix disclosed have the same core opinions. For the reasons set forth below, certain expert rebuttal opinions offered by Leonard Valenti and James Walters should be stricken.

## II. Overview of Issue:

### A. Background of Case:

This lawsuit arises out of a double-blind, placebo-controlled clinical trial sponsored by Merix to evaluate the efficacy of its over-the-counter cold sore symptom relief product, Releev. In connection with the clinical trial, Merix hired EMS Acquisition Corporation ("EMS") to manufacture the active and placebo drug products to be used in the trial. Merix also hired

another party, PRACS Institute, Ltd. ("PRACS"), as the clinical contract research organization responsible for developing the protocol for the clinical trial and running certain aspects of it. PRACS and Merix together subcontracted CSM to package, label and ship the products manufactured by EMS to various clinical trial sites located throughout the country.

Merix claims that the placebo product manufactured by EMS improperly contained an active ingredient, benzalkonium chloride. After suing and settling with EMS in a separately-filed action, Merix sued CSM alleging that it breached the work order contract.[1] The essence of Merix's Complaint is its claim that CSM failed to inspect, test or otherwise recognize that the placebo product manufactured by EMS and shipped to CSM for packaging, labeling and distribution contained an active ingredient. (Doc. 153, Fourth Amended Complaint).

### B. **Merix's Initial Expert Disclosures:**

To support its claims against CSM, on July 15, 2013, Merix disclosed a "liability expert," James Walters, to provide opinion testimony as to the varying ways he thinks CSM failed to comply with the work order contract, industry standards and applicable regulations. Merix also disclosed another expert, Robert Pinco, to opine that Merix's product, Releev, is a lawfully marketed product.[2] Both witnesses provided extensive opinion reports and CSM took James Walters' deposition. (Ex. 1, Walters' First Report; Ex. 2, Pinco's Report; Ex. 3, Walters' Deposition).

**James Walters:** James Walters is a former FDA investigator who claims to have experience with Current Good Manufacturing Practices ("CGMP") regulations. He first received materials on this case nine days before his expert report was due. (Ex. 3, Walters' Dep., at 7,

---

[1] Merix's Fourth Amended Complaint also includes other causes of action, but all essentially relate back to CSM's performance of the work order contract.

[2] Merix's disclosure of Mr. Pinco to defend the purported lawfulness of its product was presumably triggered by the fact that the FDA previously issued a warning letter to Merix stating that its Releev product was not lawfully marketed and was misbranded.

169). He thereafter generated a 16-page report that contains nine core opinions. (Ex. 1). He also gave a deposition in which he offered a couple of additional opinions. **All of his opinions relate to CSM's role and the handling of its responsibilities during the clinical trial.** They can be fairly summarized as follows:

1. **Report Opinion 1 – CSM is a Manufacturer:** CSM is a "manufacturer" under CGMP regulations and therefore had a duty to comply with all regulations relating to the manufacture of a drug product. (*Citing* 21 CFR 210.1(a) and 210.3(b)(12) (Ex. 1, at 2-3).

2. **Report Opinion 2 – CSM failed to train employees to identify active ingredients:** "CSM was obligated and had a duty to assure that the employees involved in the receipt and preparation of the clinical trial materials were qualified to assure the drug products were suitable for distribution of blinded active products and inactive placebos . . . In particular, the workers must have been qualified to identify and keep separate products with active ingredients and those with only inactive ingredients (placebos). (*Citing* 21 CFR 211.25(a) (Ex. 1, at 4).

3. **Report Opinion 3 – CSM failed to supervise its employees such that they could recognize the presence of an active ingredient in the placebo:** "That CSM failed to recognize that the active RELEEV product and placebo as received both contained the same identical active ingredient . . . This is particularly true when the product manager, whose job it was to obtain the information necessary to perform the contract and disseminate the information to the CSM personnel who would need it to perform the contract, was specifically alerted that PRACS had concerns about the identity of the placebo, such that it appeared the placebo included an active ingredient and was not inert . . . "[H]e should have recognized that the documentation (Certificates of Analysis "CofAs") drawn to his attention clearly demonstrated the articles identified as placebo were not inert and in fact contained the identical active ingredient as the RELEEV active product." (*Citing* 21 CFR 211.25(b)-(c) (Ex. 1, at 5-6).

4. **Report Opinion 4 – CSM was required to sample and test the drug products per 21 CFR 211.84 and failed to do so:** "Upon receipt of the active products and placebos and any and all components, containers, and closures from the contract manufacturer, CSM had the obligation to approve or reject those drug product components, containers, and closures by means of appropriate sampling. CSM failed to do that and, therefore, failed to detect that the placebo, which should have been inert, in fact contained the identical active ingredient as the RELEEV active product . . . CSM should have subcontracted with a contract laboratory to do the testing" CSM also failed to take into account the past quality history of the supplier, EMS. (*Citing* 21 CFR 211.22(a) and 211.84) (Ex. 1, at 7-9).

