**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MERIX PHARMACEUTICAL CORPORATION,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **Case No. 11 C 3318** |
| **CLINICAL SUPPLIES MANAGEMENT, INC.,** | ) ) | |
| **Defendant.** | ) ) | |

**CORRECTED
MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Merix Pharmaceutical Corporation has sued Clinical Supplies Management, Inc. (CSM) asserting claims including breach of contract, breaches of confidential disclosure agreements, fraud, breaches of a master services agreement, conspiracy, and negligent spoliation of evidence. The Court previously dismissed certain of Merix's claims. *Merix Pharm. Corp. v. Clinical Supplies Mgmt., Inc.*, No. 11 C 3318, 2012 WL 1577676 (N.D. Ill. May 4, 2012). Merix has now moved for summary judgment on its breach of contract claim, and CSM has moved for summary judgment on all of Merix's remaining claims and separately on Merix's request for consequential damages. For the following reasons, the Court denies Merix's motion, grants CSM's motion for summary judgment on some of Merix's claims but not others, and grants in part CSM's motion for summary judgment as to consequential damages.

**Background**

Merix is a pharmaceutical company based in Illinois that produces a drug called

Releev, which is used to treat cold sores.  The active ingredient in Releev is benzalkonium chloride (BKC).

In 2005, Merix was involved in litigation in New Jersey with GlaxoSmithKline (GSK), a pharmaceutical company that manufactures medications that compete with Releev.  GSK challenged claims that Merix made about the efficacy of Releev in the drug's packaging and advertising.  The court in the New Jersey case issued a preliminary injunction prohibiting Merix from making claims about Releev, save for any references to "a clinical study concerning RELEEV which is conducted in accordance with principles which are generally approved by the scientific community."  Pl.'s Ex. 43 at 2.  Then, while the litigation was still ongoing, Merix hired PRACS Institute, Ltd. to conduct a clinical trial comparing Releev to a placebo.[1]  To avoid learning which patients received Releev and which the placebo, PRACS decided to use a subcontractor to receive the clinical supplies and then label, package, and distribute the supplies to the sites where the trial would occur.  PRACS suggested CSM as the subcontractor.  In October 2005, PRACS hired CSM to process the clinical supplies and distribute them to test centers.

In October 2005, Merix, CSM, and PRACS entered a contract entitled "CSM$^{TM}$ WORK ORDER."  Def.'s Ex. 9 at 1.  The Work Order had a "Scope of Services" section featuring three subsections identifying tasks that "will be provided by CSM$^{TM}$":  "Project Management," "Packaging and Labeling," and "Storage and Distribution."  Id.  Under "Packaging and Labeling," the Work Order stated that CSM will "[i]nspect and release for processing all incoming components by Quality Assurance."  Id.  Under "Storage and

---

[1] Merix previously dismissed its claims in this case against Cetero Research, Inc., the successor to PRACS.

Distribution," the Work Order similarly stated that CSM will "[i]nspect and release for processing all incoming products by Quality Assurance," and it stated that CSM would "[o]btain MSDS and Certificate of Analysis or equivalent for all drug supplies received." *Id.* at 2. In addition, the Work Order included an "Optional Services" section for tasks that were "[n]ot included in the stated prices but may be added for additional cost"; among the tasks was "ID confirmation." *Id.* at 2. The Work Order also featured a cost breakdown, with $14,700 to be paid to CSM.

Finally, the Work Order included two other sections: "General Terms" and "Additional Terms." *Id.* at 4–5. The General Terms section stated that "[w]hen this Work Order is finalized by signatures from both Parties, it will become incorporated into the MSA between the parties." *Id.* at 4.[2] The Additional Terms section stated the following:

> CSM shall use its best efforts to be available to Merix Pharmaceutical Corporation to testify, if necessary, in any litigation concerning the Study(ies), and Merix Pharmaceutical Corporation and CSM shall enter into a separate agreement concerning such services on CSM's then customary and reasonable rates and related expenses for expert testimony. . . . Any expert testimony given by CSM will be based solely on its independent testing, evaluation and objective opinions of its employees.

*Id.* at 5.

The signatories to the Work Order were Brian Moe, CSM's vice president of operations, Meryl Squires, president and CEO of Merix, and a PRACS representative.

---

[2] The Work Order contained other references to an "MSA," such as CSM's responsibility for "[n]otifying PRACS Institute in writing if the Work Order requires adjustment by means of a Change Order as specified in the Master Services Agreement (MSA)." *Id.* at 2; *see also id.* at 4 ("If the study as outlined is terminated prematurely by PRACS Institute as noted in the MSA, thereby terminating CSM[TM] [sic] involvement, the amount due will be determined as noted in the MSA."); *id.* ("The terms for the invoices are stated in the MSA.").

When asked during her deposition what CSM or PRACS told her about what tasks CSM would perform for Merix, Squires said "they would oversee the quality of the materials from start to finish." Pl.'s Ex. 1 at 190–91. When asked to elaborate, Squires said: "They would quality control it, quality assure it. They would receive— They would receive the materials. . . . They would quality control and quality assure the materials what—what the materials were and what they were meant to do." *Id.* at 191. Squires was then asked whether she expected "CSM to run independent tests on the placebo and active trial products that were shipped to them." *Id.* "True," she responded. *Id.* She was then asked if anyone "from CSM suggested to you that they would run independent tests on those particular products." *Id.* Her response: "Correct." *Id.*

During the same deposition, CSM's counsel asked Squires other questions about this phone call, which Merix alleges occurred on October 6, 2005. On the call, Squires said, were a PRACS employee named Vicki Clauson as well as Moe and another CSM employee named Stephen Pirdee. (CSM denies that the phone call occurred.) During the call, Squires testified in her deposition, she asked whether Moe and Pirdee had signed Merix's confidential disclosure agreement. In response, Squires testified, Clauson "said yes," and Squires also "heard murmurs of assent," although she could not tell who uttered the murmurs. *Id.* at 182. Following this exchange, Squires testified, the parties discussed the litigation history between Merix and GSK, as well as the protocol for the clinical trial Merix wanted to conduct.

The Work Order made reference to a "Protocol," entitled "A Multicenter, Randomized Double-Blind, Placebo-Controlled Trial of ViraMedix®-RELEEV™ in the Treatment of Recurrent Herpes Simplex Labialis in Immunocompetent Subjects." Def.'s

Ex. 9 at 1. The Protocol is also mentioned under the duties attributed to PRACS: "Ensuring that CSM™ receives current copies of the Protocol." *Id.* at 2. PRACS had to "[p]rovid[e] drug product and appropriate documentation, including MSDS, Certificate of Analysis, material expiration date" under the Work Order. *Id.* There are multiple copies of a document the parties refer to as the Protocol in evidence, but they dispute which one governed the Releev clinical trial. One, submitted in evidence by Merix, is dated August 10, 2005. Another, submitted by CSM, is dated August 12, 2005. Under the heading "STUDY PRODUCT," the August 10 document lists ingredients for both the "Test Product" and the placebo in the study; the test product contains, among other ingredients, something called "Viracea," which has among its ingredients "bezalkonium [sic] chloride." Pl.'s Ex. 5 at 17. The placebo ingredient list does not contain Viracea. The August 12 version of the Protocol, however, has a different ingredient list for the placebo, including "Viracea®." Def.'s Ex. 6 at 17. The August 12 Protocol has signatures from Squires, as well as three PRACS employees; the August 10 Protocol that has been offered in evidence has no signatures.

