**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MERIX PHARMACEUTICAL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:11-cv-03318 |
| | ) | |
| v. | ) | Judge: Hon. Matthew F. Kennelly |
| | ) | Magistrate: Hon. Sidney Schenkier |
| CLINICAL SUPPLIES MANAGEMENT, INC.; | ) | |
| | ) | |
| Defendant. | ) | |

**CSM'S MOTION FOR JUDGMENT AS A MATTER OF LAW
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 50(a)**

Defendant Clinical Supplies Management, Inc. ("CSM") requests entry of judgment as a matter of law in its favor with respect to Plaintiff Merix's claims for Breach of Contract and Fraud. Further, CSM submits the evidence does not support Merix's claim for consequential and punitive damages. In support, CSM states as follows:

**STANDARD OF LAW**

Federal Rule of Civil Procedure 50(a) states:

If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

In determining whether judgment as a matter of law is appropriate, "the question is simply whether the evidence as a whole, when combined with all reasonable inferences permissibly drawn from that evidence, is sufficient to allow a reasonable jury to find in favor of the plaintiff." *Hall v. Forest River*, 536 F.3d 615, 619 (7th Cir. 2008). In order to withstand entry of judgment as a matter of law, the evidence supporting a finding in favor of plaintiff must be

substantial. *See Mut. Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 612 (7th Cir. 2001). A "mere scintilla" of evidence is not sufficient to defeat a motion for judgment as a matter of law. *Hall*, 536 F.3d at 619.

## ARGUMENT

### I. Punitive Damages

No evidence has been presented that would enable the jury to find a legally sufficient basis to award punitive damages to Merix. Illinois law governs the substantive standard which this Court must employ in determining whether punitive damages are appropriate. *Medcom Holding Comp. v. Baxter Travenol Laboratories ("Medcom")*, 106 F.3d 1388, 1402 (7th Cir. 1997). Illinois courts "take a rather dim view" of punitive damages "and insist that the plaintiff seeking them demonstrate not only simple fraud, but gross fraud, breach of trust, or other extraordinary or exceptional circumstances clearly showing malice or willfulness." *AMPAT/MIDWEST v. Illinois Tool Works ("AMPAT")*, 896 F.2d 1035, 1043 (7th Cir. 1990)(internal citations and quotations omitted). In other words, "punitive damages should not be awarded absent a finding of culpability that exceeds bad faith." *Medcom*, 106 F.3d at 1402.

Further, "to justify punitive damages, the allegedly outrageous conduct must involve some element of outrage similar to that usually found in a crime." *Roboserve v. Kato Kagaku*, 78 F.3d 266, 276 (7th Cir. 1996). Accordingly, "without evidence of gross fraud or some exceptional circumstances clearly indicating malice or willfulness – if the evidence demonstrates only a garden variety fraud – under Illinois law **the question of punitive damages is not even submitted to a jury**." *Id*. (emphasis added)

In Illinois, deceit alone cannot support a punitive damages award. *Id*. Instead, "a plaintiff seeking punitive damages…must at least put forth some evidence of intent to injure." *Id*. (finding

in breach of contract and fraud case that without malicious conduct and intent to harm, district court erred in not granting defendant's motion for judgment as a matter of law on the question of punitive damages). Decisions from Illinois federal courts are instructive on this point.

In *AMPAT*, the plaintiff was a window contractor that was hired to install windows in a Chicago building. 896 F.2d at 1038. To fulfill its contract, the plaintiff purchased screws manufactured by the defendant for use in the installation. *Id*. The screws were defective, which substantially increased the plaintiff's cost of performing its window installation contract. *Id*. The plaintiff sued the defendant under theories of breach of contract and fraud, including a request for punitive damages. *Id*. The plaintiff alleged that the defendant made fraudulent misrepresentations regarding testing of its product and the gravity of the product defect as well fraudulent omissions in failing to disclose a similar defect at another site and the test results regarding the replacement product given to the defendant. *Id*. at 1040. In upholding the district court's finding that punitive damages were not appropriate, the Seventh Circuit found that while the defendant should not have lied, it did have some reason to believe in the misrepresentation it was making. *Id*. at 1044. The court further found that there was indication that the hazard created by the fraud was not great. *Id*. Although the court found irresponsible behavior on the part of the defendant, there was "no suggestion that the fraud was designed to make money…or to hurt [plaintiff]." *Id*.

The U.S. District Court for the Northern District of Illinois similarly granted a motion for judgment as a matter of law on the issue of punitive damages in *BP Amoco Chemical v. Flint Hills Resources*, 2009 U.S. Dist. LEXIS 131270 (N.D. Ill. 2009). In that case, the plaintiff claimed fraud arising out of an alleged misrepresentation regarding the defendant's production capacity. *Id*. at *2, 8. In granting judgment as a matter of law, the court found that "failing to

verify the accuracy of the representation does not, without more, permit imposing disfavored punitive damages under Illinois law." *Id*. at *8-9. The court further explained that "what is missing from the record is any evidence of [the defendant's] intentionally misrepresenting the production capacity numbers with the purpose of (or in reckless disregard of) harming [the plaintiff]." *Id*. at *9. The court held that considering the evidence as a whole and "drawing all reasonable inferences in [the plaintiff's] favor, there is, at most, a mere scintilla of evidence supporting an award of punitive damages. That is not sufficient." *Id*. at *10.

In the instant case, the record is completely devoid of evidence of even "garden variety" fraud, much less fraud rising to the level of gross fraud, malice, or intent to injure. Merix's claim for punitive damages is based upon its contention that CSM either misrepresented that it had signed a Confidential Non-Disclosure Agreement ("CDA") or concealed that it had not done so. Specifically, Meryl Squires testified that during an alleged telephone conversation of October 5 or 6, 2005, (that lasted either six and a half or thirty minutes), she asked PRACS representative Vicki Clauson whether CSM had signed her CDA, and Vicki Clauson said "Yes." (Trial Transcript, at 261; 366). Ms. Squires thereafter testified that she heard "a man's voice" say "Uh-huh" or "Um-hm." *Id*. at 261. The only information in the evidentiary record about the identity of the "man's voice" was that "it was the voice nearest." *Id*. at 366. No other purported participant on the phone conversation has a recollection that such a phone call ever took place. *See id.* at 684. Ms. Squires further admitted that CSM did, in fact, sign a CDA with PRACS which obligated CSM not to disclose information it may gain in the course of its relationship with PRACS or any PRACS client (such as Merix). *Id*. at 368; 391-92.

