**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**


**MERIX PHARMACEUTICAL CORPORATION,)**
)
    **Plaintiff,**   )
)
  **vs.**      )   **No. 11 C 3318**
)
**CLINICAL SUPPLIES MANAGEMENT, INC.,** )
)
    **Defendant.**   )


**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

  In 2005, Merix Pharmaceutical Corporation hired a company called PRACS

Institute, Ltd. to conduct a double-blind, placebo-controlled clinical trial comparing

Releev, a herpes drug manufactured by Merix, to a placebo. PRACS hired Clinical

Supplies Management, Inc. (CSM), the defendant in this case, to receive the clinical

supplies and label, package, and distribute them to the sites where the trial would occur.

CSM signed a work order, also signed by PRACS and Merix executives, which detailed

the services the company would provide. After the clinical trial was completed, Merix

discovered that the placebo CSM received from EMS, the manufacturer Merix hired to

produce the drugs for the trial, was adulterated. The placebo contained benzalkonium

chloride, the active ingredient in Releev, and therefore was not a placebo. Because of

the error, Merix claimed that the results of the trial were useless.

  Merix sought to hold CSM accountable for this error. Merix sued CSM, and the

case proceeded to a jury trial on two claims. First, the jury considered whether CSM

was contractually obligated to check the chemical makeup of the samples it received and if so whether CSM breached that contract by failing to discover the adulterated placebo.  Second, the jury considered whether CSM fraudulently induced Merix to hire CSM.  Merix claimed that a CSM executive intentionally lied when he said that he had signed a non-disclosure agreement with Merix and that Merix relied on that representation to its detriment.

The jury returned a verdict in favor of CSM.  Merix has moved for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b)(3) and for a new trial pursuant to Federal Rule of Civil Procedure 59 based on allegedly improper arguments made by CSM's counsel, Jeffrey Singer, during his closing argument.  Merix has also asked the Court to impose sanctions against Singer.  For its part, CSM has asked the Court to award costs incurred during the litigation pursuant to Federal Rule of Civil Procedure 54(d)(1).

**A.      Motion for relief from judgment and for a new trial**

A new trial is appropriate under Federal Rule of Civil Procedure 59 "if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party."  *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014).  Relief from final judgment under Rule 60 for misconduct by the opposing party is appropriate if the party seeking relief "had a meritorious claim that he could not fully and fairly present at trial due to his opponent's fraud, misrepresentation, or misconduct."  *Id*. at 651; Fed. R. Civ. P. 60(b)(3).  Relief under Rule 60(b) is "an extraordinary remedy and is only granted in exceptional circumstances."  *Willis v. Lepine*, 687 F.3d 826, 833 (7th Cir. 2012) (internal quotation marks omitted).

Because Merix argues that the same alleged misconduct entitles it to relief under either Rule 59 or Rule 60(b) without distinguishing between the two standards, the Court considers the motion for new trial as a unitary request, not two separate requests. *See id.* at 836 (stating that the standard for a new trial under Rule 59(a) is "substantially similar to Rule 60(b)(3)'s 'fully-and-fairly' standard" and concluding that "the district court did not err in examining the two motions together"). Merix is entitled to relief only if Singer acted improperly and his actions prejudiced Merix or prevented it from fully and fairly presenting its case. *Id.* at 834, 840. The Court considers five factors to determine whether an improper argument "deprived a party of a fair trial: (1) the nature and seriousness of the argument, (2) whether the statement was invited by the opposing party, (3) whether the statement could be rebutted effectively, (4) whether an effective curative instruction was given, and (5) the weight of the evidence." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 760 (7th Cir. 2013). "[I]mproper remarks made during closing arguments rarely are so serious as to constitute reversible error." *Venson*, 749 F.3d at 657.

### 1.      Arguments to which Merix did not object at trial

Merix's counsel, Richard Cannon, did not object to many of Singer's allegedly improper comments about which Merix now complains. Specifically, Merix now contends that Singer engaged in misconduct during his closing argument when he (1) attacked Meryl Squires, Merix's CEO and key witness; (2) discussed CSM's financial condition and the stakes of the litigation for CSM's employees; (3) mischaracterized pre-litigation communications between CSM and Merix; (4) suggested that the jury could go home earlier by checking two boxes on the verdict form; (5) encouraged the jury to

violate the Court's instruction prohibiting consideration of Merix's recovery in other lawsuits; and (6) compared Merix's allegations against CSM to Merix's false advertising about Releev's efficacy.  Merix did not interpose objections to these arguments during Singer's closing.

A party forfeits any post-trial challenge to opposing counsel's arguments by failing to object at trial.  *See Venson*, 749 F.3d at 657; *Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008).  Merix "should have voiced its objection . . . at the time the immoderate comments were made" and is now bound by its "decision to sit silent." *Gonzalez v. Volvo of Am. Corp.*, 752 F.2d 295, 298 (7th Cir. 1985) (declining to reverse a jury verdict, even though "counsel's conduct was grossly immoderate").  Merix has forfeited its challenges to each of these arguments by failing to object.

Even if Cannon had objected, however, the arguments in question were not inappropriate or were harmless.  First, with respect to Singer's accusations about Meryl Squires, it was appropriate for Singer to highlight inconsistencies in Squires's testimony, particularly because the contract and fraud claims turned on her credibility.  *See Ramsey v. Am. Air Filter Co.*, 772 F.2d 1303, 1311 (7th Cir. 1985).  Singer did not make his attacks in an inappropriate way.

Second, Singer's statements about CSM's net income and the stakes of the litigation for CSM's seventy employees were proper subjects for argument.  Contrary to Merix's assertion, Singer did not violate any ruling; the Court had barred testimony about the Squires family's finances, not CSM's financial condition.  *See* 9/4/2014 Tr. 109:14–110:2.  CSM's financial condition was relevant, because the jury was instructed to consider awarding punitive damages if it found CSM liable based in part on the

"amount of money [ ] necessary to punish CSM and discourage CSM and others from future wrongful conduct in light of CSM's financial condition."  Trial Tr. 1848:20–21.