5. **Report Opinion 5 – CSM was not entitled to rely on the CofAs and, based upon the CofAs, CSM should have known there was an active ingredient in the placebo:** "CSM's reliance on certificates of analysis to satisfy its obligation to

determine and verify *particularly* the identity, but also the safety, strength, quality, and purity of the placebo, was not appropriate, and it was inadequately performed. Without confirming the reliability and accuracy of CofAs created by the unfamiliar supplier, CSM should have tested the products to make certain that the RELEEV active product was in fact active, and that the placebo was inert. However, even though reliance on the CofA's was inappropriate in this instance, had CSM performed an adequate review of those CofA's it received, using qualified personnel, they would have detected that the placebo was in fact active and rejected it." (*Citing* 21 CFR 211.84) (Ex. 1, at 9-11).

6. **Report Opinion 6 – CSM violated Current Good Manufacturing Practices in nine ways:**
    i.   CSM failed to have qualified and trained employees; (21 CFR 211.25(a));
    ii.  CSM failed to have supervisors qualified to assure the drug products have the safety, identity, strength, quality and purity they purport to have (21 CFR 211.25(b)-(c));
    iii. CSM failed to review the CofAs or fully investigated the "easily detected error" that both contained the same active ingredient (21 CFR 211.22(a));
    iv.  CSM failed to properly evaluate and reject the placebo (21 CFR 211.22(a));
    v.   CSM failed to properly collect samples of the clinical trial materials (21 CFR 211.84);
    vi.  CSM failed to test the clinical trial materials to verify the identity of each component (21 CFR 211.84);
    vii. CSM failed to test the components of the drug products with all written specifications (e.g. the Protocol);
    viii. CSM's use of the CofAs to verify the identity of the placebo and CSM's review of the CofAs was inadequate (21 CFR 211.84); and
    ix.  CSM failed to follow its own Standard Operating Procedures when it failed to review the CofAs (21 CFR 211.22) (Ex. 1, at 12).

7. **Report Opinion 7 – the drug products CSM shipped were adulterated:** "CSM's non-compliance with GMP regulations rendered both the active RELEEV product *and* the placebo adulterated" . . . (Ex. 1, at 13).

8. **Report Opinion 8 – CSM was required to comply with Good Manufacturing Practices as part of the work order contract:** "The obligation and agreement of the contractor, to comply with all FDA regulations and particularly the GMP regulations, is read into each and every contract which is entered into to provide FDA-regulated manufacturing and clinical trial services. Since CSM failed to fulfill its obligation to be GMP compliant, it failed to adhere to the contract it had with Merix and PRACS." (Ex. 1, at 14)

9. **Report Opinion 9 – CSM misbranded the drug product it received:** The drug product shipped to the clinical trial sites by CSM was misbranded because it was labeled as "placebo" but in fact contained active ingredient. (Ex. 1, at 15-16).

4

10. **Deposition Opinion 1 – CSM was a Contract Research Organization ("CRO") and assumed responsibility to inspect and release the drug products:** Merix, as the sponsor of the clinical trial, transferred in writing to CSM the responsibility to confirm that the drug products were manufactured consistent with the specifications of the protocol. (Ex. 3, at 370-371).

**Robert Pinco:** Separately, as mentioned above, Merix disclosed Robert Pinco as an expert witness to opine that Merix's RELEEV product was lawfully marketed. In particular, Pinco opines that RELEEV is lawfully sold under the FDA's "old drug" Monograph process, where certain drug ingredients have been "generally recognized as safe and effective (GRAS/E)." (Ex. 2, at 10).

C. **CSM's Expert Disclosures:**

CSM disclosed two liability experts—a clinical supplies industry expert, Martin Jeiven, and an FDA regulatory expert, Maxine Fritz. They disagree with Merix's expert, James Walters, and opine that CSM satisfied its obligations under CGMP regulations, its Standard Operating Procedures and the work order contract. They also raise a new issue, which is that Merix, as the sponsor of the clinical trial, had certain regulatory responsibilities it failed to perform, including, but not limited to: (i) failing to ensure the drug products were properly manufactured; (ii) failing to audit its contract manufacturer, EMS; (iii) failing to reject or question the drug products when it had repeated concerns about the quality and contents of the products during the manufacturing process; (iv) failing to give appropriate manufacturing instructions to EMS; and (v) failing to properly accept or reject manufactured batches. (Ex. 4, Jeiven Report and Ex. 5, Fritz Report).