In October 2005, CSM received two boxes of drug products from EMS, a manufacturer that Merix hired. EMS also sent PRACS two certificates of analysis, one for each of the boxes EMS sent to CSM. The certificate for the "Viramedx Releev Placebo" states that EMS performed analyses on the product, and in the "Results" section says, "BKC % 0.1308%." Def.'s Ex. 11. A PRACS employee sent a copy of the two certificates to CSM. After CSM packaged the drug products for the clinical trial and the trial was completed, Merix had the drug products tested. It discovered that the placebo contained benzalkonium chloride, the listed active ingredient in Releev, and

thus it was not in fact a placebo.  This, Merix said, made the trial useless.  Merix says

that it then paid for a new clinical trial, the duration of which prolonged Merix's litigation

with GSK and consumed funds Merix otherwise would have used for advertising.  GSK's

litigation against Merix ultimately settled.  In addition, at some point after GSK filed its

suit against Merix, Merix filed suit against GSK in Illinois for false advertising.  Merix

also filed suit in Illinois against its onetime counsel in the GSK litigation, Winston &

Strawn, alleging it had committed legal malpractice during the pendency of the GSK

litigation.  Merix hired another firm to prosecute that lawsuit and incurred expenses in

doing so.  Merix also began to pay a monthly $20,000 retainer to its current attorney,

Richard Cannon, during the GSK litigation.

Merix filed its complaint in this case on May 17, 2011.  In May 2012, the Court

dismissed Merix's claims for negligence, breach of fiduciary duty, breach of implied

warranty, and breach of a confidential disclosure agreement.  The Court also dismissed

Merix's fraud claim for its failure to comply with Federal Rule of Civil Procedure 9(b) but

noted that Merix potentially could amend its complaint to comply with Rule 9(b).  The

Court later denied Merix's motion for reconsideration.

In October 2012, Merix filed a fourth amended complaint (the current version),

reasserting its fraud claim and adding claims alleging further breaches of a master

services agreement, conspiracy, and spoliation of evidence.  Merix moved for summary

judgment on its breach of contract claim in March 2014, and CSM filed two summary

judgment motions that same month:  one for summary judgment on Merix's claims, and

another on Merix's request for what CSM termed consequential damages.  In May 2014,

Merix filed a motion for relief from Local Rule 56.1(b)(3), in which Merix's counsel

argued that he mistakenly failed to file responses to CSM's statements of undisputed facts associated with its motions for summary judgment. The next day, CSM filed a motion to strike Merix's reply to CSM's response to Merix's Local Rule 56.1(b)(3) statement of undisputed facts associated with its own summary judgment motion.

### Discussion

A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court "must determine whether the evidence, so construed, establishes genuine disputes of material fact with respect to" plaintiffs' claims. *Harper v. Fulton Cnty.*, 748 F.3d 761, 765 (7th Cir. 2014). A genuine dispute of material fact "exists only if there is enough evidence upon which a reasonable [finder of fact] could return a verdict in" the non-movant's favor. *Swetlik v. Crawford*, 738 F.3d 818, 826 (7th Cir. 2013). On cross motions for summary judgment, the court assesses whether each movant has satisfied the requirements of Rule 56. *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). "As with any summary judgment motion, we review cross-motions for summary judgment construing all facts, and drawing all reasonable inferences from those facts, in favor of the non-moving party." *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013) (internal quotation marks omitted).

### A.    Breach of contract

Both Merix and CSM have moved for summary judgment on Merix's breach of contract claim. Because the parties' arguments associated with their respective motions merge somewhat, the Court will discuss both motions together.

"When there are no triable issues of fact, . . . contract interpretation is a subject

particularly suited to disposition by summary judgment."  *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1389 (7th Cir. 1993) (internal quotation marks and alterations omitted). "If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning.  However, if the language of the contract is susceptible to more than one meaning, it is ambiguous."  *Thompson v. Gordon*, 241 Ill. 2d 428, 441, 948 N.E.2d 39, 47 (2011).  The question of whether a contract is ambiguous is a question of law in Illinois.  *Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009).  But if "contractual ambiguity is established, the task of interpreting the contract's meaning generally becomes a question of fact for the jury."  *Harmon v. Gordon*, 712 F.3d 1044, 1051 (7th Cir. 2013).  There is an exception to this rule if "the extrinsic evidence bearing on the interpretation is undisputed," in which case a court "can decide the matter on summary judgment."  *Citadel Grp. Ltd. v. Wash. Reg. Med. Ctr.*, 692 F.3d 580, 587 (7th Cir. 2012).

Merix contends that the Work Order required CSM to perform "independent testing" on the drug products for the clinical trial, during which it presumably would have discovered that the purported placebo contained BKC, which would have revealed it was not a placebo for purposes of the trial.  Pl.'s Mot. at 4.  Merix also argues that the Work Order obligated CSM to comply with federal regulations, which, Merix argues, separately required CSM to test the drug products for the clinical trial before packaging them for use.  For its part, CSM contends that Merix's complaint alleges that CSM failed to inspect the certificates of analysis for consistency of the drug products with the Protocol, and it contends that it did, in fact, make such an inspection.  CSM further argues that the certificates of analysis were indeed consistent with the Protocol and

thus that CSM did not breach its contract with Merix.

### 1.    Federal regulations

Merix argues that a passage in the Work Order stating that CSM "is conducting an independent labeling and packaging of Merix Pharmaceutical Corporation's product(s) under current GMP and federal regulations" obligated CSM to follow certain drug manufacturing regulations that require manufacturers to test drug components. Pl.'s Mot. at 4. These regulations, Merix argues, required CSM "to do an identity test to verify that the drug product it was labeling as a 'placebo' was in fact appropriate for use as such." *Id.* at 8.

The Food and Drug Administration's regulations for good manufacturing practice of finished pharmaceuticals include subparts related to "Control of Components and Drug Product Containers and Closures," as well as "Production and Process Controls," "Packaging and Labeling Control," "Holding and Distribution," and "Laboratory Controls." 211 C.F.R. § 211, subparts E–I. Merix cites a provision entitled "Responsibilities of quality control unit," which states, "There shall be a quality control unit that shall have the responsibility and authority to approve or reject all components, . . . and drug products, and the authority to review production records to assure that no errors have occurred or, if errors have occurred, that they have been fully investigated." *Id.* § 211.22(a). The same section requires a quality control unit to have "[a]dequate laboratory facilities for the testing and approval (or rejection) of components, drug product containers, closures, packaging materials, in-process materials, and drug products." *Id.* § 211.22(b). Elsewhere, the regulations state: "Each lot of components, drug product containers, and closures shall be withheld from use

until the lot has been sampled, tested, or examined, as appropriate, and released for use by the quality control unit." *Id.* § 211.84(a). That section also lays out requirements for testing of samples, but it permits a manufacturer to accept a report of analysis from a supplier in lieu of testing each component, "provided that at least one specific test is conducted on such component by the manufacturer," and provided further that the manufacturer establishes the supplier's reliability. *Id.* § 211.84(d)(2).