Taking the evidence as a whole, Plaintiff has not shown even a scintilla of evidence that CSM committed a gross fraud of outrageous conduct with an intent to injure, harm, or

wrongfully induce Merix that would warrant this Court submitting the issue of punitive damages to the jury. At best, the evidence shows that PRACS, and not CSM, misrepresented whether CSM had signed Merix's CDA and that an unidentified male voice uttered a sound which Ms. Squires took to infer agreement with Ms. Clauson. As stated in *BP Amoco Chemical,* failing to verify the accuracy of Ms. Clauson's omission does not permit the imposition of disfavored punitive damages. Just as in *BP Amoco Chemical*, what is missing from the record is any evidence of CSM's intentionally misrepresenting the signing of the CDA for the purpose of harming Merix. 2009 U.S. Dist. LEXIS 131270 at *8-9.

In fact, CSM did sign a CDA which obligated it not to disclose Merix's confidential information. Accordingly, as in the *AMPAT* case, to the extent a misrepresentation was made by Ms. Clauson, CSM did have some reason to believe she was telling the truth, and there is no evidence that such misrepresentation was wrongful and intentional or was an attempt to induce Merix to agree to have CSM work on this project.

Moreover, there is no evidence of record that CSM knew there was a distinction between the CDA it signed with PRACS and a separate CDA with Merix. Further, the hazard in the alleged misrepresentation made by Ms. Clauson was non-existent, as CSM had already signed a CDA that it would not disclose confidential information about Merix. *AMPAT*, 896 F.2d at 1044. There is no evidence that the alleged fraudulent misrepresentation or omission was made with wrongful intent or "designed to make money…or to hurt [plaintiff]." *Id*. In fact, the evidence establishes that CSM actually <u>lowered</u> the offer price of its services from $17,350 to $14,700 following the alleged October 5th or October 6th phone call. (Trial Transcript, at 276-77).

Finally, "punitive damages cannot be assessed against a corporation for the acts of its agents or employees under a theory of *respondeat superior.* It must be shown, rather, that the

responsible employee was acting in a managerial capacity or that his acts were authorized or ratified by the corporation." *Jannotta v. Subway Sandwich Shops*, 125 F.3d 503, 513 (7th Cir. 1997)(internal citations and quotations omitted). Merix has offered no evidence regarding the identity of "the man's voice" that allegedly made a fraudulent misrepresentation or omission. As a result, the record is devoid of information about "the responsible employee" and whether he was acting in a managerial capacity. Without more, punitive damages cannot be assessed against CSM as a matter of law in Illinois.

## II. Fraud

Merix's fraud claim arises out of the same alleged October 5 or October 6, 2005 telephone call discussed above between Ms. Squires, PRACS' Vicki Clauson, and CSM's Brian Moe and Stephen Purdy. Ms. Squires testified that during this call, Ms. Clauson told her that CSM had signed the CDA, and that an unidentified male voice uttered "Uh-huh" or "Um-hm." (Trial Transcript, at 261). This telephone call—which Mr. Moe, Mr. Purdy and Ms. Clauson do not recall having occurred—is Merix's only scintilla of evidence in support of its fraud claim. (Trial Transcript, at 684, 1052-53, 1155-56). While it is unclear whether Merix's claim is one for fraudulent concealment or fraudulent misrepresentation, what is clear is that Merix has not presented sufficient evidence for a reasonable jury to have a legally sufficient evidentiary basis to find in its favor under either theory.

In Illinois, fraud must be established by clear and convincing evidence of each and every essential element of the claim. *Mack v. Earle M. Jorgensen Co.*, 467 F.2d 1177, 1179 (7th Cir. 1972). In order for a plaintiff to demonstrate fraudulent concealment under Illinois law, it must prove by clear and convincing evidence: (1) the concealment of a material fact; (2) that the concealment was intended to induce a false belief, under circumstances creating a duty to speak;

(3) that the innocent party could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist; (4) that the concealed information was such that the injured party would have acted differently had he been aware of it; and (5) that reliance by the person from whom the fact was concealed led to his injury. *Trustees of AFTRA Health Fund v. Biondi*, 303 F.3d 765, 777 (7th Cir. 2002) (citing *Schrager v. North Community Bank,* 767 N.E.2d 376, 381-82 (Ill. Ct. App. 2002)).  Importantly, the concealment "may not be a mere passive omission of facts during a business transaction, but must have been done "*with the intention to deceive* and under circumstances creating an opportunity and duty to speak." *Perlman v. Time, Inc.*, 380 N.E.2d 1040, 1044 (Ill. Ct. App. 1978)(citations omitted)(emphasis added); *accord Park v. Sohn*, 433 N.E.2d 651, 654 (Ill. 1982).

The elements of a cause of action for fraudulent misrepresentation are similar to those for fraudulent concealment.  To establish fraudulent misrepresentation, a plaintiff must prove by clear and convincing evidence: (1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) with the intent to induce the other party to act; (4) the other party's justifiable reliance on the truth of the statement; and (5) damages resulting from reliance on the statement. *BP Amoco Chem. Co. v. Flint Hills Res., LLC*, 615 F.Supp.2d 765, 784 (N.D. Ill. 2009) (citing *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill.2d 179, 193 (1989)). Further, "it is well established that a misrepresentation is fraudulent either where a party makes the representation knowing it is false or where the misrepresentation was made with a reckless disregard for its truth or falsity." *BP Amoco Chem. Co.*, 615 F.Supp.2d at 784 (citing *Gerill Corp.*, 128 Ill.2d at 193).

Courts in the Seventh Circuit do not look favorably on fraud claims that are based on

what can, at best, be called a misunderstanding. The U.S. District Court for the Northern District of Illinois recently granted summary judgment on a fraud claim involving a misunderstanding in *Northbound Grp., Inc. v. Norvax, Inc.*, 11 C 6131, 2013 WL 6987185 (N.D. Ill. Dec. 3, 2013). In that case, the defendants filed a counterclaim alleging that the plaintiff provided knowingly false information regarding its customer relationships and its life insurance lead purchases in order to induce the defendants to enter into an asset purchase agreement. *Id*. at *16. In particular, the plaintiff purportedly represented that it had customers who were "willing to purchase thousands of life insurance leads per month," even though they knew that they were offering these customers a type of insurance lead that the defendant did not provide and did not want to provide because of the high cost of generating those types of leads. *Id*. The court, however, was unpersuaded. In granting summary judgment on the counterclaim, the court emphasized that "[t]he vague 'representations' [the defendants] allege are at best, overly-hopeful projections about future sales, and at worst, misunderstandings about mutual expectations— *nowhere near actionably fraudulent misrepresentations*." *Id*. at *17 (emphasis added).