Third, Singer's comments about pre-suit communications between Merix and CSM's attorneys did not unfairly prejudice Merix.  Singer said during his closing argument that

> the first communication we got from Merix, five years after invalidation of the clinical trial, [was] when she sued us.  That makes no sense.  If there was such an agreement for us to be her watchdog, her eyes and ears as pursuant to this contract, you would think she wouldn't be waiting five years to let us know that she holds us accountable.

Trial Tr. 1923:20–25.  According to Merix, the e-mails that the Court excluded showed that Merix and CSM communicated earlier than the date of filing suit and that CSM knew early on that it might be blamed for the error in the clinical trial.  Singer did make an inaccurate statement.  The filing of this lawsuit in 2011 was not the first communication between CSM and Merix; the companies' lawyers exchanged e-mails as early as 2010.  But Singer's misstatement during closing argument was harmless.  If anything, the e-mails that the Court excluded support Singer's suggestion that CSM did not know it would be blamed until 2011.  In the e-mails, Cannon offered to help CSM's attorney avoid producing discovery in response to a subpoena sent by EMS related to the Merix–EMS litigation.  *See* Pl.'s Mots. in Limine, Exs. 8–11.  Nothing in those communications suggested that Merix might hold CSM accountable.  Thus, even though Singer misstated the timing of the first communications between Merix and CSM, he was correct that Merix waited five years to hold CSM accountable.

Fourth, Merix contends that Singer improperly suggested that the jurors could go home earlier by checking two boxes on the verdict form.  Trial Tr. 1931:21–1932:7.  To

the contrary, there was nothing improper in Singer's request that the jury find in CSM's favor. Moreover, Cannon responded to this point during his rebuttal. *Id.* 1932:21–1933:3.

Fifth, Merix argues that Singer's statements suggesting that PRACS and EMS were to blame for the adulterated placebo violated the Court's instruction prohibiting the jury from considering Merix's recovery in other lawsuits for purposes other than bias. Singer highlighted EMS and PRACS employees' mistakes and asked why CSM, rather than EMS or PRACS, was being blamed for the failed study. *Id.* 1912:19–22, 1931:20. These statements did not encourage the jury to consider other awards obtained by Merix. Instead, the remarks supported the argument, which was developed by CSM throughout the trial, that Squires and the other companies involved in the study were to blame for the adulterated placebo, not CSM. This was an appropriate trial strategy and argument.

Sixth, Merix contends that Singer improperly discussed earlier false advertising claims against Merix. Before the PRACS clinical study, GlaxoSmithKline Consumer Healthcare, L.P. (Glaxo) sued Merix for false advertising, and a federal court in New Jersey issued a preliminary injunction prohibiting Merix from making claims about Releev's efficacy without a valid clinical study. Singer referred to Merix's claims against CSM as "another false and misleading claim," implying that Merix's allegations against CSM were similar to Merix's false advertising, and he noted that a federal judge "stepped in" to "stop what was deemed to be unfair competition." *Id.* 1893:22–23; 1909:3–10. Cannon did not object, and in any event this was fair argument. Before trial, the Court concluded that the false advertising claims and the preliminary injunction

were relevant to explain why Merix initiated the PRACS trial.  As the Court put it,

> if there's a problem from the fact that your lawsuit stems from the fact that
> the client got sued for false advertising, well, that's part of the background
> that you have to live with.  That doesn't entitle you to refute the false
> advertising claim.  That's not what this trial is about.

9/4/2014 Tr. 91:13–18.  In addition, as explained in the next section of this decision with

regard to a related point, Merix itself introduced the preliminary injunction into evidence,

including the judge's findings about Merix's claims concerning Releev.  Singer did not

cross the line when he alluded to the false advertising claims.

### 2.     Arguments to which Merix objected at trial

Cannon did object to several of Singer's remarks during his closing argument.

The Court addresses each argument individually and then considers the cumulative

effect of Singer's improper comments.

Merix contends that Singer violated the Court's instruction barring the jury from

considering evidence of other lawsuits filed by Merix for purposes other than bias, by

encouraging jurors to consider Merix's recovery in litigation against EMS and PRACS.

Specifically, Singer referred to Merix as a "serial litigant" during his closing argument

and stated that litigation "is part of their business."  Trial Tr. 1885:4–5.  The Court

sustained Cannon's objection, instructed the jury to disregard the comment, and

reiterated that the jury could consider litigation by Merix against other parties only for

the purpose of assessing the potential bias of certain witnesses.  *Id.* 1885:6–12.

Where, as here, opposing counsel immediately objects to an improper argument and

the court issues a curative instruction, the instruction is presumed to be effective.  *See*

*Christmas v. City of Chicago*, 682 F.3d 632, 642 (7th Cir. 2012); *Willis*, 687 F.3d at 834.