D. **Merix's Rebuttal Expert Disclosures:**

The only appropriate topic for rebuttal is the issue affirmatively raised by CSM's experts concerning Merix's failures as the sponsor of the clinical trial. CSM's role in the clinical trial and, particularly its compliance with CGMPs, is part of Merix's case-in-chief and was already

5

the subject of James Walters' first report. Merix, however, is attempting to retread old ground by disclosing two rebuttal experts to testify to the same issues already covered.

For its rebuttal experts, Merix disclosed James Walters and a new witness, Leonard Valenti. Both experts share the same expertise, as former FDA employees with purported experience with CGMP regulations. Nearly all of the opinions contained in their respective rebuttal reports relate to CSM's role and responsibilities in the clinical trial—a subject matter that was already exhaustively addressed by James Walters as part of Merix's case-in-chief. With one exception, Walters' "rebuttal opinions" simply regurgitate his initial opinions. CSM's motion to strike Walters' rebuttal report, therefore, is limited to a single new opinion he offers. The vast majority of Leonard Valenti's rebuttal opinions do nothing more than support Walters. As a matter of fact, of the 63 rebuttal opinions disclosed by Valenti, 49 expressly and specifically express his support and agreement with Walters' original opinions (i.e., the majority of Valenti's rebuttal opinions close with the comment: "James Peter Walters' opinion is correct"). Valenti's opinions are "supportive," not "rebuttal." And they are also cumulative. It appears that Merix is simply trying to "backdoor" another FDA expert to give case-in-chief opinions concerning CSM's responsibilities in the clinical trial. With only a few exceptions (described herein) Valenti's report should be stricken.

### III. Applicable Law:

"The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of evidence offered by an adverse party." *Peals v. Terre Haute Police Dep't.*, 535 F.3d 621, 630 (7th Cir. 2008). A party cannot advance new arguments for this first time in a rebuttal or sur-rebuttal expert report. *Hussein v. Oshkosh Motor Truck Co.*, 816 F.2d 348, 360 (7th Cir. 1987). **"A party may not offer testimony under the guise of a 'rebuttal' only to provide additional support for his case in chief."** *Noffsinger v. The Valspar Corp.*, 2011 WL 9795, at 6 (N.D. Ill.

Jan. 3, 2011) (emphasis added). "The reply or surrebuttal is not an opportunity for the correction of any oversights in the party's initial report. *Ernst v. City of Chicago*, 2013 WL 4804837 (N.D. Ill. Sep. 9, 2013).

"The plaintiff who knows that the defendant means to contest an issue that is germane to the prima facie case (as distinct from an affirmative defense) must put in his evidence on the issue as part of his case in chief." *Noffsinger v. The Valspar Corp*., 2011 WL 9795, at 6 (N.D. Ill. Jan. 3, 2011) quoting *Braun v. Lorillard, Inc*., 84 F.3d 230, 237 (7th Cir. 1996). In *Noffsinger*, the plaintiff allegedly suffered respiratory injuries as a result of his exposure to toxic fumes emitted by the defendant's solvent-based coating. Plaintiff initially retained and disclosed two expert witnesses—his treating physician and a toxicologist—to offer opinions about the plaintiff's diagnoses and causation. Defendant subsequently disclosed an expert toxicologist and immunologist, both of whom disagreed with one of the diagnoses offered by plaintiff's experts. Plaintiff then disclosed a "rebuttal report" from another physician who, like plaintiff's original experts, offered opinions about plaintiff's diagnoses and their causation. In granting defendant's motion to strike portions of the rebuttal report, Magistrate Brown reasoned that the report went beyond the scope of a proper rebuttal witness and was instead "an expert report and opinion on issues for which [the plaintiff] bears the burden of proof as part of his prima facie case. [Plaintiff] cannot, at this late date, attempt to introduce another expert witness to bolster his case." *Noffsinger v. The Valspar Corp*., 2011 WL 9795, at 6 (N.D. Ill. Jan. 3, 2011).

In addition, experts testifying on the same subject matters are cumulative and should be stricken pursuant to Rule 403. Fed. R. Evid. 403 ("[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the . . . needless presentation of cumulative evidence.") "Multiple expert witnesses expressing the same opinions on a subject is a waste of time and needlessly cumulative. It also raises the unfair possibility that jurors will

7

resolve competing expert testimony by 'counting heads' rather than evaluating the quality and credibility of the testimony." *Noffsinger v. The Valspar Corp.*, 2011 WL 9795, at 6 (N.D. Ill. Jan. 3, 2011) quoting *Sunstar, Inc. v. Alberto-Culver Co., Inc.*, 2004 WL 1899927 at 25 (N.D. Ill. Aug. 23, 2004).