Merix contends that CSM is a "manufacturer" under these regulations and thus was obligated to perform testing as the regulations required. As support, Merix points to this provision from the "Definitions" section of the regulations: "*Manufacture, processing, packing, or holding of a drug product* includes packaging and labeling operations, testing, and quality control of drug products." *Id.* § 210.3(b)(12). Merix also references a section of the regulations that says the regulations "contain the minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug." *Id.* § 210.1(a).

In response, CSM points to another section of the regulations, which states: "If a person engages in only some operations subject to the regulations in this part [and] in part[ ] 211, . . . and not in others, that person need only comply with those regulations applicable to the operations in which he or she is engaged." *Id.* § 210.2(b). Because CSM does packaging and labeling and not manufacturing operations, it argues, the testing provisions of the regulations do not apply to its conduct. Thus the Work Order, CSM says, did not require it to test Merix's drug products prior to the clinical trial.

Merix argues that CSM "ignore[s] the FDA's definition of 'manufacture,'" a

definition that has "plain meaning." Pl.'s Corr. Reply at 2. However, the provision from the "Definitions" section Merix cites is not a definition of "manufacture" or "manufacturer." The provision states that a list of four things, separated by "or" ("[m]anufacture, processing, packing, or holding of a drug product") "includes" four other things ("packaging and labeling operations, testing, and quality control of drug products"). 21 C.F.R. § 210.3(b)(12). The provision does not tell the reader with any specificity what exactly a "manufacturer" is, or what it means to "manufacture." Yet the provisions Merix cites to argue that CSM failed to comply with the regulations' requirements pertain specifically to manufacturers. *E.g.*, *id.* § 211.84(d)(2) (" . . . provided that at least one specific identity test is conducted on such component by the manufacturer . . . ").

The subsection CSM cites assists in resolving this issue because it provides that entities "need only comply with those regulations applicable to the operations in which [it] is engaged." *Id.* § 210.2(b). Further, certain provisions within the regulations plainly refer to just some of the four functions of manufacturing, processing, packing, and holding a drug. *See, e.g.*, *id.* § 211.89 ("Rejected components, drug product containers, and closures shall be identified and controlled under a quarantine system designed to prevent their use in manufacturing or processing operations for which they are unsuitable."). Other sections discuss manufacturing alone. *E.g.*, *id.* § 211.101(b) ("Components for drug product manufacturing shall be weighed, measured, or subdivided as appropriate."); *id.* § 211.105 ("In cases where only one of a particular type of equipment exists in a manufacturing facility, the name of the equipment may be used in lieu of a distinctive identification number or code."). In light of these provisions,

certain parts of the regulations appear to apply solely to individual functions, and they expressly exempt an entity that does not perform all of the functions from adherence to the regulations that govern functions the entity does not perform.

Considering these provisions, Merix has not persuasively argued that CSM is a "manufacturer" for purposes of the federal drug regulations that it contends CSM failed to follow—assuming the regulations govern CSM's duties under the Work Order in the first place, a question the Court need not decide. Merix says that another part of the regulations states that the regulations are intended to "supplement, not supersede, each other." Pl.'s Corr. Reply at 2 (quoting 21 C.F.R. § 210.2(a)). But that does not mean that task-specific regulations apply equally to all manufacturers, processors, packers, and holders of drug products. The regulations expressly exempt non-manufacturers from manufacturing requirements, and manufacturers from non-manufacturing requirements. One would not, for example, expect compliance from a non-manufacturer with section 211.173, which says that laboratory animals must "be identified, and adequate records shall be maintained showing the history of their use." The provision does not say in so many words that only manufacturers must keep such records, but the application only to those who test drugs on animals is clearly implied. Merix makes no persuasive argument that CSM is a "manufacturer" or that it failed to comply with the parts of the regulations that might apply specifically to its functions. The Court concludes that the section of the Work Order referring to federal regulations did not require CSM to analyze the drug products it handled for Merix's clinical trial and thus that CSM did not violate that provision of the Work Order.

## 2.     Work Order

Merix also points to several passages in the Work Order itself that it contends required CSM to perform testing on Merix's drug products.  The "Additional Terms" section of the Work Order states that "[a]ny expert testimony given by CSM will be based solely on its independent testing, evaluation and objective opinions of its employees."  Pl.'s Ex. 17 at 5.  Inclusion of this passage is "clearly" an indication, Merix says, that "the language of the Work Order envisioned CSM doing 'independent testing', [sic] of the drug products it received, as part of its duties."  Pl.'s Mot. at 4.  What might have been envisioned and what the Work Order's terms actually required are, however, not necessarily the same thing.  The passage Merix cites states only that if someone from CSM ultimately testified in litigation, that person would have to testify based on independent testing.  It does not by its terms obligate CSM to do its own testing of Merix's products at the outset of a clinical trial.[3]

Merix also points to the term in the Work Order that says CSM will "[i]nspect and release for processing all incoming products by Quality Assurance."  Pl.'s Mot. at 4 (quoting Pl.'s Ex. 17 at 1).  This term appears under the "Storage and Distribution" section of the services that CSM was to provide.  The term, Merix says, "included the obligation for [CSM's] QA to *evaluate* whether the products it received were appropriate

---

[3] Merix points to a 2006 FDA "Establishment Inspection Report" on CSM, which states that at CSM, "[i]f any testing is required the testing is performed by a contract lab."  Pl.'s Ex. 20 at 4.  Based on this document, Merix says CSM is "disingenuous" in claiming not to do testing.  Pl.'s Resp. at 8.  This document, however, plainly is not part of or related to the contract between CSM and Merix.  Even if it were, the word "if" in the sentence on testing makes clear that testing is not a standing requirement in CSM's operations.  Furthermore, it is unclear whether the sentence in question is in reference to CSM or to "DPP," a company with which CSM apparently shared employees and office space.  *See* Pl.'s Ex. 20 at 4.

for use in *placebo-controlled* (i.e. efficacy comparison) clinical trial."  Pl.'s Repl. at 9.  In response, CSM says the term "does not translate into CSM performing laboratory/chemical identity testing," because its "inspection and release" procedures are outlined in one of its Standard Operating Procedure documents, which do not mention "identity testing."  Def.'s Resp. at 8–9.