A. <u>There is No Evidence of Intent</u>

This case, like *Northbound Grp., Inc.*, involves what can only be described as a simple misunderstanding at best. There is no evidence that CSM *intended* to mislead Merix into believing that CSM had signed the Merix-PRACS CDA or *intended* for Merix to rely on Clauson's misstatement in deciding to go forward with using CSM as the contract packaging and labeling company for the PRACS clinical trial. Even assuming Mr. Moe or Mr. Purdy took part in the alleged October 5 or 6, 2005 telephone call with Ms. Squires, and even assuming one of them uttered, "Uh-huh" or "Um-hm", such a response was, at best, a misunderstanding and, at worst, inadvertence. Merix has provided no evidence of any motive or intent to suggest CSM

would not have entered into the Merix-PRACS CDA as represented by Ms. Clauson.  In fact, as discussed above, the undisputed evidence shows that CSM did, in fact, execute a CDA with PRACS in January of 2005, which by its terms applied to the PRACS clinical trial and all other projects that CSM would be engaged in with PRACS.  (Trial Transcript, at 368).  Further, there is no evidence that Mr. Moe or Mr. Purdy knew or believed Ms. Clauson's statement was false or that the utterance—an "Uh-huh" or "Um-hm"—was made with a reckless disregard for its truth or falsity.  In light of this evidence, no reasonable jury could find the alleged unidentified male utterance was made with the intent to induce Merix into believing that CSM had signed the Merix-PRACS CDA in order to get hired as the contract packaging and labeling company for the PRACS clinical trial.  Without any evidence of intent, much less evidence that is clear and convincing, Merix's fraud claim fails as a matter of law.

     B.  <u>There is No Evidence of Duty</u>

A claim for fraudulent concealment under Illinois law requires intent under circumstances creating a duty to disclose material facts.  Merix has presented no clear and convincing evidence that would allow a reasonable jury to determine that such a duty existed here.  A duty to disclose arises only when the parties have "a special or fiduciary relationship, which would raise a duty to speak."  *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 401 (7th Cir. 2011) (citing *Neptuno Treuhand–Und Verwaltungsgesellschaft Mbh v. Arbor*, 692 N.E.2d 812, 817 (Ill. Ct. App. 1998)).  There is no duty to speak absent a fiduciary or other legal relationship between the parties.  *Neptuno*, 692 N.E.2d at 817 (citing *Magna Bank v. Jameson*, 604 N.E.2d 541, 544 (Ill. Ct. App. 1992); *Warner v. Lucas*, 541 N.E.2d 705, 707 (Ill. Ct. App. 1989)).  This Court previously ruled as a matter of law that CSM did not owe Merix a fiduciary duty, and Merix has offered no clear and convincing evidence at trial which would

allow a jury to reasonably conclude that CSM and Merix had any other legal relationship that would give rise to a duty to disclose under the law. (Dkt. No. 107, p. 13).

C. Merix Could Have Discovered the Truth Through Reasonable Inquiry or Inspection

Merix also failed to provide clear and convincing evidence that it "could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection," which is an element required for a claim of fraudulent concealment. *Trustees of AFTRA Health Fund*, 303 F.3d at 777. Merix could have easily discovered that CSM did not sign the Merix-PRACS CDA if it merely requested a copy of the document from CSM. Yet Ms. Squires admitted she never even made a request to CSM for a copy of the signed CDA. Instead, Ms. Squires testified that she went forward with using CSM as the contract packaging and labeling company without requiring a copy of the signed CDA for her inspection and review. (Trial Transcript, at 394–95). There is no evidence that Merix was prevented from making a reasonable inquiry into the truth of Ms. Clauson's alleged statement regarding CSM's execution of the Merix-PRACS CDA.

D. There is No Evidence of Injury or Harm Caused by the Alleged Fraud

Finally, Merix did not introduce any evidence that it was damaged as a result of CSM's purported fraud. In order to establish this element under either theory of fraud, Merix needed to present clear and convincing evidence that it suffered damages as a result of its reliance on the alleged "Uh-huh" or "Um-hm." There is no evidence at all, much less clear and convincing evidence, that the absence of a signed Merix-PRACS CDA in any way caused the presence of benzalkonium chloride in the placebo product or the damages Merix incurred while litigating against GSK from April 19, 2006 to August 25, 2008. As such, CSM is entitled to judgment as a matter of law on Merix's fraud claim.

### III. Breach of Oral Contract

When submitting its proposed jury instructions less than one month ago, Merix announced for the first time that it intended to pursue a theory based on breach of oral contract, despite the fact that such an allegation has never been pled by Merix in the Complaint nor any of the four Amended Complaints it later filed. Specifically, Merix contends in its proposed jury instructions that "Merix also claims it is entitled to recover contract damages from CSM for breach of a separate oral contract between the parties." (Dkt. No. 408, Final Pre-Trial Order, App. D, at 38). CSM is entitled to judgment as a matter of law on Merix's new allegation because 1) the statute of limitations has expired on such a claim, and 2) no evidence has been presented which would give the jury a legally sufficient basis for concluding there was formation of a valid oral contract.

### A. The Statute of Limitations Has Expired

Illinois' statute of limitations for breach of an unwritten contract is five years. 735 ILCS 5/13-205. The statute of limitations "begins with knowledge, express or implied, of a breach of the contract." *Anderson v. Doss*, 271 N.E.2d 109, 110 (Ill. Ct. App. 1971). Ms. Squires testified she first learned in April 2006 that the placebo for the PRACS clinical trial was manufactured to include benzalkonium chloride, invalidating the clinical trial. (Trial Transcript, at 337-39). Merix's complaint was filed May 17, 2011. (Dkt. 1, Complaint). The time between Merix's knowledge of the alleged breach and the filing of its Complaint thus exceeds five years. Accordingly, neither this Court nor the jury has a legally sufficient basis to find for Merix on its oral contract theory. Merix's oral contract theory is barred by the applicable statute of limitations, and judgment as a matter of law against Merix is appropriate.

B.  There is No Evidence an Oral Contract Was Formed

Additionally, no evidence has been presented to allow the jury to find that a valid oral contract even existed. Under Illinois law, "a plaintiff asserting breach of an oral contract bears the burden of establishing the existence of the contract and all material terms." *Exipno v. Advo, Inc.*, 1997 U.S. Dist. LEXIS 4347, at *4 (N.D. Ill. 1997). Accordingly, the plaintiff must establish "offer, acceptance, consideration, plaintiff's performance, defendant's breach, and damage." *Id*. Additionally, the oral contract must be "sufficiently definite and certain so that the terms are either determined or may be implied. When material terms and conditions are not ascertainable, no enforceable contract is created." *Id*.

Illinois courts have found that general or informal conversations or representations are insufficient to constitute an oral contract. *See Kraftco Corp. v. Kolbus*, 274 N.E.2d 153 (Ill. Ct. App. 1971). In *Kolbus*, the alleged oral contract at issue involved representations made during a conversation with a manufacturer inquiring as to the sale of a distributorship. *Id*. at 155. In dismissing the claim for breach of an oral contract, the court found that the "representations alleged do not appear to have the strength of a contractual commitment and appear as general statements made by a third party on inquiring as to what would be done…" *Id*. The court further found that "the representations appear informal and do not set forth terms of any purported agreement." *Id*.