There is nothing here that rebuts the presumption.[1]

Merix argues that Singer improperly expressed his belief about Squires's honesty when he accused her of fabricating a letter for trial.  Merix offered the letter, written by Squires to her granddaughter, to rebut the testimony of employees of EMS, the drug manufacturer, who stated that Squires had instructed them to put benzalkonium chloride in the placebo while she was in Philadelphia.  The letter was intended to show that Squires did not instruct the manufacturer to put benzalkonium chloride in the placebo, as the letter indicated that Squires worked on Releev rather than the placebo during her trip.  The letter read:  "I went to the company that manufactures Releev for us [in Philadelphia]. . . .  We improved the way they will manufacture Releev."  Trial Tr. 306:5–7.  During his closing argument, Singer accused Squires of fabricating the letter and "us[ing] her granddaughter as a source for making money."  *Id.* 1927:25–1928:1.  The Court overruled Cannon's objection but directed Singer to "move forward."  *Id.* 1928:5.  Although Singer's comment that Squires was "pathetic" was unnecessarily derisive, it was not improper for him to challenge the authenticity of the handwritten note based on conflicting testimony elicited at trial.  *See Probus v. K-Mart, Inc.*, 794 F.2d 1207, 1210–11 (7th Cir. 1986) ("The tone of counsel's remarks here was unnecessarily harsh, perhaps even belligerent and derisive, but that does not mean that they were improper

---

[1] The Court will not consider the statements of individual jurors, which Merix submitted to show that Singer's improper arguments affected the verdict.  Specifically, certain jurors told a jury consultant that they did not want Squires "to get rich from suing" and "didn't understand why Merix was going after CSM and not the other two companies, . . . especially EMS."  Pl.'s Ex. 16 (Rudolph Aff.) ¶ 2.  When analyzing the validity of a verdict, courts are prohibited from considering "any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."  Fed. R. Evid. 606(b)(1).

argument.").

Merix argues that Singer repeatedly violated the Court's orders by discussing the details of the false advertising claims and the preliminary injunction opinion in the Glaxo litigation. The Court declined to exclude all evidence about the Glaxo case. Some background regarding that case was relevant and probative because "it set[ ] the background for the clinical trials" at issue in the present case. Trial Tr. 230:8–10, 235:18–22. Indeed, Merix itself contended that the preliminary injunction ruling in the Glaxo case was what prompted it to commission the clinical trials. That said, Merix correctly points out that the Court ruled, on two separate occasions, that Merix could not "retry" the underlying claims in the Glaxo case by attempting to show that the pre-marketing studies of Releev were scientifically valid. *See* 9/4/2014 Tr. 91:2–92:3 (final pretrial conference); Trial Tr. 230:8–21 (sidebar during testimony of Squires); *see also* Trial Tr. 235:23–236:1 (telling the jury that "this case is not about the dispute between [Glaxo] and Merix").

But despite knowing that it would not be able to relitigate the accuracy of the pre-marketing studies, *Merix itself* put in evidence regarding the adverse findings about those studies made by Judge Debevoise in the Glaxo suit. First, during his direct examination of Squires—after being told by the Court that he could not elicit testimony regarding whether Squires believed in the accuracy of the studies, *see* Trial Tr. 231:25–232:9—Cannon elicited the following testimony from Squires:

> Q: And without giving any details or itemizations of the clinical trial evidence that you had at that point in time, did you understand that you had clinical trial support for the claims that you had made on your package?
>
> A: I understood that I did, yes.

Q: All right. *But Judge Debevoise, the judge in that case, disagreed?*

A: *Yes.*

Q: Okay. And he entered an injunction, did he not?

A: He did.

*Id.* 236:10–19 (emphasis added).

When Cannon elicited from Squires testimony that the judge in the Glaxo case had "disagreed" with Merix's contention that it had clinical trial support for the efficacy claims on the Releev package, he did so knowing full well, given the Court's earlier ruling, that Merix was not going to be able to "retry" the accuracy of that contention.

Later during the trial, Merix itself introduced the full text of Judge Debevoise's preliminary injunction decision, which contained specific findings adverse to Merix regarding the accuracy of its claims about Releev. *See* dkt. no. 406 at 70 (final pretrial order; listing decision as PX 93). Merix introduced the judge's decision via the deposition testimony of Lawrence Weinstein, the lawyer who had represented Merix in the Glaxo litigation. During portions of Weinstein's deposition that Merix designated as evidence at trial, Merix introduced the preliminary injunction ruling and elicited testimony that the judge found Merix's reliance on the study in question to be "a very significant problem." *See* dkt. no. 409-11 at 38:24–41:21 (Weinstein dep. transcript; introducing the preliminary injunction ruling); dkt. no. 406 at 51 (Final pretrial order, App. A, designation of these pages by Merix). And Merix did not object to CSM's designation of testimony by Weinstein detailing the judge's findings regarding the falsity and lack of substantiation with respect to Merix's claims about Releev. *See* dkt. no. 409-11 at 152:4–156:20, 158:15–163:24 (Weinstein dep. transcript); dkt. no. 406 at 54 (counter-

designation of these pages by CSM; no objection by Merix indicated).[2]  Nor did Merix

seek any sort of a limiting instruction regarding how the jury should consider this

evidence.

Because of the admission of this evidence, most of it introduced by Merix and all

of it introduced without any objection by Merix, it was not inappropriate for Singer to

discuss the details of the false advertising claims and Judge Debevoise's findings during

his closing argument.  For instance, he argued that there was "no scientific basis" for

Merix's claim that Releev could prevent or heal herpes outbreaks in one day and that

the claim had been found to be false.  Trial Tr. 1886:4–13; *see also id*. 1887:3–10

("[T]he court found that the claims that Merix had made for Releev . . . had been found

to be literally false or false in a variety of ways; that the consumers could not help but

receive the impression that here is a wonder drug that can prevent [ ] cold sores and

can cure them in 24-hour period").   Singer also said during his closing argument that

studies "discredit [Merix's] one-day healing claims and demonstrate its falsity." *Id.*

1886:20–23.  Cannon objected that evidence about such studies had not been

presented to the jury, and the Court instructed Singer to move on to another topic. *Id.*

1886:24–1887:1.  But Singer's argument about the absence of a scientific basis for

Merix's claims about Releev was not inappropriate.  The argument was based on

---

[2] The Court notes that at the time it made the previously-referenced rulings and
comments above about not "retrying" the Glaxo case, it was unaware that Merix was
offering Judge Debevoise's preliminary injunction decision into evidence.  Merix listed
the decision as an exhibit among its 400-plus exhibits identified in the final pretrial order,
and at some point before the trial it also submitted the excerpts of Weinstein's
deposition that it wished to offer.  But the Court did not review the parties' exhibit lists in
detail before trial (and certainly did not commit them to memory), and it did not review
the Weinstein deposition designations at all until September 12, the day after Squires
completed her trial testimony.  *See* Order of Sept. 12, 2014 (dkt. no. 435, ruling on
objections to Weinstein testimony).

evidence that was in the record, largely because Merix introduced it.