## IV.  Argument:

### James Walters:

With one exception, all of Walters' rebuttal opinions are the same in substance as his original opinions.  That exception is Walters' opinion that Releev is a "marketed product" in the context of this clinical trial.  (Ex. 6, Walters' Rebuttal Report, at 3).  Merix is taking the position that Releev is a marketed product because, if it is, CSM would attach the product label to the receipt documentation pursuant to CSM's Standard Operating Procedures ("SOPs").  Merix originally raised this theory at the deposition of CSM's President, Gerald Finken, during fact discovery.  (Ex. 7, Finken Dep., at 80-83)[3].  For whatever reason, Walters did not opine on this issue as part of his original disclosures.  Nor did CSM's expert, Maxine Fritz, whose opinion Walters is purportedly rebutting.  Rather, Merix's counsel asked Ms. Fritz whether the active product used in the clinical trial was "marketed" and she simply confirmed that it was not.  (Ex. 8, Fritz Dep., at 146-147).

This is clearly an issue that Merix intends to raise in its case-in-chief.  It was a theory known to Merix and inquired about during fact discovery.  James Walters' oversight in failing to address this theory as part of his original report cannot be cured now.  *Ernst, supra.*

---

[3] Mr. Finken's deposition is designated as "confidential," but the particular testimony cited herein, and attached, is neither confidential nor proprietary.  CSM does not waive its confidential designation as to the remainder of Mr. Finken's deposition.

**Leonard Valenti:**

Like James Walters, Leonard Valenti is a former FDA employee with purported experience in CGMP regulations. Nearly all of Valenti's opinions are directed at CSM's performance of its clinical trial responsibilities and, therefore, are properly the subject of Merix's case-in-chief. As demonstrated below, his opinions involve the same subject matters as those already covered by James Walters. In fact, over 77% of Valenti's opinions expressly state, in one way or another, that he supports Walters' earlier opinion on the same subject.[4] As such, Valenti's opinions are not "rebuttal", they are supportive and they are cumulative. With only a few exceptions (identified herein) his report should be stricken.[5]

1.      **Rebuttal No. 1** is offered to rebut Maxine Fritz's opinion that only certain CGMP provisions apply to CSM, a packaging and labeling manufacturer. CSM's responsibilities in the clinical trial and, specifically, the issue of whether it's a "manufacturer," were already covered by Walters in his first report. (*See* Report Opinion 1, *supra*). Also included in Valenti's comments is his statement that CSM distributed an adulterated product—which was an opinion Walters included in his first report. (*See* Report Opinion 7, *supra*). Valenti expressly states, as he does throughout his report, that his analysis "is wholly consistent with James Peter Walters' correct opinions."

2.      **Rebuttal No. 2** disagrees with Fritz's summary of 21 CFR 211.125. His opinion relates to CSM's responsibilities under CGMP regulations, an issue that was addressed throughout Walters' first report. (Ex. 1, Walters Report, generally).

---

[4] Although the remaining 23% of Valenti's opinions do not *expressly* support Walters, aside from a select few, they very clearly relate to the same subject matters and agree in substance.

[5] Valenti's report is 44 pages and purports to rebut the reports by CSM's experts. Valenti did not number his rebuttal opinions, so for the ease of reference within this motion, we have taken the liberty of inserting numbers into his report (in red, bold font). His report is attached as Exhibit 9.

9

3. **Rebuttal No. 3** disagrees with Fritz's summary of 21 CFR 211.130. In doing so, he opines that that "supervision of the samples of drug product should have been performed" . . . and that CSM "failed to recognize that the test materials were identical with respect to the listed active ingredient." Both issues were covered by Walters in his first report. (*See* Report Opinion 3, *supra*). Valenti twice recognizes this point, stating "the opinion of James Peter Walters is completely correct" and that his opinion "is consistent with Mr. Walters' opinion that CSM is obligated to supervise its employees."

4. **Rebuttal No. 4** disagrees with Fritz's summary of 21 CFR 211.134. In doing so, Valenti opines that that the active ingredient was "clearly indicated by the CofAs" and that the "examination by CSM was not adequate to determine that the product error had occurred . . ." The content of the CofAs and whether CSM was required to perform sampling and testing were both addressed by Walters in his first report. (*See* Report Opinions 4-5, *supra*). Valenti in fact confirms that "James Peter Walters's [sic] opinions are perfectly rational and correct" and that Walters' "expert opinion no. 4 regarding this issue is correct . . ."

5– 6. **Rebuttal Nos. 5 and 6** respond to Fritz's commentary on CSM's SOPs and her opinion that CSM was not required to conduct identity testing on the drug products it received. Valenti disagrees and opines that identity testing was required. In Opinion 6, he states, "an identity test was required before CSM could label the bottle (even by blinded number) as containing inactive "placebo", and a mere visual examination of the bottles was insufficient." He also comments that, "CSM did not perform an identity test, nor did it authorize identity testing by its contract laboratory." CSM's roles and responsibilities in the clinical trial and the issue of identity testing in particular were addressed in Walters' first report (*See* Report Opinions 4, 5 and 6(v-vii), *supra*), a point Valenti concedes: "James Peter Walters' opinion No. 5 fully addresses the requirements for testing incoming materials. . ."