The term "Quality Assurance" appears in two other places in the Work Order.  First, under "Packaging and Labeling," the Work Order includes language nearly identical to that just quoted:  it obligates CSM to "[i]nspect and release for processing all incoming components by Quality Assurance."  Pl.'s Ex. 17 at 1.  Also under "Packaging and Labeling," the Work Order requires CSM to prepare packaging and labeling "batch records" of the clinical trial drug products which it was to "submit to Quality Assurance for review and approval."  Pl.'s Ex. 17 at 1.

The Work Order does not contain a definition of the requirement to "inspect and release for processing" by "Quality Assurance."  And the additional terms that Merix cites are of little assistance in establishing what the parties intended the requirement to mean.  A duty to inspect, taken alone and without a contractually-based definition, could mean any one of several different things along the spectrum from simply visual inspection of the exterior to thorough examination of the contents—some of which might support Merix's claim, and some of which might undercut it.  The Court concludes that the Work Order's requirement for CSM to "[i]nspect and release for processing all incoming products by Quality Assurance" is "susceptible to more than one meaning," *Thompson*, 241 Ill. 2d at 441, 948 N.E.2d at 47, and is thus ambiguous.

The Court's conclusion that the operative contractual term is ambiguous means

the Court "can consider extrinsic evidence to determine the parties' intent." *Id.* If the Court determines that "the extrinsic evidence bearing on the interpretation is undisputed," the Court can grant summary judgment to the party whose interpretation carries the day. *Citadel Grp. Ltd.*, 692 F.3d at 587. Otherwise, however, summary judgment in either party's favor on this point is inappropriate.

The only extrinsic evidence that CSM offers is its Standard Operating Procedure document number 203-05. *See* Def.'s Ex. 16. That document contains several references to "Quality Assurance," including the requirement that "QA reviews the completed Receipt Form and accompanying documentation and inspects the clinical supplies." *Id.* at 5. Among the inspections QA makes is "Visual Identification Inspection (visual confirmation that the clinical supplies are indeed what is identified on the clinical supplies' specifications, or equivalent documentation)." *Id.* These terms, CSM requires, show that it did not have to perform chemical testing. CSM has introduced no evidence, however, that the Standard Operating Procedure document itself is relevant to interpretation of the Work Order—i.e., that CSM ever presented it to Merix, such that the term might be helpful in determining *both* parties' understanding of the Work Order's terms. "[I]n Illinois one party's understanding [of a contract] is irrelevant; only shared meaning counts." *Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp.*, 73 F.3d 150, 152 (7th Cir. 1996); *see also Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 314, 515 N.E.2d 61, 65 (1987) (one party's "subjective understanding of the terms of the contract is immaterial").

CSM further contends that Squires admitted during her deposition that she did not expect CSM to perform any testing. The Court disagrees. Squires testified that she

expected CSM to "quality control and quality assure the materials what—what the materials were and what they were meant to do." Pl.'s Ex. 1 at 191. Thus there is some evidence that would permit a finding that the parties intended that CSM would perform testing to confirm the identity of the drugs it received as part of the clinical trial.

CSM also argues that the Work Order makes it clear that the testing Merix contends CSM was required to do was optional (an option not picked up by Merix), given the fact that among the "Optional Services" listed in the Work Order is "ID confirmation." *See* Pl.'s Ex. 17 at 2. Yet neither CSM nor Merix offers any evidence that might be of assistance in defining this phrase as it is used in the Work Order. Although "ID confirmation" could be construed to mean "testing of drugs to confirm their ingredients," that is not the only reasonable meaning of the phrase. CSM points to no that would assist a fact finder in determining what particular sort of "ID confirmation" the Work Order is referring to. This term likewise is ambiguous.

In sum, without undisputed extrinsic evidence defining the disputed terms in the Work Order, the meaning of the operative terms is for the trier of fact to determine. *See Harmon*, 712 F.3d at 1051. For these reasons, summary judgment is inappropriate for either party on Merix's breach of contract claim.[4]

## B.   Breach of confidential disclosure agreement and conspiracy

CSM also seeks summary judgment on Merix's claim for breach of a claimed

---

[4] Given this conclusion, the Court need not evaluate another argument, discussed primarily in connection with CSM's motion for summary judgment: whether CSM complied with the Work Order because the Protocol governing the clinical trial listed a component including BKC among the placebo's ingredients, and the placebo did contain BKC. It is undisputed that CSM did not test the drug products, and as the Court has indicated there is a genuine factual dispute on whether the terms of the Work Order required it to do so.

confidential disclosure agreement between the two entities and its claim alleging a conspiracy between CSM and GSK. In response to CSM's arguments that Merix has no evidence to support these claims, Merix asks the Court to dismiss both claims without prejudice, "only to be refiled if and when supporting evidence is uncovered." Pl.'s Resp. at 10. Merix maintains that "it is _not_ undisputed" that it had a confidential disclosure agreement with CSM, and it argues that circumstantial evidence supports its conspiracy claim. _Id._ at 9–10. Merix says, however, that it "cannot in good conscience represent to this Court that Merix has located sufficient direct evidence of disclosures or an agreement to proceed with these two claims at this time." _Id._ at 10. In its reply brief, CSM argues that summary judgment is appropriate on these claims because fact discovery closed in June 2013 and thus Merix is not entitled to a further opportunity to obtain and offer evidence bearing on the issue.

The Court concludes that CSM is entitled to summary judgment on these claims. Merix has not shown good cause to leave the door open to further litigation of these claims, considering that it had a reasonable opportunity to uncover supporting evidence about them in discovery. Merix contends that it was "not permitted any discovery of CSM's corporate and officers' financial or computer records which would have enabled Merix to potentially locate and follow the trail of communications and incentives for disclosures to, and related agreements with, GSK as alleged." _Id._ at 10. Merix does not specify what it is referring to, but assuming this is a criticism of a ruling by the Court on disputed discovery requests, it is not a persuasive justification to allow Merix to retain the opportunity to conduct further litigation on these claims in the future.

## C.   Fraud

CSM also seeks summary judgment on Merix's fraud claim.  The claim is based on CSM's alleged misrepresentations or misleading omissions during a phone call in which a PRACS employee told Squires that CSM representatives had signed a confidential disclosure agreement (CDA) related to their dealings with Merix.  The CSM employees, Merix alleges in its most recent complaint, "remain[ed] silent and fail[ed] to challenge or correct" that statement, "and thereafter permit[ed] Meryl Squires and PRACS to continue disclosing to them Merix'[s] confidential information."  4th Am. Compl. ¶ 59.  Merix says that if it had known that CSM had not signed the CDA, it "would not have permitted disclosure of its confidential information to CSM, would not have signed the Work Order," and would not have proceeded with the clinical trial.  *Id.* ¶ 64.

In Illinois, the elements of common law fraud are "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d. 482, 497, 675 N.E.2d 584, 591 (1996); *see also Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 613 (7th Cir. 2013).