It appears Merix is alleging it entered into a "separate" oral contract with CSM based upon the alleged telephone conversation that occurred on either October 5 or October 6, 2005. Ms. Squires testified that the conversation lasted six and a half minutes. (Trial Transcript, at 260). She testified that she told CSM that she needed them to be her "eyes and ears" and that she

needed experts to "handle" the clinical trial and "make sure everything was right." *Id.* at 263. She further testified that Brian Moe responded that CSM "can handle it." *Id.*

Importantly, Ms. Squires testified she did <u>not</u> offer CSM additional money to perform the work discussed on the telephone call. *Id.* at 371. Thus, there is no evidence of consideration. Furthermore, there is no evidence of sufficiently definite terms and conditions of this separate oral contract. As Ms. Squires testified, the conversation was only six and a half minutes long, and the discussion involved several topics, including Squires' purported desire to have "eyes and ears" to "handle" the clinical trial. No evidence has been presented to outline the material terms of the oral contract. There is no evidence of a meeting of the minds as to how CSM would endeavor to be Merix's "eyes and ears", what would be included in their "handling" of the clinical trial, the services provided, the duration of the oral contract, or the price. Ms. Squires' testimony regarding an alleged oral contract amounts to mere general and informal requests – requests that do not have the strength to trigger a contractual commitment.

## IV. Consequential Damages Claim

No evidence has been presented which provides the jury with a legally sufficient basis to award consequential damages on either Merix's breach of contract or fraud claims. Whether sounding in breach of contract or tort, a Plaintiff must prove all elements of it causes of action. Both Merix's breach of contract and fraud claims require proof of damages resulting from the wrongdoing alleged. Merix has offered no legally sufficient proof regarding the amount of consequential damages sustained as a result of CSM's alleged conduct.

The law mandates that "a 'plaintiff has the burden of proving damages to a reasonable degree of certainty.'" *Haslund v. Simon Prop. Group, Inc.,* 378 F.3d 653, 658 (7th Cir.2004) (*quoting Williams v. Bd. of Educ.,* 52 Ill.App.3d 328, 367 N.E.2d 549, 553 (1977)). While

damages need not be proven with the certainty of calculus, they cannot be based on pure speculation or guesswork. *BE & K Const. Co. v. Will & Grundy Counties Bldg. Trades Council,* 156 F.3d 756, 770 (7th Cir.1998); *Razor v. Hyundai Motor America*, 854 N.E.2d 607, 626 (Ill. 2006)("basic contract theory requires that damages be proved with reasonable certainty and precludes damages based on conjecture or speculation"); *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946)(finding a jury's estimate of damages must be based on relevant data). In other words, a "plaintiff is not permitted to throw himself on the generosity of the jury. If he wants damages, he must prove them." *Taliferro v. Augle*, 757 F.2d 157, 162 (7th Cir. 1985).

Merix is now requesting $3,102,137.59 in consequential damages. Throughout this litigation, Merix's calculation of those damages has been based on the premise that it could have promptly settled with GSK had the PRACS clinical trial been successful. However, Merix never introduced any evidence that it *would* have settled (even assuming it *could* have settled) had the PRACS clinical trial been successful, a glaring omission that is fatal to Merix's consequential damages theory and calculation. Merix has presented absolutely no evidence to support its theory, leaving the jury to engage in rank speculation and guesswork in the absence of any relevant data.

The only evidence of record regarding settlement in the GSK litigation is that 1) throughout settlement negotiations, GSK always insisted on a permanent injunction that could be publicized; 2) Merix received the Riley study results in March 2008; and 3) the case was sent to mediation in May 2008 and settled thereafter when Merix agreed to entry of the injunction GSK had been insisting on from the onset of settlement negotiations. (Trial Transcript, at 349-50; 567-69). Specifically, Merix has presented no evidence as to when a settlement would have occurred

had the PRACS clinical trial been successful or what the terms of the settlement would have been. Even Merix's own expert, Mr. Weinstein, testified that he could not determine when such a settlement would have taken place, whether a mediation would have been necessary, or what the terms of the settlement would have been. (Trial Transcript, at [1]).

Merix's calculation assumes that the GSK litigation would have settled on April 19, 2006 – the day Merix learned that the PRACS clinical trial was invalidated – but Merix offers no evidence to support such an assumption. Without such crucial information as to when, how, and for what amount the case would have settled if the PRACS clinical trial had been successful, the jury has no relevant data upon which to rely in calculating any consequential damages owed to Merix. Any consequential damages calculation awarded by the jury would be based upon pure speculation and guesswork and is thus specifically prohibited under Illinois law. Merix has presented no sufficient legal evidentiary basis to permit the jury to calculate consequential damages. Accordingly, judgment as a matter of law should be granted against Merix on its prayer for consequential damages.

<div style="margin-left:40%">

Respectfully submitted,

SEGAL MCCAMBRIDGE SINGER & MAHONEY, LTD.

By: /s/ Brian Eldridge
     Jeffrey Singer (ARDC No. 2620510)
     jsinger@smsm.com
     Brian H. Eldridge (ARDC No. 6281336)
     beldridge@smsm.com
     Adam J. Jagadich (ARDC No. 6280278)
     ajagadich@smsm.com
     233 South Wacker Drive, Ste. 5500
     Chicago, Illinois 60606
     (312) 645-7800
     Attorneys for Defendant Clinical Supplies
     Management, Inc.

</div>

---

[1] Mr. Weinstein's testimony is being offered via video deposition, which had not been presented to the jury at the time this motion was drafted. The testimony cited occurs at pp. 185-86 of his deposition.

**APPENDIX TO CSM's RULE 50(a) MOTION**

**TRIAL TRANSCRIPT EXCERPTS**

M. Squires - direct

1    call that we've been referring to previously as occurring

2    between CSM and PRACS and yourself?

3    A.  Yes.  I accidentally wrote down October 6th, but it was

4    October 5th.  I sometimes do that when making notes.

5    Q.  Okay.  And that shows a conversation for six minutes and 30

6    seconds?

7    A.  Yes.

8    Q.  All right.  Now, the phone call was made at 4:31 p.m.  Does

9    that indicate anything to you whether it was prearranged or

10   happenstance?

11   A.  It was a scheduled call.

12   Q.  And who scheduled the call?

13   A.  Vicki called and said she would set up a conference call.  I

14   could call in, and she would bring the other parties on line

15   from CSM.

16   Q.  And to the best of your recollection, did that occur?

17   A.  Yes.

18   Q.  And what happened during that telephone call?  What was

19   stated to you first?

20   A.  Well, first Vicki introduced everyone.  And it was fast

21   introductions.  So, I was trying to listen.  There was a man's

22   voice who was closer, and then there was a man's voice who was

23   far away.  She introduced a Brian Moe and a Stephen Purdy.  And

24   introduced Merix, me, to them.