By introducing some of this evidence itself, failing to object to the rest of it, and failing to seek a limiting instruction, Merix forfeited any legitimate objection to Singer's arguments. *See Christmas*, 682 F.3d at 640. For this reason, and because Singer's comments on Merix's claims about Releev's efficacy were based on evidence that was before the jury, his arguments were not inappropriate.

Singer did, however, cross the line when he referred to the public's need for safe and effective products and accused Squires of failing to conduct sufficient safety testing. He stated that "each and every one of us rightfully assumes that [a] product has been tested for safety and effectiveness." Trial Tr. 1888:6–7. Additionally, he remarked, "There is an expectation that before somebody starts putting healthcare products on the market [ ] they know that they are not going to hurt somebody and they know that the representations that they are making to the public are true." *Id.* 1888:9–13. He went even further by accusing Squires of intentionally deciding not to conduct safety testing before putting Releev on the market "because she didn't want to spend the money" and by saying that she was "ripping off consumers." *Id.* 1888:8–15; 1887:18–19; *see also id.* 1887:24–1888:3 ("Ms. Squires—not neglected—intended not to do a placebo-controlled, double-blind clinical trial before she introduced her product to the market."). According to Singer, the reason "Merix had engaged in false and misleading claims to us, to the consumers . . . . [was t]o make money." *Id.* 1885:18–21; *see also id.* 1886:4–8 (stating that Merix made baseless claims "[t]o make money").

These comments were improper. Singer's suggestion that Squires intentionally marketed an unsafe product was inflammatory, irrelevant, and not based on any

evidence that was presented to the jury. *See Wilson v. Groaning*, 25 F.3d 581, 587 (7th Cir. 1994) (finding certain testimony "highly inflammatory and totally irrelevant"). As the Court said to Singer at sidebar, "you are basically saying that Merix and Ms. Squires are a bunch of lying money-grubbers that were basically defrauding the public in order to obtain money. That's not what this trial is about." Trial Tr. 1889:17–21. There was no testimony concerning why Squires put Releev on the market before conducting a double-blind, placebo-controlled study

Singer's inappropriate accusations also took unfair advantage of one of the Court's pretrial rulings. Specifically, CSM moved before trial to bar evidence regarding Merix's financial condition. The Court ruled that evidence of Merix's financial condition was inadmissible unless CSM argued that Merix should have completed clinical trials more quickly. 9/3/2014 Tr. 67:14–70:25. CSM now contends that this ruling only related to Merix's financial duress after the Glaxo litigation, whereas Singer's reference during his closing argument was to Merix's failure to do a clinical study before putting Releev on the market. Although argument during the pretrial conference focused on the financial effects of the Glaxo litigation on Merix, CSM's motion was styled as a request to exclude *all* evidence of Merix's financial condition. Given the Court's ruling granting the motion and its instruction indicating that the early development and studies of Releev were not relevant, Merix had no opportunity to respond to Singer's accusations. According to Merix, it did not conduct a double-blind clinical trial earlier due to financial constraints. Thus because the Court had precluded Merix from eliciting testimony concerning its financial condition, it effectively could not reply to Singer's contention.

But although Singer's comments during this part of his closing argument were

inappropriate, Cannon objected, and the Court sustained the objection and instructed the jury that the false advertising claims were not at issue in the trial. The potential prejudice from Singer's improper comments was negated by the Court's prompt corrective action. *See Wilson*, 25 F.3d at 587; *Christmas*, 682 F.3d at 642.

Singer also took unfair and inappropriate advantage of the Court's ruling barring testimony related to Merix's financial condition when he remarked, "you would think that when [Squires] gets a valid clinical trial, the Riley study, that she would publish this in a scientific journal." Trial Tr. 1908:19–22. The Riley study was a valid clinical trial, whose favorable results were released in 2007, after the PRACS trial. CSM argues that Singer's statement was appropriate to show that a successful clinical trial was not as important to Merix as the company claimed. But Squires had testified during her deposition that the results of the Riley study were not published because of financial constraints. Pl.'s Mem. in Supp. of Mot. for Relief from J. and for a New Trial, Ex. 12 at 73:18–19:10. That was part of the evidence the Court effectively ruled out in granting CSM's motion to preclude evidence of Merix's financial condition, and thus Merix was unable to offer evidence about its reason for not publishing the Riley study. Thus Singer's argument was improper. The Court, however, immediately sustained Cannon's objection concerning the scientific journal argument. Trial Tr. 1908:11–12. This was sufficient to head off any unfair prejudice to Merix.

### 3. Cumulative effect

In addition to analyzing individually each of Singer's improper arguments to which Merix interposed a contemporaneous objection, the Court must analyze whether they prejudiced Merix cumulatively. To prevail on its cumulative effect argument, Merix must

show "(1) that multiple errors occurred at trial; and (2) those errors, in the context of the entire trial, were so severe as to have rendered [the] trial fundamentally unfair." *Christmas*, 682 F.3d at 643 (internal quotation marks omitted).  The Court reviews the trial record as a whole to determine whether Merix suffered prejudice, recognizing that improper comments during closing argument rarely require reversal.  *Id.*

The Court has identified three lines of improper argument to which Merix objected at trial:  (1) Singer's statements encouraging jurors to consider Merix's recovery in litigation against EMS and PRACS; (2) his accusations that Squires intentionally sold potentially unsafe products for financial gain; and (3) his comments about Merix's failure to publish the Riley study.  The Court sustained objections to each of these improper arguments and offered a curative instruction for all except the last. And even though the Court did not give a curative instruction on the last point, the Court emphasized at multiple points before and during closing arguments that the attorneys' statements were not evidence, which is "sufficient to remedy any harm that may have been caused."  *Willis*, 687 F.3d at 834; *see also Soltys*, 520 F.3d at 745.  The Court's response to these objections is presumed to negate any prejudice.  *Christmas*, 682 F.3d at 643; *Soltys*, 520 F.3d at 745.