10

7.      **Rebuttal No. 7** is in response to Fritz's factual statement that she could not attend a scheduled audit at CSM's facility due to a death in the family and that she would reschedule and supplement her report (which she did). Valenti's "rebuttal"—that the last FDA inspection of CSM in March 2011 is "not closed"— does not rebut Fritz's statement. This is a new "opinion" and should be stricken.

8.      **Rebuttal No. 8** raises two issues. The first is Valenti's opinion that 21 CFR 312 does not apply to this case because Releev was not a "new drug." CSM concedes that this is an appropriate rebuttal opinion since it relates to Merix's role in the clinical trial. Valenti further opines, however, that Releev was lawfully marketed through an OTC monograph and was generally recognized as safe and effective (GRASE). This is something that was already opined to by Robert Pinco as part of Merix's case-in-chief and, as such, should be stricken. (Ex. 2, at 10).

9.      **Rebuttal No. 9** responds to Fritz's factual statement that the FDA previously issued Merix multiple 483s (observations of violations) on issues directly relevant to its duties in the subject clinical trial. Valenti finds Fritz's statement "not pertinent" and, "in agreement with James Peter Walters' opinion No. 6," opines that CSM did not comply with CGMP and shipped an adulterated product. Both opinions are already part of Merix's case-in-chief and were addressed by Walters. (*See* Report Opinions 6 and 7, *supra*).

10-12.  **Rebuttal Nos. 10-12** purport to rebut Fritz's commentary about the nature and necessary contents of Certificates of Analysis ("CofAs") in support of her opinion that CSM's interpretation of the CofAs was reasonable and appropriate. Valenti disagrees. This issue— CSM's interpretation of the CofAs—is part of Merix's case-in-chief and was part of Walter's first report. (*See* Report Opinions 3, 5, 6 (viii-ix) *supra*).

11

13.     **Rebuttal No. 13** purports to rebut Fritz's description of the varying uses of benzalkonium chloride. Valenti claims Fritz's comments are "not pertinent" and he opines that benzalkonium chloride "is generally recognized as safe and effective within certain levels allowed under a tentatively approved OTC monograph." The same issue was directly addressed by Robert Pinco as part of Merix's case-in-chief. (Ex. 2, at 10).

14.     **Rebuttal No. 14** responds to Fritz's opinion that the manufacturing error was made by EMS, not by CSM. Valenti disagrees and claims that CSM was "required to perform physical identity testing on _all_ incoming materials . . ." As stated above, CSM's responsibilities are part of Merix's case-in-chief and identity testing was an issue Walters opined on in his first report. (_See_ Report Opinions 4, 5 and 6(v-vii), _supra_). Valenti again concedes this point, stating, "James Peter Walters provided sound and correct opinions stating that GMP were not in compliance by CSM."

15.     **Rebuttal No. 15** responds to Fritz's observation that the FDA found CSM to be a CGMP compliant company given the FDA's multiple inspections of CSM without any observations of violations. Valenti speculates that the FDA inspections were "not comprehensive and "did not cover CSM's handling of incoming clinical trial materials." Beyond the fact that Valenti is mistaken, this issue was already addressed by Walters in his deposition (as, again, indicated by Valenti's comment that he is "support[ing] James Peter Walters' opinions"). (Ex. 3, Walters Dep., at 384).

16.     **Rebuttal No. 16** purports to rebut Fritz's opinion that CSM was not required to do identity testing. This issue of identity testing is part of Merix's case-in-chief and was exhaustively addressed by Walters in his first report. (_See_ Report Opinions 4, 5 and 6(v-vii), _supra_). Valenti also claims the product shipped by CSM was adulterated which, again, was addressed by Walters. (_See_ Report Opinion 7, _supra_). In blatant support, Valenti writes, "James

Peter Walters' opinions regarding violations of the Act, and of the applicable requirements, are fully justified and correct and in agreement with the states and the regulations and the FDA's interpretations thereof."

17.    **Rebuttal No. 17** responds to Fritz's opinion that it was reasonable for CSM to conclude that the two finished products were different based upon the CofAs.  Again, Valenti supports Walters' theme that CSM was required to do identity testing and could not rely on the CofAs.  (*See* Report Opinions 3-6(v-ix) *supra*).  Valenti even recognizes that such "opinions are pointed out throughout [Walters'] Expert Witness Report . . ."