CSM argues that Merix has not shown that it was damaged as a result of reliance on the alleged misrepresentation.  It says that "contrary to the allegation in Merix's Complaint that it would not have signed the Work Order had it known CSM had not signed the CDA, Meryl Squires conceded otherwise."  Def.'s Mem.- Mot. for S.J. on Pl.'s Claims at 10.  Not so.  Merix submitted an affidavit from Squires in which she squarely

states exactly what Merix contends: "If PRACS and CSM had not affirmatively represented to me that CSM had signed Merix' CDA . . ., I would not have signed the Work Order or allowed CSM to be hired for the PRACS Clinical Trial." Pl.'s Ex. 22 ¶ 18.

That aside, CSM's claim in its brief that Squires "testified that if she knew CSM did not sign the CDA, she would have simply demanded CSM sign it," Def.'s Mem.- Mot. for S.J. on Pl.'s Claims at 10, misrepresents her actual deposition testimony. To support this claim, CSM cites paragraph 58 of its Rule 56.1 statement, which in turn cites the following testimony, and only the following testimony, from Squires's deposition:

> Q: If you would have known, in fact, that CSM did not sign the CDA, I assume that you would have asked them to sign it, right?
>
> A: Absolutely.

Def.'s Ex. 23, Squires Dep. at 153:7-10. This is certainly not a "concession" of the untruth of Merix's allegation that it would not have signed the Work Order; Squires was not asked that question. And this passage cannot be read as a statement by Squires, as CSM claims, that she "simply" would have asked for a signature had she learned CSM had not signed it; neither the question nor the answer suggested this was the only thing Squires would have done differently. In short, CSM's argument that Merix conceded the insufficiency of its fraud claim flies in the face of the record; it is a meritless argument.

CSM also argues that Merix's fraud claim is barred by the five-year statute of limitations that applies to such claims. CSM says that the relevant filing date for Merix's claim is May 17, 2011, the date Merix filed this suit. *See* Def.'s Mem.- Mot. for S.J. on Pl.'s Claims at 11. It notes that the alleged misrepresentation about its execution of the

CDA took place in October 2005 and argues that a reasonable person or entity would have requested a copy of the fully executed agreement sometime before May 17, 2006. This issue presents a genuine factual dispute that precludes its resolution on a motion for summary judgment. Merix has submitted a memo from PRACS dated November 14, 2005 in which PRACS says it was "able to obtain a CDA" from CSM. Merix argues that it reasonably relied on this, Pl.'s Resp. at 11, and a reasonable jury could so find. CSM also notes that Merix learned by May 1, 2006 that the clinical trial had been invalidated and suggests that given that fact, it should have inquired regarding the execution of the CDA before May 17. That is one possible inference from Merix's knowledge of the invalidation of the trial, but it is not the only reasonable inference. A reasonable jury could find that nothing about the invalidation of the trial ought to have triggered inquiry into whether CSM had signed the disclosure paperwork.

In its reply, CSM argues that the absence of a signed CDA did not cause the adulteration of the placebo or Merix's claimed resulting damages. *See* Def.'s Reply in Support of Mot. for S.J. on Pl.'s Claims at 12. CSM did not advance this argument in its opening brief and thus forfeited it as a basis for summary judgment on the fraud claim. That aside, this is an argument about what damages are recoverable, not about whether CSM can maintain a fraud claim.

**D.    Breach of master services agreement**

CSM has also moved for summary judgment on Merix's claim that CSM breached the master services agreement (MSA) between Merix and PRACS. In its complaint, Merix alleges that CSM "agreed to be bound by" the MSA "by incorporating the terms thereof under the Work Order which CSM signed." 4th Am. Compl. ¶ 67.

CSM's failure to tell Merix about problems with the placebo in the clinical trial, Merix alleges, was a breach of the MSA.

CSM argues that it was not a party to the MSA and thus was not bound by it. CSM acknowledges that the Work Order mentions an MSA, but it contends these were "intended to refer to a Template MSA that CSM used around the timeframe at issue." Def.'s Mem.- Mot. for S.J. on Pl.'s Claims at 12. That template, CSM says, was not part of any agreement between it and Merix, as shown by the fact that the Work Order references terms, such as "change order," that are mentioned in the template but not the actual MSA between Merix and PRACS. *Id.*

In response, Merix argues that the Work Order (which was executed by Merix, CSM, and PRACS) incorporates Merix's MSA with PRACS when it says, "When this Work Order is finalized by signatures by both Parties, it will be incorporated into the MSA between the parties." Pl.'s Resp. at 14 (quoting Pl.'s Ex. 17 at 4). Further, Merix contends that an e-mail between CSM employees that referenced an MSA along with the Work Order shows there is a dispute of fact on whether CSM was a party to the Merix-PRACS MSA. As for CSM's arguments about its MSA template, Merix says that "CSM now claims that no such Template MSA was actually created or exists." *Id.*

The Court deals with Merix's last point first. CSM does not claim that its template MSA was never created and does not exist. To the contrary, it submitted the document as an exhibit to its initial brief attached to its summary judgment motion. *See* Def.'s Ex. 28. And as CSM argues, the template does indeed include terms that are not present in the MSA between PRACS and Merix. CSM points in particular to the term "Change Order," which is included in the Work Order. *See* Pl.'s Ex. 17 at 2 (CSM is responsible

for "[n]otifying PRACS Institute in writing if the Work Order requires adjustment by means of a Change Order as specified in the Master Services Agreement (MSA)."). CSM's template MSA also includes this term, along with a similar definition. *See* Def.'s Ex. 28 at 1 ("Any proposed changes to a Work Order (a 'Change Order') including, without limitation, any changes in scope, payments, or timeline, will be documented, signed by the Administrative Contact of the Party proposing the Change Order, and presented to the other Party for its prior review."). After running the PRACS-Merix MSA through text recognition software, the Court cannot find a similar term in that document. Merix does not answer this argument; indeed, it does not even acknowledge that the template exists.

In addition, Merix's argument gets the language of the Work Order backward. As noted earlier, Merix alleges that the PRACS-Merix MSA was "expressly incorporated by reference into the Work Order." Pl.'s Resp. at 14. Yet the Work Order says the opposite: "When this Work Order is finalized by signatures from both Parties, it will become incorporated into the MSA between the parties." Pl.'s Ex. 17 at 4. Thus the MSA was not supposed to become part of the Work Order; it was the other way around. Assuming the Work Order was, as the quoted term indicates, incorporated into the PRACS-Merix MSA, Merix offers no support for its contention that a party bound by one contract that gets incorporated into another contract with a different party becomes bound by the second contract as well.

For these reasons, the Court concludes that CSM is entitled to summary judgment on Merix's claim for breach of the MSA.

**E.      Negligent spoliation of evidence**

Merix's spoliation claim describes four documents that it alleges CSM did not preserve for this litigation despite having a duty to do so.  A claim of this sort requires a plaintiff to "allege sufficient facts to support a claim that the loss or destruction of the evidence *caused the plaintiff to be unable to prove* an underlying lawsuit."  *Boyd v. Travelers Ins. Co.*, 166 Ill. 2d 188, 197, 652 N.E.2d 267, 271 (1995).  CSM has moved for summary judgment on this claim.  The Court will address in turn each document referenced in Merix's complaint.