25   Q.  All right.  And what, if anything, was stated next?

M. Squires - direct

1   A.  Well, she began to tell them about Merix, and I said, "Wait

2   a minute, Vicki.  Have they signed my CDA, my confidential

3   disclosure agreement," and she said, "Yes," and I heard a man's

4   voice say, "Uh-huh" or "Um-hm," and he was saying yes.

5   Q.  Okay.  Did you make it clear that you were referring to

6   Merix's CDA, not just a CDA?

7   A.  I said my CDA.

8            MR. CANNON:  Let's show Exhibit 38, please.

9            THE COURT:  Is this one in evidence?

10           MR. CANNON:  It's in evidence, your Honor.

11           THE COURT:  Okay.

12           MR. CANNON:  If it's not --

13           THE COURT:  You'll let me know.

14           MR. CANNON:  -- I will follow the court's instructions

15   and let you know.

16           THE COURT:  All right.  Appreciate it.  Thanks.

17           MR. CANNON:  It was actually shown to the jury

18   yesterday.  How do I get rid of the line across here?

19           THE COURT:  One of the things says clear.  If you tap

20   real hard in that corner, it makes it go away.

21           MR. CANNON:  Okay.  Thank you, your Honor.

22           All right.  If you would scroll down.  Okay.  Stop.  Go

23   up just a little bit.  Right there.  Stop.  Okay.

24           There's still underlining.  I can't get it to color to

25   highlight.

M. Squires - direct

1    Q. And what, if anything, did you tell them about your intended

2    involvement in the ongoing clinical trial?

3    A. I told them I had to be hands off. I was instructed that I

4    had to be hands off and not involved in the clinical trial.

5    Q. Did you indicate anything about your or Merix's prior

6    experience with clinical trials?

7    A. I told them I knew nothing about them. I had never been

8    involved in that kind of a clinical trial before.

9    Q. Did you ask CSM for any information or statements regarding

10    their expertise?

11    A. I told them that I needed them to be my eyes, ears, that I

12    needed experts to handle this clinical trial for me to make sure

13    everything was right, and they told me, whoever was closest -- I

14    believe it was Brian Moe -- told me that they're the experts,

15    they can handle it.

16    Q. Did they tell you anything about is that something they

17    normally do?

18    A. Well, they said this is their business. This is what they

19    do.

20    Q. Did you ask them anything about the cost of the clinical

21    trial?

22    A. I did. I asked them if they could please lower the price.

23    Q. And did you ask them anything about testifying regarding the

24    clinical trial?

25    A. That was very important to me. I asked them if they could

1          MR. CANNON:  Okay.  We might be one number off.

2   Try 131.  Actually, the dates are in your list.  It's dated

3   October 6th, 2005.  So if you look around 130 . . .

4          (Brief pause.)

5          MR. CANNON:  I apologize, your Honor.  I must have

6   been working late.  It's actually 137.  No, it's not.

7          (Brief pause.)

8          MR. CANNON:  We were one number off, your Honor.

9   It's 129.

10         If you could, scroll down to the page that's

11  Bates-numbered CSM 00051 on the right-hand side.  Stop.

12  BY MR. CANNON:

13  Q.   What is the price that is now being quoted by CSM?

14  A.   15,045.

15  Q.   Just to remind the jury, the previous quote was 17,350;

16  is that correct?

17  A.   Yes.

18  Q.   So there is a reduction in price and --

19         MR. CANNON:  Scroll back up to the first page of

20  this document.

21  BY MR. CANNON:

22  Q.   What date is this document?

23  A.   October 6th, 2005, 10:35 a.m.

24  Q.   So the next morning after the date and time of the phone

25  call that you have testified to, you get a reduced price

1    quote, correct?

2    A.   Yes.

3             MR. CANNON:   Can we see Defendant's 282?

4    BY MR. CANNON:

5    Q.   Does Jennifer Lauinger in this document send an updated

6    work order to Vicki Clauson at PRACS?

7    A.   Yes.

8             MR. CANNON:   If you could, open up the attachment,

9    please, and go to Page 4 of 6.

10            THE COURT:   The exhibit number is?

11            MR. CANNON:   282, Defendant's 282, your Honor.

12   BY MR. CANNON:

13   Q.   In fact, what is the price quote that is actually

14   transmitted to Vicki Clauson?

15   A.   14,700.

16   Q.   So the price went from 17,350 to 14,700; is that

17   correct?

18   A.   Yes.

19            MR. CANNON:   Now, if you could, show Exhibit 133.

20   And please, before you open it, confirm that it's dated

21   October 7, 2005.

22   BY MR. CANNON:

23   Q.   This is an exhibit that's an e-mail from Vicki Clauson

24   to Brian Moe, dated the next day, October 7?

25   A.   Yes.

1     A.  Yes.

2     Q.  And I'd ask you to read to the jury the sentence in the

3     third paragraph down starting with "I spoke with."

4     A.  "I spoke with Stacie Kirsch on August 12, 2005, and verified

5     that the placebo was manufactured with the same ingredients as

6     the test product, minus the active ingredient."

7     Q.  And then right below that, what does it say for test product

8     active ingredient?

9     A.  Benzalkonium chloride 0.13 percent.

10    Q.  So, not only had you instructed Stacie Kirsch that she's

11    supposed to leave out both the echinacea and the benzalkonium

12    chloride, but she's also told, according to this e-mail by Vicki

13    Clauson, that she's supposed to manufacture the product with the

14    same ingredients minus benzalkonium chloride, correct?

15    A.  Correct.

16         MR. CANNON:  All right.  And then if I can have Exhibit

17    112, please.

18    BY MR. CANNON:

19    Q.  And, again, Stacie Kirsch indicates on September 23 that

20    she's making the placebo without the active, correct?

21    A.  Yes.

22         MR. CANNON:  May I have Exhibit 261, please?

23    BY MR. CANNON:

24    Q.  Can you identify this document?

25    A.  It's a letter from Pharmaceutical Laboratories and

Squires - direct

1    Consultants, Inc.

2    Q.  And who are they?

3    A.  They do analytical testing.  Well, they do all kinds of

4    laboratory testing for products.

5    Q.  And why were they writing to Merix?

6    A.  They were writing in response to samples from the clinical

7    trial that I sent to them to be tested.

8    Q.  All right.  And what was their conclusion in the last

9    paragraph?

10   A.  "Vials were also tested for the presence of benzalkonium

11   chloride.  Vials from both lots A and B had benzalkonium

12   chloride.  Since both contained benzalkonium chloride, there was

13   no placebo.  This would invalidate a clinical trial."

14   Q.  All right.  Does their test results or their test report

15   indicate anything about whether or not Viracea was in the

16   placebo?

17   A.  No.

18   Q.  This talks strictly about benzalkonium chloride, correct?

19   A.  Yes.

20   Q.  They did not test to see if echinacea was also in the

21   placebo, did they?