Moreover, Merix's case was not terribly strong.  Both of its claims required the jury to believe Squires's testimony, and jurors were faced with a number of reasons not to believe her version of events.  In addition, with respect to the breach of contract claim, jurors were asked to consider an ambiguous contract that did not specify whether CSM was responsible for testing the materials that it packaged and labeled.  *See Merix Pharm. Corp. v. Clinical Supplies Mgmt., Inc.*, No. 11 C 3318, 2014 WL 3587294, at *5–

7 (N.D. Ill. July 17, 2014) (denying summary judgment to both parties on Merix's breach of contract claim because of ambiguity).  Although the work order stated that CSM would inspect products before release, this was listed as one of the packaging and labeling requirements.  CSM relied on this ambiguity and the testimony of its executives to argue that it was hired only to package and label and was not expected to conduct chemical analysis.  As additional support, CSM pointed out that it was paid only $14,700 for its services, whereas PRACS, the company that managed the clinical trial, was paid $935,000.  CSM emphasized that Merix, PRACS, and EMS were responsible for the chemical make-up of the placebo and that they were to blame for the error.  Squires, on the other hand, testified that CSM had a contractual obligation to test the samples, based on a CSM executive's verbal assurance that CSM would be Merix's "eyes [and] ears" to make sure the trial ran smoothly and that they were "experts."  Trial Tr. 263:11–15.  Thus although Merix's breach of contract claim survived summary judgment, it was wobbly at best.

Merix's fraudulent inducement claim, the precise allegations of which shifted between summary judgment and trial, was based on Squires's contention that a CSM executive told her over the phone that CSM had signed a non-disclosure agreement, when in fact it had not.  According to Merix, if CSM had not made this misrepresentation, Merix would have hired a different company to assist with the trial.  That company, Merix argued, would have required an identity test, and the adulterated placebo would have been identified right away.

To find for Merix on this claim, the jury would have had to believe that the phone call and misrepresentation occurred.  Yet Squires's testimony was inconsistent on that

point.  During her cross examination, she admitted that Merix's original pleadings did not list Brian Moe (CSM's vice president) as having participated in the phone call and did not mention any misrepresentation.  Yet Squires testified at trial that Moe was present and that he or Steve Purdy (a CSM project manager) verbally affirmed that CSM had signed the confidential disclosure agreement.  *Id.* 372:9–376:21.  Additionally, Squires stated during her deposition, and Merix alleged in its pleadings, that Squires received the call on October 6, 2005, but she testified at trial that she placed the call on October 5.  *Id.* 376:22–378:18.  And Singer elicited an admission from Squires that although she told the jury that the call lasted six-and-a-half minutes, she testified during her deposition that the call lasted thirty minutes.  *Id.* 380:15–382:8.  It is an understatement to say that Squires did not help her company's position on this claim.

Additionally, even if the jurors believed that the phone call occurred, they would have had to find that Merix was damaged due to its reliance on CSM's false statement.  It was reasonable for the jury to conclude that, even if there was a misrepresentation, the causal link between the statement and Merix's damages from the adulterated placebo was too tenuous—in other words, that Merix did not suffer damages as a result of the misrepresentation.  In short, Merix's fraud claim was no more solidly based than its breach of contract claim.

The cases that Merix cites in which new trials were ordered can be distinguished based on the egregiousness of the misconduct, the district court's response, and the weight of the evidence against the losing party.  In *Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753 (7th Cir. 2013), defense counsel accused opposing counsel of filing the lawsuit to coerce the defendant to license its technology to another company that was

not a party to the litigation. *Id.* at 758. Defense counsel devoted over half of his opening statement to attacking opposing counsel, without any admissible evidence to support the claim, and the accusations continued throughout the trial. *Id.* at 758–61. In that case, the improper arguments were numerous, serious, went unrebutted and uncured, and "the evidence did not so strongly favor [the prevailing party] that the error was harmless." *Id.* at 761–63. *Spicer v. Rossetti*, 150 F.3d 642 (7th Cir. 1998), involved accusations that opposing counsel did not actually believe his client's version of events. There, "defense counsel's conduct was grossly inappropriate," "the improper comments were an egregious attack into the heart of the plaintiff's case," and the district court improperly overruled plaintiff's counsel's objection. *Id.* at 644. And in *Joseph v. Brierton*, 739 F.2d 1244 (7th Cir. 1984), defense counsel "insinuated to the jury that a large judgment would ruin his clients, though he knew it would not cost them a cent," in contravention of the district court's exclusion of an indemnification agreement. *Id.* at 1247. In that case, the curative instruction was insufficient and the misconduct may have affected the verdict. *Id.* at 1246–48.

In this case, by contrast, Singer made only a handful of inappropriate comments to which Merix objected at the time, the weight of the evidence significantly favored CSM, and the Court immediately sustained objections to each improper argument. For these reasons, the Court concludes that Singer's inappropriate comments did not deprive Merix of a fair trial. Accordingly, the Court denies Merix's motion for relief from the judgment or for a new trial and denies its request for sanctions.