18.    **Rebuttal No. 18** addresses Fritz's opinion that CGMP regulations would not require CSM to know that "BKC" was an active ingredient.  Valenti disagrees, citing his belief that CSM was responsible for "identity inspection to ensure that the specifications of the product fulfills the requirements of the clinical trial."  This issue is both part of Merix's case-in-chief and, as Valenti concedes, "is consistent with James Peter Walters' opinions."  (*See* Report Opinions 4, 5 and 6(v-vii), *supra*)

19.    **Rebuttal No. 19** responds to Fritz's opinion that Merix did not properly transfer responsibility for accepting or rejecting batches and, therefore, that responsibility remained with Merix.  Although Fritz's opinion focuses on Merix, Valenti shifts the issue by focusing instead on CSM's responsibilities.  Again, supporting Walters, Valenti states: "CSM was required to comply with 21 CFR 210 and 211 on behalf of Merix – as well as on its own behalf.  This supports James Peter Walters' opinion in his assessment of CSM's failure to fulfill its agreed responsibilities."  (*See* Ex. 1, Walters report, generally; and Ex. 3, Walters Dep., at 370-371).

20.    **Rebuttal No. 20** responds to Fritz's opinion that Merix did not conduct its GMP responsibilities to accept or reject batches or audit its contract manufacturer.  Valenti again discusses CSM's responsibilities and, just like Walters, contends that CSM was required to do

identity testing ("Mr. Walters' opinions and comments are fully supportable and correct"). (*See* Report Opinions 4, 5 and 6(v)-(vii), *supra*).

21.     **Rebuttal No. 21** addresses Martin Jeiven's opinion that, as the sponsor, Merix was responsible to assure that the drug products were properly manufactured. As above, Valenti does nothing more than bolster Walters' opinions by contending that Merix transferred responsibility to CSM and CSM was, therefore, required to perform identity testing. (*See* Report Opinions 4, 5 and 6(v)-(vii), *supra*, for identity testing, and Ex. 3, Walters Dep., at 370-371 for transfer of responsibility).

22.     **Rebuttal No. 22**, like Rebuttal Opinion 8, asserts that 21 CFR 312 does not apply to this case because Releev was not a "new drug." CSM concedes this is an appropriate rebuttal opinion. Valenti further opines, however, that Releev was lawfully marketed through an OTC monograph and was generally recognized as safe and effective (GRASE). This is something that was already opined to by Robert Pinco as part of Merix's case-in-chief and, as such, should be stricken. (Ex. 2, at 10).

23–27.     **Rebuttal Nos. 23-27** purport to rebut Jeiven's opinion that Merix had certain responsibilities as the sponsor of the clinical trial. In all five rebuttal opinions, Valenti asserts that it is CSM's responsibility to perform identity testing and that "James Peter Walters' opinion is correct." In Rebuttal Opinion Nos. 24 and 25, Valenti also again regurgitates Pinco's opinion that Releev is permitted under an OTC monograph and generally recognized as safe and effective. Both issues—identity testing and the OTC monograph—were covered by Merix's case-in-chief experts. (*See* Report Opinions 4, 5 and 6(v)-(vii), *supra* for identity testing, and Ex. 2, at 10 for OTC).

28.     **Rebuttal No. 28** responds to Jeiven's statement that Merix did not transfer manufacturing responsibilities to EMS. Valenti contends that Merix instead delegated

responsibility to CSM to ensure the identity of the incoming drug product. As this opinion relates to CSM's responsibilities, it is already part of Merix's case-in-chief and, in fact, was addressed by Walters during his deposition. (Ex. 3, Walters Dep., at 370-371).

29.    **Rebuttal No. 29** attempts to "spin" Jeiven's opinion that Merix violated CGMP regulation by instead contending that Merix "delegated its responsibility to CSM to process the materials in compliance with cGMPs in accordance with the specifications." Valenti's opinion is no different than what Walters said in his deposition (consistent with Valenti's remark that "James Peter Walters' opinion is correct"). (Ex. 3, Walters Dep., at 370-371).

30.    **Rebuttal No. 30** attempts to rebut Jeiven's quote from Merix's Fourth Amended Complaint, wherein Merix claims that the trial was ruined because there was "BKC" in the placebo. Valenti mischaracterizes Jeiven's quote from Merix's Complaint as "only conjecture" and asserts, again, that it was CSM's responsibility to do identity testing—an issue already addressed by Walters. (*See* Report Opinions 4, 5 and 6(v)-(vii), *supra*).

31.    **Rebuttal No. 31** purports to rebut Jeiven's opinion that Merix was the party responsible for ensuring the placebo product was properly manufactured. Valenti shifts the focus from Merix and, yet again, opines that CSM was delegated the responsibility to perform identity testing by Merix. The scope of CSM's responsibilities and Merix's theory that CSM was required to do identity testing was addressed by Walters in Merix's case-in-chief disclosures. (*See* Report Opinions 4, 5 and 6(v-vii), *supra*)

32.    **Rebuttal No. 32** responds to Jeiven's quote from 21 CFR 211.22(a), requiring a quality control unit to approve or reject batches. Valenti's opinion is not truly rebuttal since he cannot deny the quote itself. But, in any event, he states, "James Peter Walters' opinion is correct," and regurgitates Walters' earlier opinion that CSM violated 21 CFR 211.22(a). (*See* Report Opinions 4 and 6(iii-iv), *supra*).