**1.      E-mail between CSM employees**

Merix's complaint alleges that CSM possesses or possessed an e-mail "in which CSM responded to being alerted to the lack of difference between the ingredients listed in the CofAs for the Releev product and placebo and being specifically asked to take a look at it, and in which response CSM instead approved the placebo for release."  4th Am. Compl. ¶ 81.  CSM argues that it cannot be found negligent for destroying or losing the e-mail because PRACS's successor entity produced it in discovery before Merix filed its spoliation claim, and CSM itself has also now produced it.  In response, Merix does not deny that CSM has produced the e-mail.  It accuses CSM of "intentional withholding" and argues that "Merix should not have had to endure several years of incomplete discovery productions by CSM, and incur hundreds of hours of attorney and computer consultant time and related costs, to obtain" the e-mail.  Pl.'s Resp. at 16.

As noted earlier, in Illinois, negligent spoliation of evidence involves "loss or destruction" of the evidence.  *Boyd*, 166 Ill. 2d at 197, 652 N.E.2d at 271.  It also requires the plaintiff to show that this loss or destruction "*caused the plaintiff to be*

*unable to prove* an underlying lawsuit." *Id.* The e-mail was not lost or destroyed; Merix does not dispute that it was eventually produced. The hardship Merix claims it experienced in the litigation due to delayed production might have been a basis for a motion for sanctions if Merix had filed one, but it does not support a claim of spoliation.

### 2. Signed copy of confidential disclosure agreement

Merix's complaint alleges that CSM violated its duty to preserve "its signed copy of the CDA "which Merix was specifically informed CSM had in fact signed." 4th Am. Compl. ¶ 82. In response to CSM's motion for summary judgment, Merix now asks the Court to dismiss this portion of its claim without prejudice, as it did on its claim that CSM breached the confidential disclosure agreement. The Court agrees with CSM that this would be inappropriate, for the reasons discussed earlier. The bottom line is that there is no support for this basis for Merix's negligent spoliation claim.

### 3. MSA referenced in Work Order

Merix's complaint alleges that CSM failed to produce a copy of the MSA referenced in the Work Order "which CSM signed." *Id.* The Court has already concluded that CSM is entitled to summary judgment on Merix's claim that CSM breached the MSA between PRACS and Merix. As part of that conclusion, the Court determined that CSM was not a party to an MSA associated with the claims at issue. In addition, CSM has produced its template MSA, which the Court has concluded likely was the MSA referenced in the Work Order. For these reasons, this contention by Merix does not support its spoliation claim.

### 4. Response to e-mail request by CSM employee

Finally, Merix alleges that CSM violated its duty to preserve any responses to an

e-mail from its vice president of operations requesting "copies of essential documents." *Id.* The complaint does not mention who might have sent these e-mails or when they might have been sent. CSM contends that the claim refers to an e-mail from its vice president Brian Moe to another employee, Jennifer Lauinger, asking the employee to "Please send MSA (and CDA) also." Def.'s Mem.- Mot. for S.J. on Pl.'s Claims at 15 (quoting Def.'s Ex. 33). CSM says that the employee did not respond to this request, citing her deposition and CSM's interrogatory answers. In response, Merix says "the jury can reasonably choose to disbelieve" the employee's statement that she did not respond to the e-mail. Pl.'s Resp. at 18. "If the jury disbelieves her," Merix contends, "then it can logically conclude that CSM allowed those responsive documents to be removed or destroyed." *Id.*

Merix's argument does not allow it to avoid summary judgment. A claim that a jury might disbelieve an opposing party's version of events, without more, is insufficient to give rise to a genuine factual dispute. *See, e.g., Muhammed v. City of Chicago*, 316 F.3d 680, 683-84 (7th Cir. 2002). To defeat a summary judgment motion, "the nonmoving party must point to specific facts showing that there is a genuine issue for trial; inferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009). Merix offers no "specific facts" to support its contention that e-mails actually existed that CSM lost, destroyed, or otherwise failed to produce.

For the reasons described, CSM is entitled to summary judgment on Merix's claim of negligent spoliation of evidence.

**F.      Consequential damages**

CSM has filed a separate summary judgment motion in which it argues that several elements of Merix's claimed lost profit and litigation damages are non-recoverable consequential damages because a jury could not reasonably find that they were foreseeable and contemplated by CSM.  CSM further argues that Merix cannot establish that any breach by CSM caused these damages.  Merix contends in response that its damages are recoverable because they were reasonably foreseeable to CSM, and CSM's breach was the cause of all the claimed damages.

The parties disagree about the standard for evaluation of consequential damages.  CSM contends that consequential damages are recoverable if they were "'the consequence of special or unusual circumstances' and, 'were within the reasonable contemplation of the parties' at the time of contract."  Def.'s Mem. on Conseq. Damages at 2 (quoting *Midland Hotel Corp.*, 118 Ill. 2d at 318, 515 N.E.2d at 67).  In its reply brief, CSM restates this purported rule, citing an Illinois appellate court case, to contend consequential damages are recoverable if "the damages were the consequence of special or unusual circumstances and were foreseeable and within the reasonable contemplation of the parties."  Def.'s Reply on Conseq. Damages at 1–2 (quoting *United Airlines, Inc. v. City of Chicago*, 2011 IL App (1st) 102299, ¶ 17, 954 N.E.2d 710, 716 (2011)).  CSM therefore argues that Merix must show its damages "were foreseeable to, and contemplated by, CSM as the probable result" of CSM's breach.  Def.'s Mem. on Conseq. Damages at 4.

In 2003, the Seventh Circuit dealt with a somewhat similar argument.  It stated that "[w]e doubt that Illinois requires 'express contemplation' of consequential

damages—or that, if it does, this phrase implies a subjective as opposed to an objective inquiry." *Linc Equip. Servs., Inc. v. Signal Med. Servs., Inc.*, 319 F.3d 288, 289 (7th Cir. 2003). The court explained that the English case of *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854), from which the rule of consequential damages arose, spoke only of "reasonably foreseeable" damages, not damages that the parties contemplated. *Id.* The court also examined Illinois law on the subject: "Although the phrase 'expressly contemplated' crops up in some Illinois cases, that state's judiciary has explained that it is used as a synonym for foreseeability." *Id.*

In short, the standard for consequential damages in Illinois requires an objective analysis of whether the damages were reasonably foreseeable to the parties, not an inquiry regarding whether the parties expressly contemplated the particular damages when they signed the contract in question.