22   A.  No.

23   Q.  Okay.  Are you aware of anyone that's done that test on the

24   placebo at any time since you learned that the clinical trial

25   had been ruined?

1    A.  Not to my knowledge.  No one tested outside, no.  Of any

2    laboratory.  No.

3    Q.  Now, you read the reports or the comments of the clinicians

4    from the PRACS clinical trial, correct?

5    A.  I'm sorry.

6    Q.  All right.  Let me rephrase.

7         Are you aware -- are you personally aware of any

8    reports being made that people in the clinical trial were

9    reporting burning sensations?

10   A.  From the clinical trial, that's what got my attention.

11   Q.  Okay.  What does it indicate to you as to whether or not the

12   placebo had Viracea in it?  In other words, that it had both

13   benzalkonium chloride and echinacea?

14   A.  That it did not have echinacea in it.

15   Q.  Why is that?

16   A.  Because Releev, the product that we market, is known to be

17   soothing and non-burning.  It doesn't irritate.  Echinacea

18   appears to provide a soothing effect and eliminate burning.

19   Q.  So, benzalkonium chloride by itself --

20   A.  Is an irritant.

21   Q.  -- creates burning, but with the echinacea it doesn't burn?

22   A.  That's been our experience for years.

23   Q.  Now, I heard an argument made by Mr. Singer that the test

24   results from the ruined clinical trial showed that both the

25   Releev active product and -- I'm going to put asterisks around

1    made a ruling on the amount, but I think it makes the rest of

2    the course of the settlement negotiations relevant.  You want to

3    show no, that isn't really what he's saying.  It's this.

4    Because you guys agreed to that.  So, how could it possibly have

5    been non-negotiable.  There you go.

6              MR. SINGER:  Very good.

7              THE COURT:  We're just going to do about five more

8    minutes.  Five minutes and we're going to stop.

9         (The following proceedings were had in open court, in the

10        presence and hearing of the jury:)

11             THE COURT:  Okay.  It's been awhile since you asked the

12   question.  So, why don't you put it again.

13   BY MR. CANNON:

14   Q.  Did Merix make any effort to settle with GlaxoSmithKline?

15   A.  Yes.

16   Q.  And did GlaxoSmithKline insist upon anything consistently

17   throughout whatever settlement negotiations occurred?

18   A.  Glaxo required the ability to disclose the injunction.

19   Q.  Did they require that the injunction be made permanent?

20   A.  Yeah.  They insisted that the injunction, the preliminary

21   injunction, be converted to a permanent injunction against

22   Merix.

23   Q.  And did Merix offer to do that, as long as it was kept

24   confidential?

25   A.  Yes.

Squires - direct

1    Q.  And what was GSK's response to that?

2    A.  They refused.

3    Q.  Did GSK ever deviate from those two conditions throughout

4    the entire term that is applicable here?  In other words, from

5    the date that the clinical trial was ruined up until the date

6    that settlement occurred, did they ever waiver from requiring

7    those two conditions?

8    A.  No.

9    Q.  They always wanted to publicize the entry of an order.

10   A.  Yes.

11   Q.  Okay.

12        MR. CANNON:  At this point the direct examination --

13        THE COURT:  Okay.  We're going to -- you're done with

14   your direct?

15        MR. CANNON:  I am.

16        THE COURT:  So, this is a good place to stop.  We're

17   going to stop for lunch.  As I said yesterday or today, we're

18   going to start up at 2:00.  We'll start with Mr. Singer's

19   questions at that point.  And then we're going to go 'til about

20   4:30 or maybe a smidgen after that.  So, don't discuss the case

21   with each other or anyone else.  You can go to lunch, and we'll

22   see you at 2:00.  All rise.  The jurors can come with me.

23        (Whereupon, the within trial was recessed to 2:00 o'clock

24        p.m. of the same day.)

25

1    Q.   She was the person you were primarily working with -- or

2    your company was working with day-to-day, correct?

3    A.   Yes.

4    Q.   And she is the one who you say you initiated a phone

5    call to that day to talk about a variety of issues, right?

6    A.   Yes.

7    Q.   And do you recall -- strike that.

8            The reason that you were -- strike that.

9            You are saying that Ms. PRACS made a

10   misrepresentation to you regarding the signing of a

11   confidential nondisclosure agreement and that there was some

12   kind of an "uh-huh" stated by one of the other individuals on

13   the phone; is that correct?

14   A.   I'm sorry.  You said Ms. PRACS?

15            THE COURT:  You said Ms. PRACS.  You meant Clauson.

16   BY MR. SINGER:

17   Q.   Ms. Clauson not PRACS.

18            Correct?

19   A.   Yes.

20   Q.   Now, do you know which individual said "uh-huh"?

21   A.   It was the voice nearest.

22   Q.   Nearest?

23   A.   It was a man's voice that was nearest.

24   Q.   You are certain that there were, with you, four people

25   on the phone?

1    handwritten notes that you wrote contemporaneously during the

2    telephone conversation of October 6th, 2005?

3    A.   No.

4    Q.   Do you see Brian Moe's name anywhere on the handwritten

5    notes that you purportedly authored that day?

6    A.   No.

7    Q.   Do you see anything about how critical or how essential

8    it is that a nondisclosure agreement be signed by CSM?

9    A.   No.

10   Q.   In fact, ma'am, you are aware today and for several

11   months now that CSM did sign a nondisclosure agreement with

12   PRACS in January of 2005 that applied to this clinical trial

13   and other projects that CSM would be engaged in with PRACS;

14   isn't that true?

15   A.   I know that they signed a CDA with PRACS.

16   Q.   And you are aware that that CDA, which we could present

17   to the jury -- in some minutes, we will -- encompasses all

18   confidential information that CSM may gain from PRACS or any

19   third party of a PRACS project; isn't that right?

20            You have read that CDA?

21   A.   I haven't read it.

22   Q.   Now, let's look at the handwritten note for a moment.

23   You have the initials M -- that means you -- and the initial

24   S -- and that's supposed to be Steve Purdy?

25   A.   It was whoever was talking.

1    BY THE WITNESS:

2    A.   I'm not understanding your question.

3    BY MR. SINGER:

4    Q.   I believe the record shows that you had a contract with

5    PRACS, and their role was the clinical research organization,

6    correct?

7    A.   Correct.

8    Q.   What did you understand PRACS's responsibility was?

9    A.   To write the protocol, to have oversight of the clinical

10   trial and the clinical trial multicenter sites, oversight of

11   all the data.  They oversaw the projects within the protocol

12   in the clinical trial.

13   Q.   They were the ones to manage and verify that everybody

14   was doing their job, correct?  PRACS?