**B.  Bill of costs**

Because Merix is not entitled to a new trial or relief from the judgment, the Court

turns to CSM's request for an award of costs pursuant to Federal Rule of Civil Procedure 54(d)(1). Rule 54(d)(1) provides that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." The rule creates a "presumption that the losing party will pay costs." *Rivera v. City of Chicago*, 469 F.3d 631, 634 (7th Cir. 2006). Although the Court may exercise discretion in awarding costs, "the discretion is narrowly confined because of the strong presumption created by Rule 54(d)(1) that the prevailing party will recover costs." *Contreras v. City of Chicago*, 119 F.3d 1286, 1295 (7th Cir. 1997).

### 1.     Entitlement to costs

Merix argues that CSM is not entitled to costs because of Singer's misconduct at trial. The Seventh Circuit has recognized "only two situations in which the denial of costs might be warranted:  the first involves misconduct of the party seeking costs, and the second involves a pragmatic exercise of discretion to deny or reduce a costs order if the losing party is indigent." *Mother & Father v. Cassidy*, 338 F.3d 704, 708 (7th Cir. 2003). Courts have denied costs due to misconduct only in "exceptional circumstances." *Overbeek v. Heimbecker*, 101 F.3d 1225, 1228 (7th Cir. 1996).

Singer's conduct was not so exceptional as to be "worthy of penalty." *Smith v. DeBartoli*, 769 F.2d 451, 453 (7th Cir. 1985). Few courts have found attorney misconduct extreme enough to warrant a denial or reduction of costs. Those courts that have done so were faced with extreme misconduct that needlessly extended or delayed the litigation. For instance, the Seventh Circuit upheld the denial of costs when a prevailing party's repeated misconduct subjected the court and the opposing party to a "decade of protracted and needless litigation." *Overbeek*, 101 F.3d at 1228. A court in

this district found that a reduction of costs was warranted when the court had "presided over 146 contested motions—mostly concerning discovery disputes—the vast majority of which were resolved in Plaintiffs' favor," and the defendants' attorneys "engaged in repeated obstreperous pretrial conduct" and "fail[ed] to comply with this Court's discovery orders on multiple occasions." *Fairley v. Andrews*, No. 03 C 5207, 2008 WL 961592, at *3 (N.D. Ill. Apr. 8, 2008). On the other hand, a court in this district ruled that one instance of "alleged discovery misconduct . . . while unfortunate and by no means condoned, does not rise to the level of exceptional" when compared to the "exceptional misconduct described in the case law." *IWOI, LLC v. Monaco Coach Corp.*, No. 07 C 3453, 2013 WL 870208, at *1 (N.D. Ill. Mar. 6, 2013). Singer's comments during his closing argument, although improper, did not rise to such an egregious level that a denial or reduction of costs is warranted.

### 2. Amount of costs

"Taxing costs against a losing party requires two inquiries: (1) whether the cost imposed on the losing party is recoverable and (2) if so, whether the amount assessed for that item was reasonable." *Majeske v. City of Chicago*, 218 F.3d 816, 824 (7th Cir. 2000). Under 28 U.S.C. § 1920, a court may tax, among other costs,

> (1) [f]ees of the clerk and marshal; (2) [f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) [f]ees and disbursements for printing and witnesses; (4) [f]ees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case.

28 U.S.C. § 1920. CSM has submitted a bill of costs in the amount of $63,290.51, requesting recovery for (1) deposition transcripts, (2) video recordings of depositions, (3) the pretrial conference transcript, (4) trial transcripts, (5) photocopying and imaging,

(6) witness fees and travel and lodging expenses, and (7) process servers.

### a. Deposition transcripts

CSM seeks to recover a total of $19,928.17 for the transcripts of all nineteen depositions taken in the case. "[D]eposition costs (including transcripts) are authorized under § 1920(2) as stenographic transcripts" and are therefore recoverable. *Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 454 (7th Cir. 1998). The cost of a transcript or deposition that was "necessarily obtained" may be taxed, but the cost "shall not exceed the regular copy rate as established by the Judicial Conference of the United States . . . " Local Rule 54.1(b) (N.D. Ill.).

CSM and Merix agree that should the Court award costs, the original page rate in effect at the time of the depositions ($3.65 per page) applies to the nine depositions arranged by CSM. Thus, an award of $9,880.55 is appropriate for those transcripts.

The parties dispute the applicable rate for the ten depositions that Merix arranged. CSM argues that the Court should tax the full cost of the deposition transcripts for the depositions that Merix arranged, which totals $10,047.62, because CSM had no control over the selection of the court reporters. Generally, "Judicial Conference rates apply to deposition charges by private court reporters." *Cengr*, 135 F.3d at 456. Nonetheless, the Seventh Circuit has suggested that Judicial Conference rates do not apply "when the party who must bear the costs selected the court reporter—in other words, whoever picked the reporter can't later object to that reporter's rates." *Montanez v. Simon*, 755 F.3d 547, 558 (7th Cir.), *cert. denied sub nom. Montanez v. Chi. Police Officers FICO*, 135 S. Ct. 459 (2014); *see also Haroco, Inc. v. Am. Nat. Bank & Trust Co. of Chi.*, 38 F.3d 1429, 1441 (7th Cir. 1994) (observing that

the losing party had "selected the court reporters and therefore selected the court reporters' fees"); *Engate, Inc. v. Esquire Dep. Servs. LLC*, No. 01 C 6204, 2006 WL 695650, at *3 (N.D. Ill. Mar. 13, 2006). After reviewing the invoices listing CSM's payments for deposition transcripts, the Court concludes that CSM's request for reimbursement at the private court reporters' rates is reasonable based on the per-page rates involved ($2.40 to $4.77). Accordingly, the Court taxes Merix the full cost of the deposition transcripts for the depositions that it arranged.