**33-36.**    **Rebuttal Nos. 33 – 36** respond to a series of emails cited by Jeiven showing that Merix initially requested batch records and quality assurance documentation but then proceeded with the clinical trial without obtaining or reviewing those records, in violation of 21 CFR 211.22(a). Valenti shifts the focus to CSM's responsibilities and claims that CSM was required to properly inspect the incoming materials and perform identity testing. The issues addressed by Valenti in these four "rebuttal" opinions—CSM's responsibilities and Merix's theory that CSM was required to perform identity testing—were addressed by Walters in Merix's case-in-chief opinions. (*See* Report Opinions 4, 5 and 6(v-vii), *supra*)

**37.**    **Rebuttal No. 37** responds to Jeiven's opinion that Merix did not need to be blinded (and, in fact, should not have been blinded) in manufacturing the clinical trial materials. Valenti again supports Walters, claiming, "[t]he expert opinion no. 8 of James Peter Walters is correct," and again refers back to their shared belief that CSM was required to perform identity testing. (*See* Report Opinions 4, 5, 6(v-vii) and 8, *supra*)

**38.**    **Rebuttal No. 38** responds to Jeiven's opinion that if Merix reviewed the quality documentation it was required to review, it would have seen the presence of benzalkonium chloride in the placebo. Valenti says Jeiven's "comment is not pertinent" and, instead, re-states Walters' opinion that CSM agreed to assume responsibility for inspecting all incoming materials. (*See* Report Opinions 4, 5, 6(v-vii) and 8, and Deposition Opinion 1, *supra*).

**39-40.**    **Rebuttal Nos. 39 and 40** purport to rebut Jeiven's opinions that Merix failed to audit its contract manufacturer, EMS, in violation of CGMP requirements. In both rebuttal opinions, Valenti simply regurgitates Walters' case-in-chief opinion that CSM was required to perform identity testing pursuant to 21 CFR 211.84. (*See* Report Opinions 4, 5 and 6(v-vii), *supra*)

41.     **Rebuttal No. 41** responds to Jeiven's opinion that Merix violated CGMPs by failing to reject, or at least question, the placebo product when Merix had repeated concerns about the quality of the product as it was being manufactured by EMS. In response, Valenti claims that Merix was to remain blinded—which is part of Merix's case-in-chief. (Doc. 153, Fourth Amended Complaint, at ¶ 53)(alleging that, "by the very nature of a clinical trial, Merix was to remain blinded for the entirety of the clinical trial").

42.     **Rebuttal No. 42** responds to Jeiven's opinion that Merix failed to adequately communicate the manufacturing instructions for the placebo to its contract manufacturer, EMS. Valenti again attempts to shift responsibility back to CSM by contending that CSM was responsible to test the clinical trial materials—a subject covered by Walters in Merix's case-in-chief, as Valenti plainly agrees ("I agree with James Peter Walters' related opinion"). (*See* Report Opinions 4, 5 and 6(v)-(vii), *supra*).

43.     **Rebuttal No. 43**, like Rebuttal Opinions 8 and 22, asserts that 21 CFR 312 does not apply to this case because Releev was not a "new drug." CSM concedes this is an appropriate rebuttal opinion.

44.     **Rebuttal No. 44** responds to Jeiven's opinion that Merix failed to conduct a required batch record review for the manufactured products by regurgitating Walters' case-in-chief opinion that it was CSM's responsibility to confirm the identity of the clinical trial materials. (*See* Report Opinions 2-4).

45.     **Rebuttal No. 45**, like Rebuttal Opinions 8, 22 and 43, asserts that 21 CFR 312 does not apply to this case because Releev was not a "new drug." CSM concedes this is an appropriate rebuttal opinion.

46-48.     **Rebuttal 46 – 48** purport to rebut Jeiven's opinions that CSM performed the packaging, labeling and distribution services it was contracted to perform consistent with CSM's

SOPs and CGMP requirements. In all three opinions, Valenti contends that CSM was required to do an identity test and did not do so. This very issue was addressed by Walters in Merix's case-in-chief disclosures. (*See* Report Opinions 4, 5 and 6(v-vii), *supra*).

49.     **Rebuttal No. 49** responds to Jeiven's citation to commentary from the FDA Commissioner supporting his opinion that CSM is not required to do independent identification testing. Valenti opines otherwise—that CSM was required to do testing—and again expressly supports Walters by stating his "opinion is correct."