### 1. Litigation with Merix as defendant

CSM does not dispute that "it was generally aware that Merix was being sued by GSK for false advertising, and that Merix was conducting a clinical trial regarding those claims." Def.'s Mem. on Pl.'s Conseq. Damages at 6. Yet CSM says that Merix cannot claim consequential damages associated with GSK's suit because CSM did not have "special notice that Merix planned to use the results of that clinical trial to facilitate a settlement with GSK, or that Merix was either unwilling or unable to settle until after the clinical trial was successfully completed." *Id.* at 7. As noted above, however, Merix need not show that CSM had "special notice" of the particulars of the litigation posture between Merix and GSK. It need only show that it was reasonably foreseeable that a breach of contract by CSM in invalidating the clinical trial would prolong the litigation for

which the clinical trial was intended, thus increasing expense to Merix. Given CSM's admission that it was aware of the nature of the litigation and that it was assisting in a clinical trial directly aimed at that litigation, a reasonable jury could find that it was reasonably foreseeable that invalidation of the trial caused by its breach would have the effect of prolonging or increasing the litigation and its associated expense.

CSM separately argues that Merix cannot show that CSM's breach caused its damages associated with GSK's lawsuit. Specifically, CSM contends that Merix cannot show that the litigation "would, in fact, have promptly settled upon the successful completion of the clinical trial and that it was CSM's deficient performance which caused the litigation to be prolonged" for twenty-eight months. Def.'s Mem. on Pl.'s Conseq. Damages at 9. Merix's contention that a successful clinical trial would have prompted settlement of GSK's suit against it is based on speculation, CSM argues, adding that Merix's contention is belied by the fact that it attempted to settle the case for specific dollar amounts after it discovered the clinical trial was invalidated.

Merix argues "that, had the PRACS clinical trial been completed on its original 'unblinding' date but with an unadulterated placebo, Merix would have been able to similarly move for" mediation that settled the dispute. Pl.'s Resp. at 24. As the basis for this contention, Merix relies primarily on a declaration by Squires, its CEO, as well as communications between counsel for Merix and GSK discussing settlement offers prior to the invalidation of the clinical trial. Despite this evidence, CSM contends that Merix does not have "any evidence from which a jury could reasonably conclude that GSK was willing to settle the litigation earlier, that the parties would have agreed on the amounts to be paid, or that a successful clinical trial was the only impediment to

settlement."  Def.'s Reply on Conseq. Damages at 7.

Merix's argument on the proximate cause of its expenses defending against the GSK lawsuit boils down to this:  Merix could not realistically settle with GSK until it had a favorable clinical trial result in its pocket, and CSM's part in delaying the acquisition of this favorable trial discouraged Merix from settling.  This contention comes directly from the declaration of Merix's CEO Squires:  "Merix could not earlier settle with GSK by agreeing to a permanent injunction (without proof of efficacy from a placebo-controlled clinical trial)."  Pl.'s Ex. 22 ¶ 10; *see also id.* ¶ 7 ("Merix had *no choice* but to continue the GSK litigation while obtaining clinical trial proof of efficacy.").  This may be a self-serving statement by Squires, but the Seventh Circuit has repeatedly held that "evidence presented in a 'self-serving' affidavit or deposition is enough to thwart a summary judgment motion."  *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 175 (7th Cir. 2011); *see also Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) ("[W]e long ago buried—or at least tried to bury—the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is 'self-serving.'").

CSM's arguments to the contrary—that Merix was ready to settle before generating a successful clinical trial result, belying its contention that it could not settle without such a result—show only that there is a factual dispute on this question, not that Merix's claim lacks merit.  "To survive summary judgment," a nonmovant "need not prove his claim; he need only show that there is a genuine issue of material fact."  *Gil v. Reed*, 381 F.3d 649, 659 (7th Cir. 2004).  Thus CSM is not entitled to summary judgment on the recoverability of damages claims it incurred in defending the GSK

lawsuit as a result of the alleged contractual breach.  It is left to the trier of fact to determine whether Merix can prove its damages in the lawsuit by a preponderance of the evidence.[5]

## 2. Litigation initiated by Merix

The result is different for litigation Merix itself initiated and for which it now demands compensation from CSM.  CSM contends that Merix cannot establish that any contractual breach by CSM caused Merix to file and then incur expenses in its own lawsuit against GSK in Illinois.  It argues the same regarding Merix's malpractice lawsuit against Winston & Strawn, its former counsel in the GSK litigation, along with the amounts Merix paid to another law firm to serve as its counsel in the malpractice lawsuit.  Finally, CSM says Merix cannot show CSM's breach caused it to hire Merix's current counsel, Richard Cannon, on a $20,000 weekly retainer while it prosecuted its malpractice suit against Winston & Strawn.

### a. Merix's lawsuit against GSK

CSM contends that Merix cannot show that the lawsuit it initiated in Illinois was caused by CSM's breach of the Releev clinical trial.  Merix responds that the suit "became a necessary part of Merix' defense" against GSK's suit, because the court in that case "did not permit Merix to assert the same IL claims (of GSK's bad acts)

_____

[5] The Court notes, however, that Merix appears to misinterpret the language of the preliminary injunction that was entered against it in the GSK suit in 2005.  Merix says the court enjoined Merix's claims about Releev "unless and until Merix obtains 'a clinical study concerning RELEEV® which is conducted in accordance with principles which are generally approved by the scientific community.'"  Pl.'s Resp. at 23 (quoting Pl.'s Ex. 43 at 2).  Although the injunction includes the quoted passage, it does so in a different context.  It says Merix is enjoined from making any claims about its product "except that" it may refer to a clinical study of the type described.  *See* Pl.'s Ex. 43 at 1–2.  The Court does not read injunction to say that it will be lifted upon Merix conducting such a study.

simultaneously in NJ as part of Merix' 'unclean hands' defense."  Pl.'s Resp. at 25.

Therefore, Merix argues, "Merix could not withdraw those IL claims without a favorable

ruling, without also negating Merix' 'unclean hands' defense to GSK's request for

injunctive relief in NJ."  *Id.* at 26.  This argument does not respond to CSM's clearly

accurate contention that CSM's breach did not cause Merix to file the Illinois suit against

GSK.  Arguments about Merix's hesitance to withdraw its voluntarily-filed claims have

nothing to do with CSM's breach associated with another litigation.  In any event, even if

the Illinois lawsuit constituted a reasonable strategic move by Merix in connection with

its dispute with GSK, that does not make it a reasonably foreseeable element of

damages; no reasonable jury could so find.

### b.    Merix's lawsuit against its former counsel

CSM argues that Merix cannot recover for its expenses associated with its suit

against its former counsel, Winston & Strawn, including its payment to new counsel to

prosecute the suit.  Merix contends Winston & Strawn withdrew from representing Merix

in "the GSK litigation" and that Merix then "prudently challenged" Winston & Strawn's

prior billings, presumably in a lawsuit.  Pl.'s Resp. at 25.  The resolution of that

challenge (Merix does not specify whether it was settled or litigated to a decision)

"obtained a significant reduction in the total, thus promoting settlement with GSK."  *Id.*

At the outset, the Court observes that Merix cites no admissible evidence in

making its argument on this issue.  Regardless, it is of no consequence whether the

ultimate resolution of the lawsuit against Winston & Strawn helped "promot[e] settlement

with GSK."  The fact that the lawsuit might have freed up funds to help settle the GSK

litigation does not mean that CSM's alleged botching of the clinical trial relating to the

GSK suit caused the filing or prosecution of the separate legal malpractice suit. In addition, it was not a reasonably foreseeable consequence to CSM that its actions in a clinical trial associated with one lawsuit could prompt Merix to sue its counsel in that lawsuit for malpractice. No reasonable jury could find either that CSM's alleged breach caused Merix to sue Winston & Strawn and pay for new counsel to do so or that CSM could have foreseen such a consequence when it contracted with Merix.