15   A.   I believe so.

16   Q.   That's why you paid them over $900,000, correct?

17   A.   Yes.

18   Q.   And the contract that PRACS entered with CSM, for which

19   you also signed, was for the sum of $14,700, correct?

20   A.   Yes.

21   Q.   When you had this conversation on or about October 6th,

22   did you offer CSM any more money to do this verifying work?

23   A.   That was included in what I was supposed to pay them.

24   Q.   Did you offer them any more money?

25   A.   No.

1  Q  Did you ever persist and say, you know, I haven't gotten

2  the CDA, this is so important to me, I won't do this deal with

3  CSM unless I see the CDA?  Did you ask her for the CDA?

4  A  I didn't tell her I wouldn't do this if I didn't see it.

5  I took her word for it.

6  Q  In fact, ma'am, as this exhibit reveals, it was an

7  obligation of CSM to hold in confidence information it gained

8  during the course of its contractual relationship with PRACS

9  and all of PRACS's clients, correct?

10        MR. CANNON:  Objection, your Honor.  She's not here

11  as an expert witness to interpret --

12        THE COURT:  But laypeople can talk about contracts.

13  We've already had some of that testimony on direct, actually.

14  So he's asking for her understanding, not some sort of an

15  expert interpretation.

16        MR. CANNON:  Of which document?

17        THE COURT:  I've overruled the objection.

18        Of the document that is on the screen, which is

19  Exhibit 142.

20        MR. SINGER:  There in front of you.

21        THE WITNESS:  And the question again?

22        MR. SINGER:  May I ask the question be read back to

23  the witness, your Honor?

24        THE COURT:  The question is do they have an

25  obligation under that agreement not to disclose information.

1  BY THE WITNESS:

2  A   Yes.

3  BY MR. SINGER:

4  Q   Go to the last page of this exhibit, 142, page 5.  That's

5  a signature page of that nondisclosure agreement that PRACS

6  had submitted to CSM before or during January of 2005, right?

7  A   I don't -- I'm sorry.  I don't see the effective date on

8  here.  It has signatures, but it doesn't have the effective

9  date.

10          Yes, January -- here it is.  January 25th.

11 Q   January 25, 2005, right?

12 A   Yes.

13 Q   The effective date?

14 A   I can see that, yes.

15 Q   And the last page, page 5, has signatures that includes

16 Brian Moe's signature?

17 A   It does.

18 Q   And CSM, correct?

19 A   I said yes.

20 Q   So you would not have hired --

21          Well, wait a minute.  Who did hire CSM?

22 A   PRACS.

23 Q   Not Merix, correct?  The contract is not between Merix and

24 CSM; it's PRACS and CSM, correct?

25 A   Yes, I would suppose, just to get the benefits of that.

1    A    He said he didn't recall.

2    Q    And Ms. Clauson, she was interrogated for several hours as

3    well at deposition for this case, and she too doesn't recall

4    such a conversation ever occurring?

5         This is a conversation in October of 2005 supposedly

6    with the CSM people on the phone, correct?

7    A    I'm trying to remember her testimony.

8         MR. CANNON:  Your Honor, I'm going to object to this.

9         THE COURT:  Sustained.

10   BY MR. SINGER:

11   Q    Did you ever ask for -- I think I asked you a few minutes

12   ago whether you ever asked for the signed CDA signed by CSM

13   from PRACS, and I believe you said you don't recall ever doing

14   that?

15   A    I requested it?

16   Q    Right.

17   A    From PRACS?

18   Q    You did request it, but you don't recall it ever being

19   provided to you?

20   A    Yes.

21   Q    And you don't recall persisting in saying, you know, I

22   need the CDA, this is very important to me?  From PRACS.

23   A    No, I did not persist.

24   Q    And did you request a signed CDA from CSM?

25   A    Through Vicki?

1    Q    Through Vicki, through Brian Moe or Steve Purdy or anybody

2    with CSM.

3    A    Not directly, no.

4    Q    Well, is it your testimony that you would not have gone

5    forward with the packaging and labeling contract that PRACS

6    had with CSM without getting the CDA signed?  Is that what

7    you're telling the jury?

8    A    Yes.

9    Q    But you did go forward without the signed CDA for you to

10   even inspect and review, correct?

11   A    I took Vicki's -- I took their word for it.

12   Q    This is so crucial, so important to you that you have the

13   signed CDA, and you really didn't persist in trying to get it,

14   correct?

15   A    Correct.

16   Q    This is the so-called fraud that occurred here that you

17   didn't get the CDA that you didn't ask CSM to give you?

18            MR. CANNON:  Objection.  Argumentative.

19            THE COURT:  Sustained.

20            MR. SINGER:  Now, if we can put up Defense Exhibit

21   70.

22   BY MR. SINGER:

23   Q    And I believe this was presented you to earlier today by

24   Mr. Cannon during his direct examination of you.  And this is

25   a memo that Vicki Clauson of PRACS sent you on November 14,

1  Q   Each study population can end up giving different results,

2  correct?

3  A   Certainly.

4  Q   And so that's why you run a new placebo group in each time

5  you do a clinical trial, because you have to compare it to the

6  same population, if you will, where some are getting the

7  placebo and some are getting the active, correct?

8      MR. SINGER:  Objection, Judge.  Counsel is

9  testifying.

10     THE COURT:  Objection sustained.  Leading.  The

11  answer is stricken.

12  BY MR. CANNON:

13  Q   Can you turn to page 3 of 12.  I guess it's the fourth

14  page of the document.

15     What is the conclusion?

16  A   "Releev, when applied three times daily in this clinical

17  trial, was shown to be a safe and effective treatment of

18  recurrent HSL infection and compared favorably to other

19  treatments approved by the FDA."

20  Q   That was a favorable result?

21  A   Yes.  Very favorable.

22  Q   And the date of this document again was, if you'd turn to

23  the top page?

24  A   March of 2008.

25  Q   You mentioned the term earlier "vetted."  What does vetted

1  mean in this context of this report?

2  A  All the information is gathered along with the report by

3  the principal investigator.  It's then taken to statisticians

4  and others, who will verify that the results printed in that

5  report match the subject results.  So they run the -- and then

6  they run the statistical analysis properly to make sure that

7  everything matches what is being stated in the report.  And it

8  takes a bit of time to do that.

9  Q  So even though Mr. Riley -- excuse me, Dr. Riley had some

10  preliminary data results available for you, was that at that

11  point in time something that you could submit to a jury or to

12  GlaxoSmithKline?

13         MR. SINGER:  Same objection, Judge.

14         Also lack of foundation.

15         THE COURT:  Overruled.

16         You can answer.

17  BY THE WITNESS:

18  A  Was it something that could be submitted.  No, it --

19         THE COURT:  Not asking for a lawyer's opinion, but

20  just asking for your view as to whether it was something that

21  could be submitted to a court.