Merix also argues that CSM cannot recover for deposition exhibits, because the exhibits were given to CSM during discovery and at the depositions. If this is true, then CSM cannot recover the costs of copying those exhibits. *See Cengr*, 135 F.3d at 456. Because CSM did not respond to this point in its reply, CSM has forfeited its argument that it is entitled to recover for deposition exhibits. The Court must assume that CSM already had copies of the deposition exhibits. The Court directs CSM to recalculate its request for deposition transcript expenses with exhibit costs excluded.

### b. Video recordings of depositions

CSM seeks to recover $4,736.38 for video recordings of the ten depositions Merix arranged and for videotaping the deposition of Steve Purdy. The cost of video recording and stenographic transcription may be taxed, provided that both are reasonable and necessary. *Little v. Mitsubishi Motors N. Am., Inc.*, 514 F.3d 699, 702 (7th Cir. 2008). "[A]lthough courts may not tax the costs of transcripts . . . provided merely for the convenience of the requesting attorney, a transcript need not be absolutely indispensable in order to provide the basis of an award of costs." *Majeske*, 218 F.3d at 825 (internal quotation marks and citation omitted).

Merix argues that the video recordings of certain depositions were not reasonably necessary, even though those depositions were noticed by Merix, because the witnesses were CSM's experts or employees over whom the company had control. The Court agrees. The record reflects that it was a matter of convenience, not necessity, for CSM to obtain the video recordings, given that these were its own employees and it had written transcripts of their deposition testimony.

By contrast, it was reasonably necessary for CSM to videotape Steve Purdy's deposition, because he was outside of the subpoena power of the Court and could not be called at trial. Thus, Merix is taxed the costs of videotaping Purdy's deposition. *See Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, No. 07 CV 623, 2014 WL 125937, at *4 (N.D. Ill. Jan. 14, 2014).

CSM is directed to recalculate its video recording costs to omit the expenses of the video recordings other than Purdy's deposition.

### c.    Pretrial conference transcript

CSM also requests $790.55 for the transcript of the pretrial conference. A prevailing party can recover transcripts under section 1920(2), including "trial transcripts and transcripts from other court proceedings necessarily obtained for use in the case." *Majeske*, 218 F.3d at 825. The Court rejects Merix's argument that the transcript was unnecessary because the Court issued an order ruling on the motions *in limine*. The Court stated that the written order was a summary of the rulings "the Court made in open court" and that "[e]ach of the rulings made in open court was described more fully at that time; the Court incorporates those explanations here." Order Regarding Mots. in Limine at 1. It was reasonable and necessary for CSM to order the transcript, so it

could tailor its trial presentation based on the Court's rulings.  Further, it was reasonable for CSM to request the transcript on an expedited basis, as trial commenced four days after the final day of the pretrial conference.  *See Allen v. City of Chicago*, No. 09 C 243, 2013 WL 1966363, at *3 (N.D. Ill. May 10, 2013) ("The costs incurred for the pretrial conference transcripts are reasonable; the court issued a series of oral rulings on motions in limine, jury instructions, exhibit and witness lists, and other pretrial matters, making it reasonably necessary for the City to obtain these transcripts to prepare effectively for trial.").  Accordingly, the Court taxes Merix $790.55 for the expedited transcript of the pretrial conference.

### d.    Trial transcripts

CSM also requests an award of $14,217.25 for the cost of the trial transcript (1,961 pages at an hourly rate of $7.25 per page).  Merix denies that the trial transcript was necessary and argues that CSM is not entitled to recover the higher hourly page rate.

Given the modest length of the trial, obtaining the transcript for purposes of witness examination and closing arguments was a matter of convenience, not necessity.  But given the focus of Merix's post-trial motion on language used by Singer in closing argument and the extent to which his arguments were supported by the evidence, it was reasonably necessary for CSM to obtain the trial transcript to respond to Merix's post-trial motion, except for the transcripts of the jury selection or opening statements, which were not needed to respond to the post-trial motion given the grounds it cited.  *See Majeske*, 218 F.3d at 825.  For this purpose, however, expedited production of the transcript was not reasonably necessary.  Thus Merix can recover only

at the regular rate of $3.65 per page for all trial transcripts, with the exception of the transcripts of the jury selection and opening statements, the cost of which cannot be recovered. CSM is directed to recalculate its request for trial transcript costs accordingly.

### e.    Photocopying and imaging

CSM requests $16,864.48 for photocopying, exemplification, and imaging. A prevailing party can recover fees for these items provided they are necessary and reasonable. 28 U.S.C. § 1920(4). A prevailing party may recover photocopying costs for documents provided to the court or the other parties, but not for those made for its own convenience. *See McIlveen v. Stone Container Corp.*, 910 F.2d 1581, 1584 (7th Cir. 1990). Additionally, the cost of converting files into electronic format for discovery is taxable. *See Hecker v. Deere & Co.*, 556 F.3d 575, 591 (7th Cir. 2009); *Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, No. 09 C 5619, 2014 WL 7205584, at *11 (N.D. Ill. Dec. 17, 2014); *Massuda v. Panda Express, Inc.*, No. 12 CV 9683, 2014 WL 148723, at *6 (N.D. Ill. Jan. 15, 2014).

The Court recognizes that CSM need not "submit a bill of costs containing a description so detailed as to make it impossible economically to recover photocopying costs. Rather, [CSM] was required to provide the best breakdown obtainable from retained records." *Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.*, 924 F.2d 633, 643 (7th Cir. 1991). But CSM has not even done this much. The invoices, for the most part, list only the number of pages and page rates and include no information about the documents that were copied or digitized. For instance, the invoices say things like: "Copies of trial exhibits for attorney review," "copies of discovery records for

paralegal review," and "Production of scanned documents to disk for Pracs-MX binders." Def.'s Mem. in Supp. of Bill of Costs, Ex. A at 51, 60, 78. With the exception of one invoice for $101.52 that lists the specific documents produced, the Court is unable to discern whether these documents were prepared for the Court or Merix or for CSM's convenience.