50.     **Rebuttal No. 50** purports to rebut Jeiven's statement that CSM offered "ID confirmation" to Merix as an optional service, but Merix elected not to select it. Valenti again states, "CSM was obligated to do an identity test" pursuant to 21 CFR 211.84. Walters opined to the same thing in Merix's case-in-chief opinions. (*See* Report Opinions 4, 5 and 6(v-vii), *supra*).

51-55.     **Rebuttal Nos. 51 – 55** respond to Jeiven's comments concerning the CofAs CSM received and his opinion that CSM's review and interpretation of the CofAs was reasonable and appropriate. In his rebuttal opinions, Valenti states that CSM was required to perform an "identity test" in accordance with 21 CFR 211.84 and could not rely on the CofAs—issues that were already addressed by Walters in Merix's case-in-chief opinions. (*See* Report Opinions 3-6(v-ix) *supra*). Indeed, all five rebuttal opinions close with Valenti's statement that "James Peter Walters' opinion is correct . . ."[6]

56.     **Rebuttal No. 56** defends James Walters' opinion from his first report that CSM employees were not properly trained in violation of 21 CFR 211.25. (*See* Report Opinions 2 and 6(i-ii)).

57.     **Rebuttal No. 57** defends James Walters' opinion from his first report that CSM violated 21 CFR 211.22, which describes the functions of a quality control unit. (*See* Report

---

[6] In Rebuttal Opinion No. 54, Valenti is a little more specific, stating, "James Peter Walters' opinion No. 5 is correct and completely agreeable."

Opinions 4 and 6(iii-iv)). Valenti's support of Walters is clear, as he expressly states that "Mr. Walters's [sic] opinion was correct that CSM violated 21 CFR 211.22."

58.     **Rebuttal No. 58** supports James Walters' opinion that CSM should have audited or qualified Merix's contract manufacturer, EMS. (*See* Report Opinion 4). Consistent with Walters' opinion on the same issue, Valenti opines that CSM "failed to perform a vendor qualification." He also confirms his view that "James Peter Walters' opinion is correct."

59.     **Rebuttal No. 59** defends James Walters' opinion that CSM shipped an adulterated and misbranded product. As Valenti concedes (again, "James Peter Walters' opinions are correct"), Walters already opined on the same issue. (*See* Report Opinion 7).

60-61.     **Rebuttal Nos. 60 and 61** respond to Jeiven's opinions that the parties responsible for the presence of benzalkonium chloride in the placebo are EMS and Merix. Valenti disagrees and, consistent with Walters' opinions, claims that CSM was responsible because it did not perform identity testing per 21 CFR 211.84. The same issue was already addressed by Walters in Merix's case-in-chief expert disclosures. (*See* Report Opinions 4, 5 and 6(v-vii), *supra*).

62.     **Rebuttal No. 62** disagrees with Jeiven's opinions that CSM properly labeled, packaged and shipped the drug products. In doing so, Valenti expressly adopts Walters' opinion that the products were misbranded. (*See* Report Opinion 9).

63.     **Rebuttal No. 63** responds to Jeiven's closing opinion that "the responsibility for the failed PRACS clinical trial sits squarely on the shoulders of Merix and EMS." Valenti disagrees and states that CGMPs are intended to protect consumers against adulterated products—which Walters' already opined to. (*See* Report Opinions 7 and 9).

<u>Conclusion:</u>

The vast majority of Merix's "rebuttal opinions" address CSM's responsibilities and performance during the clinical trial and, as such, are properly part of Merix's case-in-chief.

Merix is blantantly trying to use Leonard Valenti as a "backdoor expert" to support and bolster Walters' earlier opinions. Aside from his opinion that 21 CFR 312 does not apply to Merix, his report does nothing more than parrot what Walters has already said.

WHEREFORE, Defendant, Clinical Supplies Management, Inc., respectfully requests that this Court grant its motion, striking (1) James Walters' rebuttal opinion that CSM received a "marketed" drug product (p. 3), and (2) all of Leonard Valenti's opinions, except for his testimony that 21 CFR 312 does not apply to this case (part of Rebuttal Opinion 8, part of Rebuttal Opinion 22 and Rebuttal Opinions 43 and 45).

Respectfully submitted,

SEGAL MCCAMBRIDGE SINGER & MAHONEY, LTD.

By: /s/Brian H. Eldridge
      Jeffrey Singer (ARDC No. 2620510)
      jsinger@smsm.com
      Brian H. Eldridge (ARDC No. 6281336)
      beldridge@smsm.com
      Adam J. Jagadich (ARDC No. 6280278)
      ajagadich@smsm.com
      233 South Wacker Drive, Ste. 5500
      Chicago, Illinois  60606
      (312) 645-7800
      Attorneys for Defendant Clinical Supplies
      Management, Inc.