### c. Merix's hiring of Cannon

CSM further argues that Merix cannot recover the amounts it paid to its current counsel, Cannon, in 2007. CSM cites a deposition of Squires in which she testified she paid Cannon $20,000 per week for "Weekly retainer for coordination and supervision of numerous patent files in foreign prosecution oversight of litigation strategies and billings." Def.'s Ex. H at 321–22. CSM contends that Merix cannot recover for Cannon's legal work on patents not related to this case and that in any event, Cannon cannot testify about this work at trial in the present case because he is Merix's attorney in this case. As with Merix's pursuit of litigation against its former counsel and the funds it expended to prosecute that suit, Merix has not provided evidence that would permit a reasonable jury to find a causal connection between CSM's breach of the Work Order and the hiring of Cannon. That aside, Merix's need to retain another lawyer (Cannon) because of its dealings with another firm it has previously hired was not a foreseeable consequence to CSM when it contracted with Merix to assist with the clinical trial.

### 3. Lost advertising funds and lost profits

The same result holds for Merix's request for damages associated with its lost profits. CSM contends that Merix cannot show that its damages for future lost profits

were foreseeable to or contemplated by CSM:

> When Brian Moe signed the subject Work Order, neither he nor anyone else from CSM could reasonably have foreseen that a failure to properly perform contract packaging and labeling services in connection with the PRACS Clinical Trial, and for which Merix was to be paid $14,700, could cause Merix to incur . . . $46.6 Million in lost profits from diminished future sales of RELEEV.

Def.'s Mem. on Pl.'s Conseq. Damages at 6. CSM argues that the chain of inferences required to render Merix's lost profits foreseeable is too tenuous. First, CSM says, one would need to foresee that the extra expense that Merix incurred due to the prolongation of the GSK litigation prevented it from advertising Releev; then, one would have to foresee that proper allocation of those funds to advertising would have prompted "meteoric growth" in Releev sales. *Id.* at 8. CSM also contends that Merix has no basis to show that CSM proximately caused its lost profits.

In response, Merix says CSM knew that the clinical trial was associated with its defense in the GSK litigation, which CSM does not dispute. Merix goes on to argue, however, that "it cannot credibly be disputed that a company which obtains a successful clinical trial, supporting the efficacy of its product, will foreseeably seek to publicize that favorable result to enhance its marketing, and that funds used for prolonged litigation would not be available for advertising." Pl.'s Resp. at 21. Therefore, Merix contends, "it cannot be gainsaid with credibility that Merix' inability to market and invest, and the resulting opportunity damages such as lost profits and curtailed brand growth, were not reasonably foreseeable as a necessary consequence of CSM's failure to prevent ruination of the PRACS clinical trial." *Id.* at 21–22.

Aside from its assertion that its arguments "cannot be gainsaid with credibility," Merix cites no evidence and offers no logical argument to support its contention that its

lost profits were a foreseeable result of CSM's alleged breach relating to the clinical trial. As the Court has indicated, one reasonably could find that a party who knows that a contracted task is associated with another party's defense in a lawsuit could foresee that breach of the contract would cause problems in the litigation. But there is no reasonably foreseeable answer to the question of what the aggrieved party might have done instead with the funds it had to spend on the prolonged litigation, let alone what results some alternative expenditure of those funds might have produced. Indeed, Merix's contention that the alternative use of these funds would have caused a meteoric increase in its sales of Releev and resulting profits can only be characterized as wildly speculative. No reasonable jury could find such lost profits to be a reasonably foreseeable result of CSM's breach of its contractual obligations. [6]

Consequential damages based on Merix's speculation associated with how it might have spent its funds and how those funds might have spurred profits are thus not recoverable. CSM is entitled to summary judgment on its argument that Merix cannot recover those damages.

### 4.    Damages resulting from fraud

Merix also argues that the standard for assessing fraud damages is different from the rule for damages resulting from breach of contract. Merix notes, however, that "there is some overlap in determining proximate cause for fraud damages." Pl.'s Resp. at 19. In Illinois, recovery in a fraud case is limited "to those damages which might foreseeably be expected to follow from the *character* of the misrepresentation itself." *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 61, 643 N.E.2d 734, 748 (1994)

---

[6] Given this conclusion, the Court need not evaluate CSM's motions to exclude the testimony of Merix's experts who have offered opinions on Merix's lost funds or profits.

(internal quotation marks omitted).  Put another way, "damages must be a proximate, and not remote, consequence of the fraud."  *Id.* at 59, 747.

The alleged misrepresentation on which Merix bases its fraud claim concerned whether CSM had executed the CDA.  Considering the character of that misrepresentation, the foreseeable result was that Merix would be induced to reveal confidential information to CSM, and perhaps be inspired to hire CSM to assist with the clinical trial, which CSM was aware was associated with the GSK litigation.  Given the character of the misrepresentation, the foreseeable consequences are no different from those foreseeable when CSM signed the Work Order.  Indeed, Merix does not argue that the character of CSM's alleged fraud regarding execution of the CDA made Merix's future lost profits and self-initiated litigation expenses any *more* foreseeable than in connection Merix's claim for breach of contract.  The same analysis thus applies to the consequential damages that Merix seeks on both claims.  In short, the Court's conclusions on the limitation of Merix's consequential damages flowing from its breach of contract claim apply equally to its fraud claim.

### Conclusion

For the reasons stated above, the Court denies Merix's motion for summary judgment [dkt. nos. 273 & 279]; grants CSM's motion for summary judgment [dkt. nos. 270 & 283] as to counts 5 (breach of confidential disclosure agreement), 7 (breach of master services agreement), 8 (conspiracy), and 9 (negligent spoliation) in Merix's Fourth Amended Complaint; and grants CSM's motion for summary judgment on consequential damages [dkt. no. 285] on all but Merix's claim for damages incurred in its defense of GSK's New Jersey lawsuit.  The Court also terminates as moot Merix's

motion for relief from Local Rule 56.1(b)(3) [dkt. No. 322] because the Court has not taken CSM's invitation to grant summary judgment or find various matters to be admitted based on noncompliance with the rule. The Court also terminates defendants' motions to bar the testimony of certain expert witnesses [dkt. nos. 266, 267, 287 & 288] in light of the rulings made on the summary judgment motions. The case remains set for a status hearing on Monday, July 21, 2014 at 9:30 a.m. Counsel should be prepared to discuss the anticipated length of the trial in light of the Court's rulings.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 17, 2014