22         MR. CANNON:  Yes.

23         THE WITNESS:  No, because it had not been verified.

24  BY MR. CANNON:

25  Q  Okay.  And once it was verified, how long did it take

1    after that to elicit the Court's involvement in assigning the

2    case to mediation?

3    A    It went pretty fast.  I don't remember exactly, but I

4    believe by May we were going to mediation.

5    Q    Okay.  And, in fact, the case settled as a result?

6    A    It did.

7    Q    Okay.  And as part of that settlement, did you agree to

8    the entry of the injunction that Glaxo had been insisting

9    upon?

10   A    I did.

11   Q    And why were you willing to do it at that point?

12   A    Because I knew they couldn't hurt me with it.

13   Q    And the reason for that is?

14   A    Because I had a clinical trial that proved this was the

15   fastest healing treatment known, ever, so they couldn't

16   possibly hurt me with it.

17           MR. CANNON:  Can I see, please, Defendant's Exhibit

18   236.

19   BY MR. CANNON:

20   Q    I just want to call the jury's attention to the phone

21   number that this fax appears to have been sent to.  Do you

22   recognize that area code and phone number?

23   A    215?

24   Q    No.  Down here where it says to.

25   A    Oh.  That's my fax number, 847-277-1146.

1    PRACS, between CSM and PRACS?

2    A   No.

3    Q   Did CSM have any prior working relationship with Merix

4    Pharmaceutical Corporation?

5    A   No.

6    Q   Do you recall having a conversation over the telephone

7    with Vicki Clauson about the potential PRACS clinical trial?

8    A   I don't recall.

9    Q   Do you recall having a conversation over the telephone

10   with the president of Merix Pharmaceutical Corporation, Meryl

11   Squires, who's sitting to my right here?

12   A   I don't recall.

13   Q   Is it possible you had that conversation and you just

14   don't remember it?

15   A   I would have -- it's possible, but I believe if I would

16   have talked to a CEO of a pharmaceutical company that was

17   pursuing us, I would have remembered that.

18   Q   So as you sit here today you don't remember having a

19   conversation.  You believe that if you had the conversation,

20   you would have remembered it?

21   A   Correct.

22   Q   So are you denying that the conversation occurred?

23   A   I'm not denying that it didn't occur.

24   Q   I'm sorry, say that again.

25   A   I'm not denying -- I'm not saying that it occurred or

Purdy - deposition

1    A.  I have no recollection of that, no.

2    Q.  All right.  Did you have any involvement with Meryl Squires,

3    the Releev project, Vicki Clauson before you became engaged on

4    this e-mail on October 12th of 2005?

5    A.  I don't recall that at all, no.

6    Q.  Reading what you've seen here in this e-mail, is it fair to

7    say that this was your first involvement on the project?

8    A.  This would be typically how we were introduced as the

9    project manager, yes.

10   Q.  Now, Meryl Squires also claims that during the course of

11   this telephone conference that you had on October 6th, 2005,

12   that she discussed with you the fact that her business, Merix

13   Pharmaceuticals, was in litigation with GlaxoSmithKline.  Have

14   you ever heard of that fact before you became involved with this

15   deposition?

16   A.  Absolutely not.

17   Q.  So, you weren't on a telephone call with Meryl Squires on

18   October 6th of 2005 where she described the GlaxoSmithKline

19   litigation?

20   A.  I don't recall any conversation on that day, no.

21   Q.  And you have zero recollection of that or information about

22   it?

23   A.  I have no recollection, no.

24   Q.  And you have no information or recollection about speaking

25   with Meryl Squires; is that true?

Purdy - deposition

1    A.  That is true, yes.

2         MR. ELDRIDGE:  All right.  I want to mark -- I'll take

3    that exhibit back, please, sir.  Thank you.  I'm going to mark

4    as Exhibit 3 a five-page document, and I'll hand it to you and

5    hand a copy to counsel.

6    BY MR. ELDRIDGE:

7    Q.  All right.  Mr. Purdy, I've marked a three-page document as

8    Exhibit Number 4.  If you could go ahead and please identify

9    that document for the record.

10   A.  That is the packaging and labeling requirements for the

11   PRACS/Merix project.

12   Q.  What's the date on that document?

13   A.  October 14th, 2005.

14   Q.  And what's the purpose of this packaging and labeling

15   requirement?  This is the PLR?

16   A.  This is the PLR, yes.

17   Q.  What is the purpose of the PLR?

18   A.  It's detailing what we are doing with this particular

19   project, and it's at a higher level.

20   Q.  What does that mean, it's at a higher level?

21   A.  Well, it doesn't include the label text, the actual label

22   text, the actual batch records, so it's just pointing out the

23   specifics of the project.

24   Q.  This was -- this document was signed by you; is that right?

25   A.  Yes, it was.

1  Q.  All right.

2  A.  And she didn't know how to do it.

3  Q.  Okay.  So you don't remember the specific conversation,

4  but you remember the import of the information that she

5  conveyed to you?

6  A.  Yes.

7  Q.  Okay.

8          Prior to selecting CSM, did you have a discussion

9  with Meryl Squires about the three alternative bids that you

10  got?

11  A.  I don't remember.  It would have been standard to do

12  that.

13  Q.  Okay.  At some point did you obtain Meryl Squires'

14  acquiescence and/or agreement, whichever way you want to word

15  it, to select CSM?

16  A.  Again, I don't remember.  It would have been standard.

17  Q.  Okay.  Do you recall a conversation with Meryl Squires

18  on the phone when representatives of CSM were also on the

19  phone call?

20  A.  No.

21  Q.  So you don't recall a phone conversation where Brian Moe

22  and Stephen Purdy and yourself were all on the phone calling

23  Meryl?

24  A.  I don't right now, no.

25  Q.  Do you recall Meryl ever preconditioning any

1    conversation by first asking, did CSM sign her CDA, or
2    confidential disclosure agreement?
3    A.   I don't remember.
4    Q.   Do you remember Meryl Squires asking for a lower price
5    quote?
6    A.   I don't remember.
7    Q.   Do you remember Meryl Squires discussing with not only
8    yourself but with Brian Moe and Steve Purdy the fact that
9    Merix was involved in litigation with GlaxoSmithKline?
10   A.   No.
11   Q.   Do you remember Meryl Squires asking that language be
12   included in the work order that CSM would make itself
13   available to testify in that litigation?
14   A.   I don't remember that conversation.
15   Q.   You don't remember anything about it?
16   A.   I don't.
17   Q.   I'm asking these specific questions to see if they might
18   jog your memory.  That's why I'm going into those details.
19   Okay?
20          Do you remember Meryl Squires informing yourself
21   and also Brian Moe and Steve Purdy that she was supposed to
22   be hands-off in order to protect the work product privilege;
23   and so she was going to be relying upon PRACS and CSM to kind
24   of be her eyes and ears and make sure everything was done
25   properly, in accordance with the protocol?