Nonetheless, the Court recognizes that this was a complex, paper-intensive case. For this reason, the Court awards CSM $101.52 for the document that contains sufficient description and one-third of the remaining photocopying and exemplification costs. CSM is directed to recalculate its costs accordingly.

### f.     Witness fees and travel and lodging expenses

CSM seeks $5,653.68 for fees and travel and lodging expenses incurred by Maxine Fritz (CSM's expert), Angela Buchanan (a CSM employee), Jennifer Lauinger (a CSM employee), and Gerald Finken (CSM's president and CEO). Together, "28 U.S.C. §§ 1821 and 1920(3) authorize the award of costs to reimburse witnesses for their reasonable travel and lodging expenses." *Majeske*, 218 F.3d at 825–26. Barring a statutory or contractual obligation, those statutes set the limit on what a prevailing party can recover for witness travel and lodging. *Crawford Fitting Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987). Witnesses may be paid $40 per day for attendance at trial or deposition and for time spent traveling before and after attendance. 28 U.S.C. § 1821(b). Witnesses are also compensated for actual travel expenses and for subsistence when an overnight stay is required. *Id.* § 1821(c)–(d)(1). Merix points out that CSM misstated the authorized witness expenses in its bill of costs. CSM has amended its bill of costs to reflect the correct statutory rate, which in Chicago is $194

per day for lodging and $71 per day for meals.

Merix argues that there is no evidence that CSM paid its employees any fee to testify at trial. CSM has not responded and has therefore forfeited the point. It is not entitled to recover witness fees for Buchanan, Lauinger, and Finken.

Merix also argues that it should not pay the travel and lodging expenses of CSM's president and CEO, Gerald Finken. The Court agrees. Employees of a corporation and its officers can be witnesses under section 1821. *See WH Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc.*, 25 F.3d 422, 430 (7th Cir. 1994); *Interclaim Holdings Ltd. v. Ness, Motley, Loadholt, Richardson & Poole*, No. 00 C 7620, 2004 WL 557388, at *6 (N.D. Ill. Mar. 22, 2004) ("[A] prevailing party is ordinarily not entitled to recover the expenses incurred by officers who attend the trial merely as corporate representatives, but is not barred from recovery of those costs for the days on which the corporate representatives were called as witnesses."). But if a corporate officer was personally involved in the litigation or was a party in interest, he is not considered a witness under the statute. *WH Smith Hotel Servs., Inc.*, 25 F.3d at 430; 10 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2678 (3d ed. 1998) ("The expenses of witnesses who are themselves parties normally are not taxable. For example, real parties in interest or parties suing in a representative capacity are not entitled to fees or allowances as witnesses."). In this case, Finken had a "level of interest in the litigation [that] would make him a real party in interest." *Schmitz-Werke GmbH + Co. v. Rockland Indus., Inc.*, 271 F. Supp. 2d 734, 736 (D. Md. 2003). As the president and CEO of a company with seventy employees, he had a personal interest in the outcome of the case. In fact, Singer highlighted the stakes of the litigation for CSM and the small,

intimate nature of the business during his closing argument when he referred to the seventy CSM employees "waiting to hear what you do."  Pl.'s Ex. 1 at 1930:25–31:2. And Finken sat at counsel's table for the entirety of the two-week trial, which shows that he had a personal interest in the case.  Thus, CSM is not entitled to recover Finken's travel and lodging costs.

Merix also disputes Jennifer Lauinger's travel expenses.  According to Merix, CSM is only entitled to recover for one night's lodging, as opposed to the three nights CSM requested.  Lauinger testified on September 18, 2014.  It was uncertain whether she would testify on September 17 or 18, so it was reasonable for her to stay in Chicago the night of September 16 in the event that she had to testify the following day.  She did, however, finish her testimony well before lunch on September 18 and could have traveled back to her home in Fargo, North Dakota that day.  Accordingly, CSM can recover for two nights for Lauinger's lodging.

Apart from these issues, Merix does not dispute the hotel, airline, or meal expenses submitted by CSM.  The Court finds the expenses reasonable and taxes $1,281.08 for Fritz, $1,003.20 for Buchanan, $1,366.20 for Lauinger, and $0 for Finken.

### g.    Process servers

CSM also requests $1,100 that it paid to private process servers to effectuate service of subpoenas.  A prevailing party may recover costs paid to private process servers that do not exceed the marshal's fees.  *Collins v. Gorman*, 96 F.3d 1057, 1060 (7th Cir. 1996).  The marshal's fee at the relevant period was $55 per hour.  28 C.F.R. § 0.114 (2008).  Merix disputes one of the alleged charges as duplicative.  But CSM responded that the two charges were for two different subpoenas that were served on

the same individual—one in April 2013 and the other in July 2012.  The invoices

provided to the Court confirm that these were separate subpoenas.  The Court

otherwise finds CSM's request for process server fees reasonable and taxes $1,100

against Merix.

### h.    Summary

In sum, the Court taxes $790.55 for the transcript of the pretrial conference,

$3,650.48 for witness fees, and $1,100 for process services.  The Court directs CSM to

recalculate its request for the cost of deposition and trial transcripts, video recording

depositions, and photocopying and exemplification, based on the Court's instructions.

### Conclusion

For the foregoing reasons, the Court denies Merix's motion for relief from

judgment and for a new trial and for sanctions [dkt. no. 464].  The Court grants CSM's

petition for costs in part [dkt. no. 468].  CSM is directed to apply the reductions as

directed by the Court and provide a calculation and explanation to Merix by no later than

June 3, 2015.  Merix is directed to respond to CSM by no later than June 10, 2015.

The parties are directed to make a joint submission to the Court by no later than June

17,  2015, that describes and explains their contentions regarding the costs to be

awarded pursuant to the Court's ruling.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  May 27, 2015

29